# JUDGE SEIBEL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

ROBERT W. GORDON, ESQ.,

14 : Docket No.: 1 Civ. 6115

           Plaintiff,

    -against-

THE CITY OF NEW YORK, MARC ANDES, MARK
PALOMINO, GAYLE SANDERS, FAY LEOUSSIS,
MICHAEL A. CARDOZO, DAVID SANTORO, JOHN
DOE(S) AND JANE DOE(S) (names currently unknown)
each in his/her official and individual capacities,

           Defendants.

**COMPLAINT
FOR EMPLOYMENT
DISCRIMINATION**

JURY TRIAL DEMANDED

------------------------------------------------------------ x

     Plaintiff, appearing *pro se*, complaining of the Defendants, alleges as follows:

## PRELIMINARY STATEMENT

    1.    This action is brought against Defendants to secure protection and redress

deprivation of Plaintiff's civil rights conferred by the U.S. Constitution and/or federal, state, and

local laws against discrimination in employment based upon race/color. It is alleged that New

York City attorneys discriminated, retaliated, and conspired to deprive Plaintiff of these rights.

The violative conduct comes at the end of a long line of clandestine, disparate treatments within

the New York City Law Department against Plaintiff and other individuals in protected classes,

by utilizing the power of government to accomplish legally impermissible aims. This case has far

reaching implications because the culture at the New York City Law Department invariably

affects the implementation and adjudication of civil rights throughout the various agencies of the

City of New York and throughout its five boroughs as the Law Department is often a primary

litigant in such cases and what affects the culture of the Law Department affects the manner in which the City handles such civil right cases and alleged abuses.

## NATURE OF THIS ACTION

2.      This employment discrimination action is brought pursuant to: (1) Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e *et seq.*; (2) 42 U.S.C. § 1981 of the Civil Rights Act of 1866; (3) 42 U.S.C. § 1981(a)(1), (b)(1); (4) 42 U.S.C. § 1983; violations of the 4th and 14th Amendments to the U.S. Constitution; (5) 42 U.S.C. § 1985; (6) 42 U.S.C. § 1986; (7) The Civil Rights Act of 1991; (8) New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.*; (9) New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131; and (10) Local Civil Rights Restoration Act of 2005 ('Restoration Act'), N.Y.C. Local Law No. 85 (2005).

3.      Plaintiff seeks injunctive, declaratory, compensatory, and punitive damages. Plaintiff also seeks costs, and attorney's fees pursuant to 42 U.S.C. § 1988 and/or pursuant to New York City Human Rights Law, N.Y. City Admin. Code § 8-502[f]; and/or expert fees pursuant to 42 U.S.C. § 1988(c).

## JURISDICTION

4.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367(a). Jurisdiction is authorized under 42 U.S.C. §§ 1981, 1983 and 1985(3), as amended by the Civil Rights Act of 1991. The Court has supplemental jurisdiction over Plaintiff's pendent claims, pursuant to NYS Human Rights Law (N.Y.S. Executive Law § 290 *et seq.*) and NYC Human Rights Law (NYC Administrative Code § 8-101 *et seq.*) pursuant to 28 U.S.C. § 1367(a) and (c).

5.      For claims arising under Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 20000e-17 all required administrative remedies have been exhausted. The Equal Employment Opportunity Commission ("EEOC") issued a Notice of Right to Sue letter

dated June 3, 2014 and received by the Plaintiff on June 9, 2014.[1] This action is brought within ninety (90) days of the Plaintiff's receipt of the Notice of Right to Sue.

## VENUE

6.     The Southern District of New York is the proper venue for this lawsuit pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred within this District.

## THE PARTIES

7.     Plaintiff, Robert W. Gordon, Esq., (hereinafter "Plaintiff") is a black, African-American male, born in the State of New York in February 1970.  Plaintiff, a Westchester County resident, is an attorney admitted to practice law in New York State and the U.S. District Courts for the Southern District of New York. At all times relevant herein, Plaintiff was and is employed by The City of New York, in the New York City Law Department, currently assigned to the Bronx Tort Unit.

8.     Defendant The City of New York ("City") is a municipal corporation that manages and finances The New York City Law Department, and is the ultimate employer of the Plaintiff. Defendant City is an "employer" as defined by Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law and the New York City Human Rights Law. Upon information and belief, Defendant City, or any agent thereof, is an "employer" engaged in a business or industry affecting interstate commerce within the meaning of Section 701(b)(g) and (h) of Title VII. Defendant City is a "person" pursuant to 42 USC § 1981. The New York City Law Department ("Law Department") is a division or agency of Defendant City that represents the City, the Mayor, other elected officials, and the City's many agencies in all affirmative and defensive civil litigation. The Law Department which functions as the primary law firm for

---

[1] A true copy of New York EEOC Notice of Rights Letter attached hereto as **Exhibit A.**

3

Defendant City, has its primary place of business at 100 Church Street, New York, New York 10007, and is the location where the alleged discriminatory acts or decisions took place. The Tort Division is one of 17 legal divisions of the Law Department and the Special Litigation Unit ("SLU") is one of 4 special units of the Tort Division. The primary acts of discrimination occurred while Plaintiff was an attorney in SLU. At all times relevant herein through the present, Law Department employed and continues to employ at least 500 employees in each of 20 or more calendar weeks during the year. The Law Department was and continues to be the direct employer of Plaintiff.

9.     Defendant Michael A. Cardozo ("Cardozo"), a Caucasian male, was the Corporation Counsel of the City of New York and thus head of the Law Department from 2002 until his departure in 2013. For the time periods alleged herein, he was responsible for the overall operation and functioning of the Law Department and, upon information and belief, was aware of the discriminatory practices occurring within the Tort Division in general and within "SLU" in particular.

10.     Defendant Marc Andes ("Andes"), a Caucasian male, was Plaintiff's direct supervisor in "SLU" from 2007 through 2011.

11.     Defendant Mark Palomino ("Palomino"), a Caucasian male, was and is the Unit Chief and head of SLU. For the time periods alleged herein, he was responsible for the overall operations and functioning of SLU.

12.     Defendant Gayle Sanders ("Sanders"), a Caucasian female, was and is the Deputy Unit Chief of SLU. For the time periods alleged herein, she was also responsible for the overall operation and functioning of SLU.

13.     Defendant Fay Leoussis ("Leoussis"), a Caucasian female, was and is the Division Chief of the Tort Division of the Law Department from 2001 to the present. For the

4

time periods alleged herein, she was responsible for the overall operations and functioning of the Tort Division as a whole and of SLU in particular.

14.     Defendant David Santoro ("Santoro"), a Caucasian male, was the Deputy Chief of the Tort Division from June 1988 until his departure in November 2013.

15.     Defendants "John(s) Doe" and "Jane(s)" Doe, individual(s) whose names are currently unknown, are employees of Defendant City and, upon information and belief, were involved and participated in the policies and practices and discriminatory acts alleged herein.


## STATEMENT OF FACTS

16.     On August 16, 2004, Plaintiff joined the New York City Law Department as an attorney in the full-time position of Assistant Corporation Counsel ("ACC"). Plaintiff currently still holds this title.

17.     In May 2004, Plaintiff graduated from New York University School of Law, New York, New York, where he earned a Juris Doctorate (J.D.) degree.

18.     Plaintiff was admitted to the New York State Bar on May 18, 2005 and at all times mentioned herein was and is a member of the New York State Bar in good standing.

19.     Plaintiff was admitted to practice as an attorney in the District Courts of the Southern and Eastern Districts of New York on January 7, 2008.

20.     Plaintiff graduated in the top 5% of his class from Morehouse College, in Atlanta, Georgia, earning a Bachelor's Degree in philosophy, having been accepted into membership of the *Phi Beta Kappa* honor society.

21.     Plaintiff interviewed with and joined the Law Department based on the urgings of fellow NYU Law school alumnus, Janet Siegel ("Ms. Siegel"), at that time an ACC in the Environmental Law Division of the Law Department, who indicated that the Law Department

was looking to increase its numbers of ACCs who attended "top-tier" law schools as most graduates from top-tier law schools did not apply to the Law Department for work, but rather sought employment at large corporate law firms instead. Specifically, she said the Law Department was interested in recruiting graduates from NYU Law School.

22.   Upon joining the Law Department, Plaintiff worked in the Law Department's Manhattan Trial Unit ("MTU"). The Manhattan branch of the Tort Division was and is also considered a "borough unit".

23.   Plaintiff joined the Tort Division based upon the representation of Stuart Smith, Director of Legal Recruitment at the Law Department that the Tort Division was in the greatest need of attorneys; hence it would be helpful if Plaintiff went to that Division.

24.   It was in MTU in 2005 that Plaintiff experienced his first instance of reprisal when defendant Leoussis orchestrated and/or condoned a "smear campaign" against Plaintiff, in order to discredit concerns Plaintiff raised in his August 23, 2005 letter to his immediate supervisor Stephanie Messafi, with a copy to Assistant Borough Chief Michael Chadirjian, regarding *inter alia*, the "slip-shod" nature of MTU, the lack of proper training and guidance, and the effects such had on efficiency. Plaintiff also offered suggestions on how to remedy the situation.

25.   This "smear campaign" of reprisal consisted of defendant Leoussis and other John and/or Jane Does in the Law Department intentionally and artificially manipulating Plaintiff's 2005 performance evaluation to reflect a "below average" performance rating in order to cast Plaintiff, rather than the inherent practices of the Tort Division, as "the problem", thus discrediting the concerns Plaintiff raised in his letter.

26.    Performance evaluations are the sole determinant of ultimate Law Department employment decisions such as granting merit raises in salary, and for selection to the Senior Counsel Program which also carries a corresponding raise in salary.

27.    Specifically, performance evaluations are based on a numerical scale from 1 to 5 with 1 being the highest possible evaluation score, 5 being the lowest score, and a score of 3 being "average".

28.    An evaluation score of "1" carries the description: *"Consistently exceeds highest expectations by a wide margin. Should be reserved for truly outstanding individuals who are significantly ahead of the generally expected performance level for assistants of comparable experience."*

29.    An evaluation score of "2" carries the description: *"Clearly above the generally expected performance level for assistants of comparable experience. Quality of work is consistently very good. Assistant's development is progressing rapidly and continued growth is anticipated."*

30.    An evaluation score of "3" carries the description: *"At the performance level generally expected for assistants of comparable experience. Quality of work is generally good. Assistant's development is progressing and there are no clear impediments to continued improvement."*

31.    An evaluation score of "4" carries the description: *"Below the generally expected performance level for assistants of comparable experience. Quality of work varies and/or improvement necessary in substantive or other areas which should be specified in the evaluation form."*

32.    Plaintiff received a score of "4" on his 2005 performance evaluation.

7

33. In stark contrast, however, to the below average rating on his 2005 evaluation, only one month prior to receiving that evaluation, and before Plaintiff submitted his August 23, 2005 letter of complaint, Plaintiff's supervisor Messafi, had informed Plaintiff directly that he was doing a "fine job" and that she was "very happy" with Plaintiff's work in MTU.

34. In December 2005, Plaintiff met with four senior Tort Division managers, defendant Leoussis, defendant Santoro, Maurine Netchin (head of Manhattan Trial attorneys), and Michael Chadirjian to discuss Plaintiff's 2005 performance evaluation and to place Plaintiff on an "action plan" for improvement. At that meeting Plaintiff protested that his 2005 evaluation was created in retaliation for documenting problems in MTU.

35. In or about January 2006 Plaintiff submitted a formal written Equal Employment Opportunity ("EEO") complaint of discrimination, in which Plaintiff alleged he was being retaliated against because of the letter he wrote and that his 2005 performance evaluation was manipulated and used as an instrument of retaliation.

36. As a result of filing the EEO complaint, in or around August of 2006 Plaintiff was transferred to the Queens branch of the Tort Division and remained there for one year. The Queens branch of the Tort Division is also considered a "borough unit".

37. While in Queens, Plaintiff tried three jury trials to verdict, winning successful verdicts in all three trials within the space of three months and received an "above average" performance evaluation.

38. After one year in Queens, in August of 2007, Plaintiff transferred to the Law Department's Special Litigation Unit ("SLU") of the Tort Division.

39. SLU is considered an "elite" unit of the Tort Division, and has in fact been referred to as the "Special Forces" of the Tort Division.[2]

---

[2] Comment made by "Super Lawyer" Bob Genis of the law firm "Sonin & Genis".

40.     SLU has and continues to defend for the City of New York the most serious and complicated injury lawsuits which were often covered in the local newspapers and television media outlets. It handles high-exposure cases, those valued at $2 million or above, project cases such as the Staten Island ferry crash cases, and unusually controversial matters. SLU also handles personal injury and property damage cases which either present some novel issue of law or involve potential damages above a certain threshold.

41.     There was and is a dramatic difference in the quality, complexity, level of attorney involvement, and damages exposure for SLU cases compared to borough unit cases as found in MTU, the Queens branch, or the Bronx branch of the Tort Division, as borough tort units handle generally low exposure cases such as routine "trip and fall" and "slip and fall" sidewalk injury lawsuits.

42.     Upon his transfer in August 2007 to SLU, Plaintiff was immediately placed on the team of Defendant Marc Andes, the supervisor of one of several teams.

43.     Upon information and belief, and unbeknownst to Plaintiff at the time of being placed on Andes' team, Andes was then the subject of an "EEO" complaint for discrimination by fellow SLU attorney Melissa Pressley who had filed her complaint in May of 2007. Ms. Pressley is an African-American female.

44.     Melissa Pressley, who was similarly situated to Plaintiff in that she held the same position as ACC in SLU, was the only African-American attorney in the Unit for a period of time, and was under the same supervision of Marc Andes for a period of time, alleged being subjected, *inter alia*, to racial discrimination and retaliation for reporting discrimination perpetrated by Mr. Andes and other senior supervisory SLU attorneys.

45.     The alleged discriminatory abuses against ACC Pressley by defendants Andes, Palomino, and Leoussis, and others covered a time period from March 2004 until May of 2006.

46. Upon information and belief, ACC Pressley left SLU in November 2007 as a result of the alleged discrimination and retaliation.

47. From November 2007 until August 2011, Plaintiff was the only African-American ACC in SLU out of approximately 42 SLU attorneys.

48. In 2000 the Law Department introduced the Senior Counsel Program to enhance the salaries of experienced attorneys within the Law Department. To be admitted to the program, an attorney must be nominated by his/her division chief and approved by the Corporation Counsel.

49. At all relevant times herein the Corporation Counsel was Michael A. Cardozo.

50. Originally, an attorney had to be an ACC for at least five (5) years to be eligible to be nominated for the Senior Counsel program. Once admitted to the Senior Counsel program, there are six levels of Senior Counsel status with the primary distinction between levels being a raise in salary. Recommendations for promotion into the program were made in December, typically after the completion of performance evaluations.

51. In 2008, defendant Cardozo announced an "enhanced" Senior Counsel program. As of September 1, 2008 an ACC with only three (3) years of experience (instead of five) could be eligible for the Senior Counsel program.

52. Those ACCs in the class of 2004 receiving a "high evaluation score" would be eligible for this Senior Counsel program. Upon being approved for the program, the attorney's salary would immediately rise to Level #1 ($78,795) for year one and then rise automatically to $86,994 in September of 2010 without need for further nomination or prior approval.

53. Plaintiff was an ACC in the Law Department class of 2004.

54. Encompassing the years 2006 to 2010, Plaintiff had received four straight years of high evaluation scores of "above average" on performance evaluations, including the one year in the Queens Tort Division and Plaintiff's first three years in SLU.

55. Plaintiff's first three performance evaluations in SLU encompassing 2007-2010 were all graded as an overall "above average" rating of "2".

56. The evaluator in all three of these prior performance evaluations encompassing 2007-2010 was Defendant Marc Andes.

57. However, although eligible for consideration beginning in 2008, and despite having "above average" evaluation scores in the Queens Tort Division and in SLU, Plaintiff was not nominated by his division chief, Defendant Leoussis, and thus not approved by the Corporation Counsel, Defendant Cardozo, to be admitted into the enhanced Senior Counsel Program. Therefore, Plaintiff was not promoted during this time period despite his high evaluation scores.

58. Similarly, in 2009 and 2010 while Plaintiff had high evaluation scores, and had been an ACC for five and six years respectively, Plaintiff was still not nominated to the Senior Counsel program.

59. Plaintiff's 2011 performance evaluation score, however, suddenly, dramatically and intentionally dropped to a rating of "3.5" (*below average*) and the evaluation contained numerous exaggerations, omissions, and false statements.

60. The primary evaluator for plaintiff's 2011 evaluation was Defendant Marc Andes.

61. Defendant Mark Palomino, Unit Chief and head of the SLU, and Defendant Gayle Sanders, Deputy Unit Chief of SLU, were identified as contributing authors to Plaintiff's 2011 evaluation.

62. Upon information and belief, Defendant Fay Leoussis, Division Chief of the Tort Division of the Law Department, was also a contributing author to Plaintiff's 2011 evaluation.

63. Some months prior to receiving this negative, below average evaluation, Plaintiff's supervisor Andes informed Plaintiff that Andes' own superior(s) had told Andes they thought Andes was "*grading* [Plaintiff] *too high*" in prior evaluation periods.

64. Defendant Andes did not identify to Plaintiff the superior or superiors who made this comment.

65. After Andes revealed to Plaintiff this directed comment from Andes' superiors, Plaintiff began to notice a change in the manner in which Andes supervised and related to Plaintiff in that Andes started "nit picking" Plaintiff's work and started to focus on non-essential aspects of Plaintiff's performance and work product.

66. This sudden change in Andes' behavior concerned Plaintiff since it appeared to be contrary to Andes' usual character toward Plaintiff over the previous three years they worked together in SLU, such that Plaintiff directly confronted defendant Andes stating "*It appears you are trying to find things wrong with my work.*"

67. A claim which Andes denied at the time.

68. At one occasion after the comment by defendant Andes' superior(s) and just prior to the 2011 evaluation, and for the first time, defendant Andes stated to Plaintiff that Plaintiff's work was "sub-standard". Plaintiff replied, "*Ok, so then what can we do about it to correct it?*" to which Andes replied "*There are some things that you just can't teach some people.*"

69. After Andes informed Plaintiff of his superior's comment and just prior to the 2011 evaluation, there was no effort from Defendant Andes to assist Plaintiff in correcting the alleged deficiencies Andes now found in Plaintiff's work.

70.     After Andes informed Plaintiff of his superior's comment and just prior to the 2011 evaluation, there was no explanation by Andes as to what "things" Plaintiff could not be taught or why and to what defendant Andes meant by "some people".

71.     Also during this same time period, defendant Andes began for the first time directing comments to Plaintiff stating "*Maybe it would be more appropriate for you to go to a borough unit*", "*You are better at sticking to simple motions rather than the complex motions here in SLU*" and other such remarks implying that Plaintiff did no longer "belong" in SLU or that Plaintiff was not "cut out" for SLU assignments or that suddenly Plaintiff did not possess the intellectual capacity for SLU-type work, notwithstanding the previous three (3) years of above-average performances Plaintiff had received from Andes.

72.     Prior to the "*grading Mr. Gordon too high*" comment, in or about the year 2009 defendant Andes told Plaintiff that Andes had nominated Plaintiff for a "Division Chief's Award" which is awarded annually to an attorney who has exhibited "...*exemplary performance on behalf of the City of New York*".

73.     Andes told Plaintiff that defendant Leoussis, who had personally invited Andes to join SLU as a supervisor, asked Andes for nominations for a Division Chief's Award. Defendant Andes submitted Plaintiff's name, however, Leoussis immediately began to dispute against Plaintiff's nomination. Andes expressed bewilderment to Plaintiff stating "*She asked me for a nomination and I gave her the name who I thought was most deserving. If she was going to fight me on the nomination, then don't ask for my opinion.*"

74.     Andes related to Plaintiff many of the reasons why Andes thought Plaintiff was deserving of the award. Andes said "*Most attorneys who are new to SLU only receive one or two cases to start off with, so I was surprised when* [plaintiff] *were given 40 cases to start off with and on top of that handled those cases so well.*"

13

75.    Prior to the "*grading Mr. Gordon too high*" comment Defendant Andes had instructed Plaintiff to review a writing sample of another SLU attorney who was a Senior Counsel.  Andes instructed Plaintiff to "*Read this motion and tell me what you think.*" Plaintiff read the motion and, upon completion, Andes asked "*Does that look like the work of a Senior Counsel?*" to which Plaintiff replied honestly "*No, it doesn't*". After which Andes stated that Plaintiff was doing just as well as any other attorney and in some respects even *better* than some attorneys who held the title of Senior Counsel.  Such comparisons and comments made in confidence by Andes to Plaintiff occurred on several occasions.

76.    In the three years Plaintiff was in SLU prior to the 2011 evaluation cycle defendant Andes had a practice of meeting with the ACCs on his team individually and asking what accomplishments they thought should be included in their respective evaluations.

77.    Defendant Andes had in fact followed this practice with Plaintiff in all three years prior to the "*grading Mr. Gordon too high*" comment that preceded Plaintiff's 2011 evaluation.

78.    Upon information and belief, defendant Andes had followed this practice with the other ACCs on his team for their 2011 evaluations.

79.    However, Mr. Andes did not follow this practice with Plaintiff for the 2011 evaluation cycle; Andes did not ask Plaintiff what accomplishments Plaintiff thought should be in his evaluation and did not meet with Plaintiff at all during the period preceding the 2011 evaluation cycle to discuss Plaintiff's evaluation.

80.    In July 2011, Plaintiff received an offer from the University of Ulsan to teach law as an assistant professor at their university in South Korea.

81.    Prior to accepting the teaching offer, Plaintiff sought a one-year leave of absence from the Law Department and discussed the matter with Defendant Mark Palomino.  To which

14

Palomino responded in sum and substance, *"I don't know if they will approve the leave, since your upcoming evaluation doesn't look too good"*.

82. Plaintiff's 2011 performance evaluation, which he received on August 9, 2011 via electronic mail ("e-mail"), was in fact unduly negative.

83. Plaintiff's 2011 negative performance evaluation was motivated in part by a discriminatory or other unlawful motive, stemming from Defendants' pattern, practice, and policy of using subjective ratings in performance evaluations to promote or not promote, or to transfer or to affect merit raises for ACCs, and particularly against African-Americans and Plaintiff in particular.

84. Plaintiff accepted the teaching position in South Korea, taking a one-year leave of absence from the Law Department.

85. In March of 2012, while still in South Korea, Plaintiff discovered that two Caucasian attorneys in SLU, ACC Louis Gerber and ACC Tzipora Teichman (pronounced "tyke-man"), were promoted to the position of Senior Counsel based upon the results of their 2010-2011 evaluation cycle.

86. ACC Gerber and ACC Teichman were both similarly situated to Plaintiff in that both were: (a) ACC attorneys in SLU at the same time as Plaintiff; (b) potentially eligible for selection to senior counsel status having had at least three years of service within the Law Department; and (c) evaluated in the same 2010 to 2011 evaluation cycle.

87. ACC Teichman was further similarly situated to Plaintiff since Teichman had the same supervisor as Plaintiff, defendant Marc Andes.

88. Upon information and belief, both Gerber and Teichman had spent less time in SLU than Plaintiff, and did not have any particular outstanding achievements as Plaintiff since SLU had a longstanding practice of announcing significant accomplishments of its attorneys via

15

e-mail to all other attorneys in the unit, and sometimes publishing such accomplishments in similar manner to the entire Tort Division.

89.   The only ACCs to transfer to other Torts Units from SLU with promotions or raises during Plaintiff's tenure in SLU were Caucasians.

90.   Upon information and belief, decisions about career opportunities, promotions, or upward mobility unfairly favors Caucasians in the Law Department and negatively impacts the retention rate of highly qualified, talented minorities, and Plaintiff in particular.

91.   The manipulated actions of Defendants', including but not limited to Defendant Leoussis, in promoting Gerber and Teichman but not Plaintiff into Senior Counsel positions after the 2011 evaluations evidences disparate treatment based upon race.

92.   During Plaintiff's tenure at SLU, there were no racial minority supervisors or senior counsel assigned to the Unit and there were no racial minority attorneys at the City's top executive level, aside from the EEO officer who reported directly to Defendant Cardozo.

93.   In addition, the rules of the Law Department dictate that ACCs are not eligible to receive "merit raises" after their fifth year of service at the Law Department.

94.   A merit raise is a small increase in salary based on the score received on the attorney's performance evaluation.

95.   At the time of Plaintiff's 2011 evaluation, the only avenue open to him for professional and financial advancement was the Senior Counsel program since Plaintiff had already passed his fifth year of service with the Law Department.

96.   Failing to achieve Senior Counsel ranking has further reaching economic impacts beyond the immediate raise in yearly salary as an ACC's retirement benefits are calculated based in part on the highest salary levels achieved during an ACC's tenure at the Law Department.

97. At the time of Plaintiff's negative 2011 evaluation, Plaintiff was and remains a participant in the City of New York's retirement program for City employees, namely the New York City Employee Retirement System ("NYCERS").

98. Therefore, Defendants' failure to promote Plaintiff because of his race resulted in further economic damages to Plaintiff beyond the immediate raise in yearly salary.

99. On March 20, 2012 Plaintiff submitted a draft copy of his detailed objections to his 2011 evaluation to Defendant Andes via electronic mail to give defendant Andes an opportunity to explain his actions and or refute Plaintiff's objections. However, Defendant Andes refused to discuss or review the evaluation.

100. On or about May 4, 2012, Plaintiff filed a formal complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC").[3]

101. The City responded to Plaintiff's EEOC complaint on or about August 16, 2012 alleging, *inter alia*, that Plaintiff had been experiencing performance deficiencies from the very start of his career with the Law Department and arguing that Plaintiff's 2011 evaluation was the natural result of failures Plaintiff had exhibited from the time of his first evaluation in 2005, thereby making a direct connection between Plaintiff's 2011 evaluation and the circumstances surrounding Plaintiff's first evaluation in 2005.[4]

102. Upon returning to the Law Department from South Korea in late August of 2012, Plaintiff was transferred out of SLU back to the Queens Tort Division in Jamaica, Queens, a two (2) hour, one-way commute from Plaintiff's residence in Westchester County, New York.

103. Upon such transfer, defendant Leoussis insisted Plaintiff be placed on a "Corrective Action Plan" and refused to consider the facts and circumstances, despite questions

---

[3] Plaintiff's EEOC complaint is incorporated hereto by reference.

[4] City's Response to Plaintiff's EEOC complaint is incorporated hereto by reference.

over the validity of the 2011 evaluation, proof of Plaintiff's exceptional prior performance in Queens, and three above- average performance evaluations in SLU in all but the last review.

104. Moreover, such "Action Plan" was created without any analysis of Plaintiff's alleged "deficiencies", specifically there was no investigation as to why such deficiencies suddenly existed after three years of above-average performance and no discussion with Plaintiff as to which approach or method(s) would be most effective to eliminate such "deficiencies" so as to allow Plaintiff to succeed.

105. Such "Action Plan" served no legitimate business purpose; its only purposes were intentionally to discriminate and retaliate against Plaintiff because of his protected activity, to harass, annoy, injure, stigmatize and poison Plaintiff's reputation in relation to the employees and staff in SLU and Queens Tort, and to publish by implication the defamatory material contained in Plaintiff's 2011 evaluation beyond the original parties involved.

106. Nevertheless, Plaintiff successfully completed the requirements of the discriminatory Corrective Action Plan.

107. Requiring Plaintiff to undergo an "Action Plan" under these circumstances was consistent with Defendants' discriminatory policies and practices of using the subjective rating in performance evaluations to discriminate and/or retaliate against ACCs, and Plaintiff in particular, based upon his engaging in protected activity.

108. The 2012 Action Plan was also an adverse employment action and adverse consequence because it altered the conditions of Plaintiff's employment by placing added burdens on Plaintiff as a condition of continued employment and added the stigma of Plaintiff being an employee in need of "corrective action".

109. The Defendants', including but not limited to defendant Leoussis, action in transferring Plaintiff out of SLU in August 2012 back to a borough unit and subjecting him to a

18

"Corrective Action Plan" was a demotion and a direct result of the discriminatory 2011 evaluation and in retaliation for the discriminatory actions of which Plaintiff complained in Plaintiff's May 2012 EEOC complaint.

110. After one year in Queens Tort, in or around June of 2013, Plaintiff was told by Queens Borough Chief Barbara McLean that Plaintiff was on the top of the list to take a full time trial position.

111. Upon information and belief, the Tort Division ranks attorneys according to seniority in terms of assigning full time trial positions. The attorney at the top of the list is allowed to choose in which borough he/she wants to try cases depending on the availability of trial slots.

112. In July of 2013, defendant Leoussis contacted Plaintiff to ask Plaintiff which borough he would like to go to as a trial attorney. Plaintiff was offered to choose between the Bronx and Brooklyn which boroughs, upon information and belief, are the less favored boroughs and have the greatest concentration of African-American ACCs in the Torts Division of the Law Department.

113. Upon information and belief, Defendants hire African-Americans attorneys and then concentrate them mostly in units or divisions handling street offenses while the prestigious or corporate legal units, special units including SLU, or divisions are overwhelmingly, if not exclusively assigned to Caucasian attorneys.

114. Upon information and belief, only a mere 20%, collectively, of the nearly 700 lawyers in the Office of the Corporation Counsel are African-American, Latino and Asian.

115. Defendant Leoussis specifically told Plaintiff that there were no trial positions open in Queens. Borough Chief Barbara McLean also informed Plaintiff that there were no trial positions open in Queens.

116. Within a few weeks after Plaintiff accepted a trial position in the Bronx, a trial position "suddenly" opened up in Queens and was given to a Caucasian attorney who, upon information and belief, was not at the top, but more towards the bottom, of the trial attorney list.

117. When the trial position opened up in Queens, Defendant Leoussis did not call Plaintiff back to inform him of the newly opened position even though she knew that Queens was a choice Plaintiff may have considered and that Plaintiff had a significant amount of experience trying cases in Queens.

118. The Defendants', including but not limited to defendant Leoussis', actions in not notifying Plaintiff of and thus allowing Plaintiff the opportunity to transfer to a trial attorney position in Queens in 2013 was discrimination and disparate treatment based upon Plaintiff's race.

119. The Defendants', including but not limited to defendant Leoussis', actions in not notifying Plaintiff of and thus allowing Plaintiff the opportunity to transfer to the trial attorney position in Queens in 2013 was an additional and continuing act of retaliation for Plaintiff's having filed the EEOC complaint in 2012.

120. Plaintiff satisfied the prerequisites for the position he held, in that he possessed the appropriate educational background, licensing and employment experience and skills to be an Assistant Corporation Counsel and he has held the position since hired in 2004.

121. Plaintiff's job performance had been satisfactory.

122. Plaintiff alleges that Defendants, jointly and severally, unlawfully discriminated and retaliated against him in regards to training, promotion, performance evaluation, career development, advancement and placement, causing him pecuniary, professional, and severe emotional harm, and that such practices of discrimination and disparate treatment based upon

race were the custom, policy, and practice of Defendants based on, and as shown by, the experiences of Plaintiff and current and/or past employees similarly situated to Plaintiff.

## FIRST CAUSE OF ACTION
## AGAINST THE MUNICIPAL DEFENDANT
## BASED UPON DISCRIMINATION PURSUANT TO TITLE VII

123.  Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

124.  Defendant City (by way of the Law Department) was Plaintiff's employer who subjected Plaintiff to disparate treatment and discrimination in the terms and conditions of his employment based on race as a result of the municipal defendant's discriminatory actions, in violation of Title VII of the Civil Rights Act of 1964 (42 USC § 2000e et. seq.).

125.  Plaintiff was also subjected to disparate treatment which included but was not limited to similarly situated attorneys outside of Plaintiff's protected group being promoted to Senior Counsel, with such fiscal and career benefits as came with the promotions, while Plaintiff was not so promoted.

126.  As a result of Defendant City's violative actions, Plaintiff suffered several adverse employment actions including: 1) a negative 2011 performance evaluation which affected Plaintiff's ability to be promoted and to obtain an increase in salary; 2) failure to promote to Senior Counsel, which affected Plaintiff financially and his career development; and 3) being placed on a 2012 Corrective Action Plan, which affected Plaintiff's ability to be promoted, to obtain an increase in salary, and his career development.

127.  The unlawful practices of municipal Defendant City complained of, were intentional and Defendant through its management, including but not limited to Defendants Cardozo, Santoro, Leoussis, Palomino, Sanders, and Andes, knew or should have known that its discrimination of Plaintiff violated Title VII.

128. The unlawful employment practices of municipal Defendant City through its management, including but not limited to Defendants Cardozo, Leoussis, Santoro, Palomino, Sanders, and Andes, were done willfully, with malice or with reckless indifference to Plaintiff's federally protected rights.

129. Defendant's rationale for failing to promote Plaintiff to Senior Counsel in 2011-2012 because of the negative 2011 evaluation was a pretext for discrimination given Plaintiff's prior four years of above average ratings and the sudden alleged deterioration of Plaintiff's work performance shortly after Defendant Andes' superiors "suggestion" that Andes was rating "too high" Plaintiff, the only African-American attorney in SLU at the time.

130. The violative conduct of municipal Defendant City complained of deprived Plaintiff of equal employment opportunities, in regards to training, promotion, performance evaluation, career development, advancement and placement, adversely affected his status as an employee of Defendant, caused Plaintiff to suffer discrimination based solely upon his race, to lose wages and benefits, to lose career opportunities for advancement, to incur pecuniary and non-pecuniary losses, to suffer professional loss, emotional distress and humiliation, and to incur attorneys' fees and costs.

### SECOND CAUSE OF ACTION
### AGAINST MUNICIPAL DEFENDANT
### BASED ON RETALIATION PURSUANT TO TITLE VII

131. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

132. Plaintiff engaged in a protected activity in 2006 when he filed an EEO complaint of discriminatory retaliation he suffered in the Law Department's Tort Division, MTU.

22

133. As Chiefs of the Tort Division, Defendants Leoussis and Santoro were aware of or should have been aware of Plaintiff's complaint since it formed the basis for Plaintiff's transfer from MTU to Queens Tort in or about August 2006.

134. The municipal Defendant, through its employees, including but not limited to Defendant Leoussis, retaliated against Plaintiff, through the negative 2011 evaluation and for Plaintiff's May 2012 EEOC complaint, by compelling the transfer of Plaintiff from SLU in August 2012 to the Queens borough unit and subjecting Plaintiff to the 2012 Corrective Action Plan. Such retaliatory action was tantamount to a demotion.

135. Such actions in reprisal for engaging in protected activity will likely foster a chilling effect and deter others from engaging in protected activities when the professional and financial consequences to those who do engage in such protected activities are observed by other employees.

136. The unlawful practices of municipal Defendant City complained of were intentional and Defendant through its management, including but not limited to Defendant Leoussis, knew or should have known that retaliation against Plaintiff for reporting and opposing discrimination violated Title VII.

137. The violative conduct of municipal Defendant City complained of deprived Plaintiff of equal employment opportunities, in regards to promotion, performance evaluation, career development, advancement and placement, adversely affected his status as an employee of Defendant caused Plaintiff to suffer retaliation based solely upon his engaging in protected activity, to lose wages and benefits, to lose career opportunities for advancement, to incur pecuniary and non-pecuniary losses, to suffer professional loss, emotional distress and humiliation, and to incur attorneys' fees and costs.

## THIRD CAUSE OF ACTION
## AGAINST MUNICIPAL DEFENDANT
## DISCRIMINATION /DISPARATE TREATMENT BASED ON RACE
## PURSUANT TO 42 U.S.C. § 1981 AND THE CIVIL RIGHTS ACT OF 1991

138.   Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

139.   Municipal Defendant City's (through the Law Department) discriminatory actions towards Plaintiff based upon his race deprived Plaintiff of his rights to make and enforce contracts and denied Plaintiff the enjoyment of all the benefits, privileges, terms and conditions of a contractual relationship of employment as is enjoyed by white citizens.

140.   At all times alleged herein, Defendant willfully engaged in unlawful employment practices by discriminating against Plaintiff because of race and/or color, with respect to the terms, conditions and/or privileges of employment, when it engaged in, sanctioned, condoned and/or failed to stop adverse actions taken against Plaintiff because of his race and/or color, in violation of 42 USC § 1981 and the Civil Rights Act of 1991.

141.   Defendant City thou gh its agents, servants or employees, acted intentionally, maliciously, willfully and with reckless indifference to Plaintiff's federally protected rights under 42 USC § 1981.

142.   As a direct result of the violative conduct by Defendant City through its employees, including Defendants Cardozo, Leoussis, Santoro, Palomino, Sanders, and Andes, Plaintiff was deprived of equal employment opportunities, was caused to suffer unlawful discrimination, sustained substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

## FOURTH CAUSE OF ACTION
## AGAINST INDIVIDUAL DEFENDANTS
## DISCRIMINATION /DISPARATE TREATMENT BASED ON RACE
## PURSUANT TO 42 U.S.C. § 1981 AND THE CIVIL RIGHTS ACT OF 1991

143.   Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

144.   Defendant Cardozo personally engaged in unlawful employment practices by discriminating against Plaintiff with respect to the terms, conditions and/or privileges of employment, when Cardozo engaged in, sanctioned and/or condoned the discriminatory and disparate treatment of which Plaintiff complained because of race, in violation of 42 USC § 1981.

145.   Defendant Andes personally engaged in unlawful employment practices by discriminating against Plaintiff with respect to the terms, conditions and/or privileges of employment, when Andes engaged in, sanctioned and/or condoned the discriminatory and disparate treatment of which Plaintiff complained because of race, in violation of 42 USC § 1981.

146.   Defendant Palomino personally engaged in unlawful employment practices by discriminating against Plaintiff with respect to the terms, conditions and/or privileges of employment, when Palomino engaged in, sanctioned and/or condoned the discriminatory and disparate treatment of which Plaintiff complained because of race, in violation of 42 USC § 1981.

147.   Defendant Sanders personally engaged in unlawful employment practices by discriminating against Plaintiff with respect to the terms, conditions and/or privileges of employment, when Sanders engaged in, sanctioned and/or condoned the discriminatory and disparate treatment of which Plaintiff complained because of race, in violation of 42 USC § 1981.

148. Defendant Leoussis personally engaged in unlawful employment practices by discriminating against Plaintiff with respect to the terms, conditions and/or privileges of employment, when Leoussis engaged in, sanctioned and/or condoned the discriminatory and disparate treatment of which Plaintiff complained because of race, in violation of 42 USC § 1981.

149. Defendant Santoro personally engaged in unlawful employment practices by discriminating against Plaintiff with respect to the terms, conditions and/or privileges of employment, when Santoro engaged in, sanctioned and/or condoned the discriminatory and disparate treatment of which Plaintiff complained because of race, in violation of 42 USC § 1981.

150. Defendants John Doe and Jane Doe personally engaged in unlawful employment practices by discriminating against Plaintiff with respect to the terms, conditions and/or privileges of employment, when John Doe and Jane Doe engaged in, sanctioned and/or condoned the discriminatory and disparate treatment of which Plaintiff complained because of race, in violation of 42 USC § 1981.

151. As a direct result of the individual defendants' violative conduct, Plaintiff was deprived of equal employment opportunities, was caused to suffer unlawful discrimination, sustained substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

### FIFTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
### RETALIATION
### PURSUANT TO 42 U.S.C. § 1981 AND THE CIVIL RIGHTS ACT OF 1991

152. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

153. As a direct result of the violative retaliatory misconduct by municipal Defendant through its employees, and by the individual defendants as alleged herein, Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

## SIXTH CAUSE OF ACTION
## AGAINST MUNICIPAL DEFENDANT AND INDIVIDUAL DEFENDANTS IN THEIR OFFICIAL CAPACITY AS AGENTS OF THE MUNICIPALITY
## 42 U.S.C. § 1983 (MONELL CLAIM)

154. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

155. At all times relevant, the municipal Defendant City (through the Law Department) had the custom, policy, pattern, and practice of using the employee annual performance evaluations as the sole determinant of Law Department employment decisions, such as granting merit raises in salary, and for promotions, transfers or selection to the Senior Counsel program.

156. Defendant's use of employee performance evaluations was not always to serve as an objective, true, and accurate measure of an employee's actual performance, but was instead used by Defendants to manipulate and custom tailor evaluations to systematically exclude from equal employment opportunities and financial and professional benefits certain employees based on their membership in a protected class and sometimes to use such evaluations as a form of unlawful retaliation for employees' engagement in a protected activity, thus depriving protected employees of the rights, privileges, or immunities secured by the Constitution or laws of the United States.

157. Acting under color of state law and/or with governmental authority as a municipal agency, municipal Defendant through its agents, servants, and employees, including but not limited to Defendants Cardozo, Leoussis, Santoro, Palomino, Sanders and Andes, used

27

subjective ratings on the employee performance evaluations to discriminate against Plaintiff specifically, and other members in the protected race class and to retaliate against Plaintiff and others, including Melissa Pressley, who engaged in protected activity, and conversely to discriminate in favor of those Caucasian persons not in the protected class for promotions and raises.

158.    Defendants specifically used this custom, policy, pattern, and practice to deprive Plaintiff in 2005 and again in 2011 of his Constitutional rights to equal employment opportunities and rights protected by federal, state, and local laws, including, but not limited to the Fourteenth Amendment to the U.S. Constitution because he had engaged in protected activity of complaining of discrimination and/or because of his race.

159.    Upon information and belief, at times even before the relevant period for this action, promotion to the rank of Senior Counsel from SLU was not done strictly on merit, as allegedly shown by the "high rating" on an employee's evaluation, but rather the practice was that the rating was adjusted up or down and the promotion was granted or denied based on racial, religious, and/or age related criteria as determined by the municipal Defendant's agents, servants and employees, including but not limited to Defendants Cardozo, Leoussis, Santoro, Palomino, Sanders and Andes, or it was withheld or denied on an unlawful retaliatory basis.

160.    In addition, at the times referenced herein, it was the policy that the Corporation Counsel, Defendant Cardozo, had to personally approve the selection of attorneys to Senior Counsel status. Cardozo, over his long twelve year career as Corporation Counsel, knew or should have known of the then existing long history of complaints of discriminatory practices emanating from the Tort Division in general and SLU in particular. Yet Cardozo approved the recommendations of certain attorneys from SLU, Louis Gerber and Tzipora Teichman in particular, to the position of Senior Counsel in 2012 without adequate investigation into the

circumstances surrounding their selection and ascension, vis-à-vis other similarly situated persons from protected groups, namely Plaintiff. Defendant Cardozo's actions ratified and condoned the discriminatory policy, practices, and customs of the Tort Division against Plaintiff. The Corporation Counsel had final decision-making authority concerning the conferment of the title "Senior Counsel" and thus aided, condoned, and ratified such discriminatory practice by approving the nominations of such ACC's to Senior Counsel status in 2012 whose selection may have been the result of discriminatory practices.

161. It was also the policy, custom, and practice of Defendants to "steer" minority ACC's of color to the outer borough units in the Bronx and Brooklyn, as was done to Plaintiff in 2013 when he reached the top of the list for trial attorney positions, where the working conditions in terms of environment were not equal to but were much lower, more dangerous, and economically depressed than the working conditions near the financial district in Manhattan where more of the white Caucasian ACC attorneys were assigned or even in Queens.

162. The statistical anomalies of the number of African-American ACC's promoted while in SLU compared to the percentage of white Caucasian ACC's promoted during the relevant time periods show a "disparate impact" of the Defendants' policies and the unlawful practices upon protected groups of color.

163. In the actions complained of, Defendants violated Plaintiff's rights under the 14th and 4th Amendment of the U.S. Constitution.

164. As a direct result of the above complained of violative conduct of Defendants, Plaintiff was deprived of equal employment opportunities, was caused to suffer unlawful discrimination, sustained substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

## SEVENTH CAUSE OF ACTION
## AGAINST DEFENDANTS
## CONSPIRACY PURSUANT TO 42 U.S.C. § 1983

165.  Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

166.  Since Plaintiff's employer is a municipality, the individual defendants named herein are all state actors under 42 U.S.C. § 1983.

167.  Defendants Andes, Palomino, and Sanders names appear as "reviewers" of Plaintiff's 2011 discriminatory performance evaluation and, therefore, they have direct participation in that misconduct which was a violation against Plaintiff's constitutional rights.

168.  Upon information and belief, Defendant Leoussis as the Division Chief of the Tort Division of the Law Department from 2001 to the present who was responsible for the overall operations and functioning of the Tort Division as a whole and the SLU in particular, conspired with defendants including but not limited to Andes, Palomino, and Sanders concerning Plaintiff's 2011 evaluation, the 2012 action plan, Plaintiff's transfer out of SLU in August 2012 and Plaintiff's reassignment as a trial attorney in the Bronx in 2013.

169.  Defendant Leoussis, as the Division Chief of the Tort Division of the Law Department from 2001 to the present, created the discriminatory policy, or knew or should have known of the long standing and continuing discriminatory practices in the Tort Division, and in SLU in particular, yet she chose not to remedy that known wrong, and in fact was directly participating in the violations against Plaintiff, and thereby showed a deliberate indifference to the known circumstances that were likely to cause the constitutional violation against minorities in general and Plaintiff specifically.

170. Defendant Cardozo as Corporation Counsel of the City of New York and thus head of the Law Department for twelve years until 2013, failed to prevent or remedy such discriminatory acts despite having actual and/or constructive knowledge of the complaints of constitutional violations occurring against Plaintiff and other minority employees in the Tort Division and SLU in particular.

171. Defendant Santoro as the Deputy Chief of the Tort Division from June 1988 until November 2013 knew or should have known of the discriminatory acts taking place in the Tort Division in general and in SLU in particular, yet he failed to prevent such discriminatory acts and/or showed a deliberate indifference to the known complaints of racial discrimination that were likely to cause constitutional violations against minorities, and Plaintiff in particular.

172. As a direct result of acts of the individual defendants in furtherance to the conspiracy, Plaintiff was deprived of his rights and privilege to equal treatment as a citizen of the United States, lost the opportunity to be promoted, was given a corrective action plan, was transferred out of the elite SLU, was caused to suffer unlawful discrimination, sustained substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

### EIGHTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
### CONSPIRACY PURSUANT TO 42 U.S.C. § 1985

173. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

174. Plaintiff's 2011 discriminatory performance evaluation was prepared after Defendant Andes was told by his superiors that he was "*grading Mr. Gordon too high*" at the same time when two Caucasian ACCs similarly situated to Plaintiff were also being evaluated and would be promoted to Senior Counsel positions from SLU based upon their evaluation

31

ratings, however Plaintiff would not be promoted based upon his undeserved subjective below-average rating.

175. Given the policy and practice of Defendant City (through the Law Department) concerning employee evaluations, the comment to Andes about Plaintiff's ratings, the comments that followed about *"There are some things that you just can't teach some people"*, and Plaintiff's fitness to stay in SLU, the sudden change in the manner in which Defendant Andes supervised and reacted with Plaintiff, and the subsequent promotion of the two Caucasian AACs Gerber and Teichman, Defendants, including but not limited to Andes, Palomino, and Sanders whose names appear as "reviewers" of Plaintiff's 2011 evaluation, and Defendant Leoussis conspired against Plaintiff because of a racially invidious discriminatory animus for the purpose of giving Plaintiff the undeserved and incorrect evaluation so as to deprive Plaintiff of his equal rights under the laws and his equal privilege to be judged and promoted to Senior Counsel status based upon his actual performance.

176. As a direct result of this overt act in furtherance to the conspiracy, Plaintiff was deprived of his rights and privilege to equal treatment as a citizen of the United States, lost the opportunity to be promoted, was given a performance action plan, was transferred out of the elite SLU, was caused to suffer unlawful discrimination, sustained substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

### NINTH CAUSE OF ACTION
### AGAINST ALL DEFENDANTS
### DISCRIMINATION BASED ON A FAILURE TO PREVENT ACTS OF
### DISCRIMINATION PURSUANT TO 42 U.S.C. § 1986

177. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

178. Defendants, jointly and severally, having both the knowledge that Plaintiff's rights were about to be violated and having the power to prevent such violation, failed to act to prevent such violations regardless of their participation in the actual conspiracies to deprive Plaintiff of his rights.

179. To the contrary, instead of attempting to prevent the violations, Defendants intentionally committed certain overt acts in furtherance of the conspiracy, namely, altering Plaintiff's 2011 performance evaluation to prevent Plaintiff's ability to be promoted to the position of Senior Counsel and to deprive him of all the financial and professional benefits associated with that title, on the basis of race, and/or with a retaliatory motive; directing and/or unduly influencing Defendant Andes to act as the "cat's paw" to manufacture a misleading, false, and or biased evaluation for discriminatory and/or retaliatory purposes; for the purpose of reserving elite positions in SLU for Caucasian attorneys, and systematically relegating minority attorneys of color to positions in the outer and or less desirable borough units which carried less prestigious cases and working environments. Upon information and belief, such conspiracies have long been the practices of Defendants and have been effectuated in the past against other persons belonging to protected groups.

180. As a direct result of Defendants' overt acts in furtherance to the conspiracy and failure to prevent acts of discrimination, Plaintiff was deprived of his rights and privilege to equal treatment as a citizen of the United States, was caused to suffer unlawful discrimination, sustained substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

## TENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR DISCRIMINATION
## PURSUANT TO NEW YORK STATE HUMAN RIGHTS LAW

181.   Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

182.   Defendant City is an employer as that term is defined by the New York State Human Rights Law (Executive Law § 290 *et seq.*).

183.   As set forth herein, Plaintiff was subjected by Defendants to discrimination with respect to the terms, conditions and/or privileges of his employment, because of his race in violation of the N.Y. State Human Rights Law (Executive Law § 290 *et seq.*).

184.   As a direct result of the complained of violative conduct of Defendant City through its officers and/or executives, including Defendants Cardozo and Santoro, plus managers and employees, including Defendants Leoussis, Andes, Palomino, and Sanders, Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, and costs.

## ELEVENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR RETALIATION
## PURSUANT TO NEW YORK STATE HUMAN RIGHTS LAW

185.   Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

186.   Plaintiff was subjected by Defendants to intentional and willful retaliation for engaging in protected activities of complaining about and opposing discrimination, which affected the terms, conditions and/or privileges of Plaintiff's employment, in violation of the N.Y. State Human Rights Law (Executive Law § 290 *et seq.*).

187. As a direct result of the complained of retaliatory conduct of Defendants, Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, and costs.

## TWELFTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
## FOR AIDING, ABETTING, INCITING, COMPELLING AND/OR COERCING
## THE DEPRIVATION OF RIGHTS,
## PURSUANT TO NYS HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 296(6)

188. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

189. To the extent certain individual defendants were not the main or direct actors in the deprivation of Plaintiff's rights, by their actions complained of they did aid, abet, incite, compel and/or coerce the deprivation of Plaintiff's rights, all in violation of the N.Y. State Human Rights Law (Executive Law § 296(6)).

190. Particularly, one or more of Defendant Andes' superiors, who included Defendants Leoussis, Santoro, Palomino, and Sanders, compelled or coerced Defendant Andes by advising that Andes was grading Plaintiff, the only African-American attorney in the Unit, "too high" in his past performance evaluations even though Defendant Andes had been the one to work with, supervise, and evaluate Plaintiff over the prior three years. By creating and or approving the inaccurate 2011 evaluation without reviewing its contents or discussing with Plaintiff, Defendants Andes, Palomino, and Sanders, aided and abetted the scheme to deprive Plaintiff of his rights to equal treatment.

191. It was and is the custom, policy, and practice of the Tort Division to request supervisors to produce draft performance evaluations in and around June of every year before the evaluations' formal promulgation in August. The purpose of these early draft submissions is to

35

give Defendants the opportunity to change and manipulate evaluations of specific employees through additions, deletions, and artful wording to make the evaluations conform to pre-conceived designs not necessarily reflective of actual merit or actual fault and motivated by racial or other class-base, invidious discriminatory animus. Such policy committed by Defendants aided, abetted and condoned the deprivation of rights of certain employees in general, and Plaintiff in particular.

192. By approving the promotions of the two Caucasian AACs Gerber and Teichman to the position of Senior Counsel in 2012 without adequate investigation into the circumstances surrounding their selection and ascension, vis-à-vis other similarly situated persons from protected groups in SLU, namely Plaintiff, Defendant Cardozo aided, abetted and condoned the known long standing discriminatory policy, practices, and customs of the Tort Division against minorities in general, and Plaintiff in this particular instance.

193. Defendants, jointly and severally, engaged in unlawful discriminatory practices by performing and/or permitting, and/or aiding and abetting the discriminatory conduct of which Plaintiff complained, and by retaliating against Plaintiff with respect to the terms, conditions, and/or privileges of employment because of Plaintiff's complaints of discrimination based upon race and or retaliation, all in violation of NYS Executive Law § 290 *et seq.*

194. As a direct result of the complained of conduct of Defendants, Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, and costs.

## THIRTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS
## FOR DISCRIMINATION
## PURSUANT TO THE NYC HUMAN RIGHTS LAW, N.Y. ADMIN. CODE. § 8-107

195.    Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

196.    Plaintiff was subjected by Defendants to discrimination with respect to the terms, conditions and/or privileges of his employment, because of his race in violation of the N.Y. City Human Rights Law (N.Y. Admin. Code. § 8-101 *et seq.*).

197.    As a direct result of the complained of violative conduct of Defendant City (through the Law Department) through its officers and/or executives, including Defendants Cardozo and Santoro, plus managers and employees, including Defendants Leoussis, Andes, Palomino, and Sanders, Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

## FOURTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR RETALIATION
## PURSUANT TO NYCHRL, N.Y. CITY ADMIN. CODE §§ 8-101 *ET SEQ.* IN
## CONJUNCTION WITH THE LOCAL CIVIL RIGHTS RESTORATION ACT OF 2005
## ('RESTORATION ACT'), N.Y.C. LOCAL LAW NO. 85 (2005)

198.    Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

199.    Plaintiff was subjected by Defendants to intentional and willful retaliation for engaging in protected activities of complaining about and opposing discrimination, which affected the terms, conditions and/or privileges of Plaintiff's employment, in violation of the N.Y. City Human Rights Law (Administrative Code § 8-101 *et seq.*).

200.    As a direct result of the complained of retaliatory conduct of Defendants, Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial

emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

## FIFTEENTH CAUSE OF ACTION
## AGAINST DEFENDANTS IN THEIR INDIVIDUAL CAPACITY
## FOR RETALIATION - CREATING A HOSTILE WORK ENVIRONMENT
## PURSUANT TO NYCHRL, N.Y.CITY ADMIN. CODE §§ 8-101 et seq.,
## AND SPECIFICALLY N.Y.C. ADMIN. CODE § 8-107(13)(B)(2)

201. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

202. Plaintiff was subjected by Defendants to intentional and willful retaliation for engaging in protected activities of complaining about and opposing discrimination, which created a hostile work environment and affected the terms, conditions and/or privileges of Plaintiff's employment, in violation of the N.Y. City Human Rights Law (Administrative Code § 8-107(13)(B)(2)).

203. The hostile work environment included, but was not limited to, creating a negative, false, and manipulated evaluation against Plaintiff in 2011, Defendant Andes' constant comments and suggestions that Plaintiff *"did not belong in SLU"* or that Plaintiff was better off only writing *"simple motions"* contributed to an atmosphere with the purpose of constructively discharging Plaintiff from SLU and relegating Plaintiff to one of the outer borough units, forcing Plaintiff to comply with an unnecessary, and improper "Corrective Action Plan", causing Plaintiff to suffer the stigma of being under a "Corrective Action Plan" as the plan had to be administered by at least three supervisors in Queens Tort who but for the imposition of the "Corrective Action Plan" would not have known of the circumstances and details of Plaintiff's 2011 evaluation, affecting Plaintiff's reputation in the eyes of these Queens Tort supervisors. In addition, the "demotion" to Queens Tort caused mental and physical distress, such that Plaintiff

required medical attention with such medical conditions and treatment continuing even to the present.

204. There were also other instances in Plaintiff's fourth year in SLU, of the "hostile work environment" where supervisors would threaten attorneys in general with the loss of their job. There was an unprecedented "command" for all the attorneys to "clean the halls" and remove very heavy and dirty boxes from the hallway. When one attorney, protested in a meeting that this was not what attorneys should be doing but rather the facilities staff, one supervisor, Defendant Sanders stated "*Well in this economy, you should be lucky that you have a job*", rather than address the substance of the protest itself. Similar comments were the norm during Plaintiff's fourth year in SLU communicating an atmosphere of "*we are ready to fire trouble makers and you don't want that in this economy*".

205. As a direct result of the complained of hostile conduct of Defendants, Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, attorneys' fees and costs.

## SIXTEENTH CAUSE OF ACTION
## AGAINST ALL DEFENDANTS FOR DISPARATE IMPACT
## PURSUANT TO 42 U.S.C. 2000E-2(K) (TITLE VII) AND
## NEW YORK STATE HUMAN RIGHTS LAW

206. Plaintiff repeats and realleges each allegation contained in each preceding paragraph of this Complaint as though fully set forth herein.

207. The evaluation practices of the Defendants resulted in a disparate impact, such that, but not limited to, no African-American ACCs were promoted while they were in SLU during the relevant time periods, whereas upon information and belief at least 30% to 40% of Caucasian, similarly situated ACC's were promoted to Senior Counsel while they were in SLU. Such statistical disparity is indicative of discrimination.

208. As a direct result of the complained of discriminatory conduct of Defendants Plaintiff was deprived of equal employment opportunities, was caused to suffer and sustain substantial emotional and psychological distress, humiliation, and pain and suffering, and was caused to incur pecuniary and non-pecuniary losses, and costs.

## JURY DEMAND

209. Plaintiff demands a jury determination of facts and applicability to the law on all claims herein.

## REMEDIES SOUGHT

**WHEREFORE**, Plaintiff demands judgment against the Defendants, jointly and severally, as follows:

**On All Causes of Action:**

A.    Grant a permanent injunction enjoining municipal Defendant The City of New York, its officers, executives, successors, managers, agents and assigns, from engaging in any employment practices which discriminate against employees on the basis of race or color and who engage in protected activity;

B.    Order The City of New York to institute and carry out their policies, programs and practices which provide equal employment opportunities for all employees of municipal Defendant and which eradicate the effects of municipal Defendant's unlawful employment practices toward persons of color or who engage in protected activity.

C.    Grant a permanent injunction enjoying all Defendants from denying Plaintiff any of his rights, privileges, or benefits of employment or otherwise harassing him on account of his race or because he engaged in protected activity and instruct that Plaintiff's 2011 evaluation be removed from his employment record.

## A. On the Federal Causes of Action:

### On First and Second Causes of Action – Pursuant Title VII

    (a) An award to make Plaintiff whole by providing nominal and general damages in the amount of Plaintiff's lost back pay and all lost fringe benefits from 2012 when he should have been promoted to the present, with prejudgment interest;

    (b) Promotion to position of Senior Counsel, with commensurate benefits and restoration of seniority in that position back to 2012;

    (c) An award of compensatory/punitive damages in an amount not to exceed Three Hundred Thousand Dollars ($300,000.00) each, pursuant to Title VII of the Civil Rights Act of 1964 (42 USC § 1981a) and;

    (d) An award of reasonable attorney's fees, pursuant to Title VII of the Civil Rights Act of 1964 and/or 42 USC § 1988.

### On Third, Fourth and Fifth Causes of Action – Pursuant to 42 USC § 1981.

    (a) An award to make Plaintiff whole by providing nominal and general damages in the amount of Plaintiff's lost back pay and all lost fringe benefits from 2012 when he should have been promoted to the present, with prejudgment interest;

    (b) Promotion to position of Senior Counsel, with commensurate benefits and restoration of seniority in that position back to 2012;

    (c) An award of compensatory/punitive damages in an amount not to exceed Three Hundred Thousand Dollars ($300,000.00) on each cause and;

    (d) An award of reasonable attorney's fees pursuant to 42 USC § 1988.

### On Sixth through Ninth Causes of Action – Pursuant to 42 USC §§ 1983, 1985, 1986

    (a) An award to make Plaintiff whole by providing nominal and general damages in the amount of Plaintiff's lost back pay and all lost fringe benefits from 2012 when he should have been promoted to the present, with prejudgment interest;

    (b) Promotion to position of Senior Counsel, with commensurate benefits and restoration of seniority in that position back to 2012;

    (c) An award of compensatory/punitive damages in an amount not to exceed Three Hundred Thousand Dollars ($300,000.00) on each cause and;

    (d) An award of reasonable attorney's fees pursuant to 42 USC § 1988.

## B. On the Pendent State Causes of Action:

### On Tenth and Eleventh Causes of Action – Pursuant to NYSHRL

    (a) An award of compensatory damages in an amount of Five Hundred Thousand Dollars ($500,000.00) each and;

    (b) An award of punitive damages in the amount of one million Dollars ($1,000,000) on each cause; and

    (c) For costs and disbursements incurred;

**On Twelfth Cause of Action – Pursuant to NYSHRL**

    (a) An award of compensatory damages against each individual defendant in an amount of One Hundred Thousand Dollars ($100,000.00) each and;

    (b) An award of punitive damages against each individual defendant in the amount of One Hundred Thousand Dollars ($100,000.00); and

    (c) For costs and disbursements incurred;

**On Thirteenth through Sixteenth Causes of Action – Pursuant to NYCHRL**

    (a) An award against municipal defendants to make Plaintiff whole by providing nominal and general damages in the amount of Plaintiff's lost back pay and all lost fringe benefits from 2012 when he should have been promoted to the present;

    (b) Promotion to position of Senior Counsel, with commensurate benefits and restoration of seniority in that position back to 2012;

    (c) An award of compensatory damages against the municipal defendant in an amount of Five Hundred Thousand Dollars ($500,000.00) on each cause of action;

    (d) An award of compensatory damages against each individual defendant in an amount of One Hundred Thousand Dollars ($100,000.00) on each cause;

    (e) An award of punitive damages against the municipal defendant in an amount of One Million Dollars ($1,000,000.00) on each cause;

    (f) An award of punitive damages against each individual defendant in an amount of One Hundred Thousand Dollars ($100,000.00) on each cause;

    (g) An award of reasonable attorney's fees;

    (h) For costs and disbursements incurred.

Plus interests on all awards.

       **WHEREFORE**, Plaintiff prays that the Court grant such relief as may be appropriate, together with such other and further relief as this Court may deem just and proper.

Dated:      White Plains, New York
              August 4, 2014

                            Yours, etc.
                            ROBERT W. GORDON, ESQ.

                            By: ROBERT W. GORDON, ESQ.

*Pro se Attorney for Plaintiff*
38 Tomahawk Drive
White Plains, New York 10603
(914) 671-4181
rwg215@nyu.edu

# EXHIBIT A

# EXHIBIT A

# EXHIBIT A

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

New York District Office
33 Whitehall Street, 5th Fl
New York, N.Y. 10004

OFFICIAL BUSINESS
PENALTY FOR PRIVATE USE, $300

02 1P           $ 000.48°
0100506097    JUN 03 2014
MAILED FROM ZIP CODE 10004
UNITED STATES POSTAL SERVICE
PITNEY BOWES

Robert Gordon, Esq.
38 Tomahawk Drive
White Plains, NY 10603



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
For General Information: (800) 669-4000
TTY: (800)-669-6820
District Office: (212) 336-3620
General FAX: (212) 336-3625

Robert Gordon, Esq.
38 Tomahawk Drive
White Plains, NY 10603

Re:     EEOC Charge No. 520-2012-02260
        Gordon v. NYC Law Department

Dear Mr. Gordon,

The Equal Employment Opportunity Commission ("EEOC" or "Commission") has reviewed your charge according to our charge prioritization procedures. These procedures, which are based on a reallocation of the Commission's staff resources, apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce. In accordance with these procedures, we have evaluated your charge based upon the evidence provided.

You allege that you were discriminated against by NYC Law Department ("Respondent") on the basis of your race and age. Respondent's position statement has been previously shared with you. Your rebuttal to this position statement has been received and reviewed.

Based upon a review of information and documents submitted by you and the Respondent, the Commission is unable to conclude that the information establishes a violation of Federal law on the part of the Respondent. Although you may disagree with this determination, it is very unlikely that EEOC would find a violation if it invested additional resources. Therefore, the EEOC has decided not to further pursue its investigation of this charge and no further action will be taken by the Commission regarding this matter.

Enclosed is your Notice of Dismissal and Right to Sue. This determination is final. If you wish to pursue this matter on your own, you may file a lawsuit against the Respondent named in your charge in Federal District Court **within 90 days of receipt of your Notice of Dismissal and Right to Sue**. Please contact Federal Investigator Debra L. Richards at (212) 336-3768 if you have any questions regarding this matter.

Sincerely,

_Debra L. Richards_  for                    6/3/14

Kevin J. Berry                              Date
District Director

Enc.

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

### DISMISSAL AND NOTICE OF RIGHTS

To: Robert Gordon, Esq.
38 Tomahawk Drive
White Plains, NY 10603

From: New York District Office
33 Whitehall Street
5th Floor
New York, NY 10004

| | |
|---|---|
| ☐ | On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a)) |

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2012-02260 | Debra L. Richards, Investigator | (212) 336-3768 |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes. No finding is made as to any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other (briefly state)

### - NOTICE OF SUIT RIGHTS -
(See the additional information attached to this form.)

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS** of your receipt of this notice; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that backpay due for any violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.

On behalf of the Commission

Kevin J. Berry
District Director

6/3/14
(Date Mailed)

Enclosures(s)

cc: Michael A. Cardozo
Corporation Counsel
NYC LAW DEPARTMENT
100 Church Street
New York, NY 10007

Enclosure with EEOC
Form 161 (11/09)

# INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS** -- **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *mailed* **to you** (as indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS** -- **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 -- *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice *and* within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION** -- **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do *not* relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE** -- **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Docket No.: 14 Civ ____ ( ___ )

| |
|---|
| UNITED STATES DISTRICT COURT<br>SOUTHERN DISTRICT OF NEW YORK |
| ROBERT W. GORDON, ESQ.,<br><br>                                      Plaintiff,<br><br>                -against-<br><br>THE CITY OF NEW YORK, MARC ANDES,<br>MARK PALOMINO, GAYLE SANDERS, FAY<br>LEOUSSIS, MICHAEL A. CARDOZO, DAVID<br>SANTORO, JOHN DOE(S) AND JANE DOE(S)<br>(names currently unknown) each in his/her official<br>and individual capacities,<br><br>                                  Defendants. |
| **SUMMONS AND COMPLAINT** |
| ***ROBERT W. GORDON, ESQ.***<br>Plaintiff *Pro Se*<br>38 Tomahawk Drive<br>White Plains, N.Y. 10603<br><br>_____<br>*Tel: (914) 671-4181* |