UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------ X
                                 :

ROBERT W. GORDON, ESQ.,             :

                                 :

                       Plaintiff,     :

                                 :

                 -v-                   :

                                 :

THE CITY OF NEW YORK, MARC ANDES,    :          14-CV-6115 (JPO)
MARK PALOMINO, GAYLE SANDERS,      :
FAY LEOUSSIS, MICHAEL A. CARDOZO,    :       OPINION AND ORDER
DAVID SANTORO, JOHN DOE(S) AND       :
JANE DOE(S) (names currently unknown) each  :
in his/her official and individual capacities,     :

                                 :

                    Defendants.   :
------------------------------------------------------------ X

J. PAUL OETKEN, District Judge:

         Plaintiff Robert W. Gordon ("Gordon"), an African-American attorney for the New York

City Law Department ("the Law Department"), brings this action *pro se* against the City of New

York ("the City") and several of its officials pursuant to Title VII of the Civil Rights Act of 1964

("Title VII"), 42 U.S.C. § 2000e *et seq.*; 42 U.S.C. §§ 1981, 1983, 1985, and 1986; the New

York State Human Rights Law ("SHRL"), N.Y. Exec. Law § 290 *et seq.*; and the New York City

Human Rights Law ("CHRL"), N.Y.C Admin. Code § 8-101 *et seq.*  Gordon claims that the City

of New York and at least six employees of the Law Department (collectively, "Defendants")

discriminated against him on the basis of race and employed facially neutral practices that have a

disparate impact on African Americans.  He further alleges that he was subjected to a hostile

work environment and retaliated against for filing a complaint with the Equal Employment

Opportunity Commission ("EEOC") identifying these unlawful practices.  Defendants have

moved to dismiss all claims pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons that follow, the motion is granted in part and denied in part.

## I.     Background

The Court takes the following facts, pleaded in the Complaint, as true for the purpose of resolving the motion to dismiss.

Gordon is a "black, African-American male."  (Dkt. No. 1 ("Compl.") ¶ 7.)  He received his undergraduate degree from Morehouse College in Atlanta, Georgia, where he graduated in the top five percent of his class and was inducted into the *Phi Beta Kappa* honor society.  (*Id.* ¶ 20.)  In May 2004, he received his J.D. from New York University School of Law, and a year later, was admitted to the New York State Bar.  (*Id.* ¶¶ 17-18.)  Upon graduating from law school, Gordon immediately joined the Law Department as a full-time "Assistant Corporation Counsel" ("ACC").[1]  (*Id.* ¶ 16.)  He continues to hold this title today.  (*Id.*)

When Gordon joined the Law Department, he was first placed in the Manhattan Trial Unit ("MTU"), one of the "borough units" of the Law Department's Tort Division.  (*Id.* ¶¶ 8, 22.)  On August 23, 2005, after a year of working in MTU, Gordon wrote a letter to his immediate supervisor, with a copy to the assistant borough chief, regarding, among other things, "the 'slip-shod' nature of MTU, the lack of proper training and guidance, and the effects such [problems] had on efficiency."  (*Id.* ¶ 24.)  He offered suggestions on how to remedy the problems.  (*Id.*)

To discredit the concerns Gordon raised in his letter, Defendant Fay Leoussis ("Leoussis"), Chief of the Tort Division, "orchestrated and/or condoned" a "smear campaign"

---

[1] The Law Department represents the City, the Mayor, other elected officials, and the City's agencies in affirmative and defensive civil litigation.  (Compl. ¶ 8.)

against Gordon.  (*Id.* ¶¶ 13, 24.)  Specifically, Leoussis, along with other unknown parties, "intentionally and artificially manipulat[ed] [Gordon's] 2005 performance evaluation to reflect a 'below average' performance rating in order to cast [Gordon], rather than the inherent practices of the Tort Division, as 'the problem,' thus discrediting the concerns [Gordon] raised in his letter."  (*Id.* ¶ 25.)  As a result, Gordon received a score of "4" on his 2005 performance evaluation.  Evaluations are based on a scale from 1 to 5, with 1 being the highest score and 5 being the lowest, and a score of "4" carries the following description: "Below the generally expected performance level for assistants of comparable experience.  Quality of work varies and/or improvement necessary in substantive or other areas which should be specified on the evaluation form."  (*Id.* ¶¶ 27, 31, 32.)  Only a month before receiving this low performance score, and before he submitted his letter of complaint, Gordon was told by his supervisor that he was doing a "fine job" and that his supervisor was "very happy" with his work.  (*Id.* ¶ 33.)

A few months after Gordon received the 2005 performance evaluation, his superiors placed him on an "action plan" for improvement.  (*Id.* ¶ 34.)  Gordon protested, arguing that his low performance score was in retaliation for his letter of complaint, and not an indicator of his actual performance.  (*Id.*)  In January 2006, Gordon submitted a formal EEOC charge in which he made the same argument, namely, that he was given a low performance score in 2005 because he had complained about the various deficiencies he had observed at MTU.  (*Id.* ¶ 35.)

Gordon was subsequently transferred from MTU to the Queens Tort Division, another borough unit.  In Queens, he obtained favorable verdicts in all three trials for which he was responsible in the space of just three months.  (*Id.* ¶¶ 36-37.)  He was given a score of "2" on his 2006 performance evaluation.  A score of "2" carries the description: "Clearly above the generally expected performance level for assistants of comparable experience.  Quality of work

is consistently very good.  Assistant's development is progressing rapidly and continued growth is anticipated."  (*Id.* ¶¶ 29, 54-55.)

In August 2007, after a year in the Queens Tort Division, Gordon was transferred to the Special Litigation Unit, or "SLU."  (*Id.* ¶ 38.)  SLU is "considered an 'elite' unit of the Tort Division, and has . . . been referred to as the 'Special Forces' of the Tort Division."  (*Id.* ¶ 39.)  It handles "the most serious and complicated injury lawsuits," "high-exposure cases," which are "valued at $2 million or above," lawsuits involving "unusually controversial matters," and actions that "either present some novel issue of law or involve potential damages above a certain threshold."  (*Id.* ¶ 40.)

Upon transfer to SLU, Gordon was supervised by Defendant Marc Andes ("Andes").  (*Id.* ¶ 42.)  Andes had been named in an EEOC complaint for discrimination by Melissa Pressley, another African-American ACC in SLU.  (*Id.* ¶¶ 43-44.)  Pressley left SLU soon after Gordon arrived, allegedly because of racial discrimination and retaliation for reporting discrimination by Andes and others, at which point Gordon became the only African-American ACC of SLU's 42 attorneys.  (*Id.* ¶¶ 44, 46-47.)

In 2008, while Gordon was still working in SLU, the City Corporation Counsel, (the head of the Law Department), Defendant Michael A. Cardozo ("Cardozo"), announced a change to the Law Department's method of promotion.  (*Id.* ¶ 51.)  Prior to 2008, an attorney at the Law Department was eligible for promotion to the "Senior Counsel Program" after five years as ACC. (*Id.* ¶ 50.)  With the 2008 amendment, an ACC with only three years of experience was eligible for promotion, so long as that assistant received a "high evaluation score."  (*Id.* ¶¶ 51-52.) Promotion to the Senior Counsel Program resulted in an immediate pay raise, and a subsequent pay raise the year after promotion.  (*Id.* ¶ 52.)

An ACC since 2004, Gordon had more than three years of experience at the Law Department by 2008.  (*Id.* ¶¶ 52-53, 57.)  Moreover, he had received an "above average" score of "2" on his 2007 and 2008 performance evaluations.  (*Id.* ¶ 55.)  Nonetheless, Defendant Leoussis, his division chief, did not nominate him for a promotion to the Senior Counsel Program.  (*Id.* ¶ 57.)  In 2009 and 2010, Gordon again received performance scores of "2" on his annual evaluations.  But again, in neither of these years was he nominated for the Senior Counsel Program.  (*Id.* ¶ 58.)

Despite Gordon's failure to be nominated for a promotion, he continued to receive positive feedback from Andes.  In 2009, Andes told Gordon that he had nominated him for a "Division Chief's Award," which is awarded every year to an attorney who has exhibited "exemplary performance on behalf of the City of New York," but that Leoussis had rejected the nomination.  (*Id.* ¶¶ 72-73.)  Andes told Gordon that he believed Gordon deserved the award because "[m]ost attorneys who are new to SLU only receive one or two cases to start off with," but Gordon had received "40 cases to start off with and on top of that handled those cases so well."  (*Id.* ¶ 74.)  Andes also told Gordon that he was doing "just as well as any other attorney and in some respects even better than some attorneys who held the title of Senior Counsel."  (*Id.* ¶ 75 (emphasis omitted).)  Andes made similar favorable comparisons and comments to Gordon on other occasions.  (*Id.*)

At some point between Gordon's 2010 and 2011 evaluations, Andes informed Gordon that Andes' superiors had told him that they thought he had been "grading [Gordon] too high" on performance evaluations.  (*Id.* ¶ 63.)  Gordon subsequently noticed a change in the manner in which Andes treated him.  In particular, Andes started "nit picking" his work and "focus[ed] on non-essential aspects" of his "performance and work product."  (*Id.* ¶ 65.)  Gordon confronted

Andes, saying, "It appears you are trying to find things wrong with my work." (*Id.* ¶ 66.)  Andes denied that this was the case, and later told Gordon that his work was "sub-standard."  When Gordon asked him, "[W]hat can we do about it to correct it?" Andes responded, "There are some things that you just can't teach some people," and made no effort to help Gordon correct the deficiencies in his work.  (*Id.* ¶¶ 67-69.)  Instead, he said to Gordon that it might be "more appropriate for [him] to go to a borough unit," because Gordon was "better at sticking to simple motions . . . than the complex motions here in SLU."  Andes made similar remarks on other occasions that implied that Gordon was not suited to the work at SLU.  (*Id.* ¶ 71.)

Moreover, prior to completing a performance evaluation, Andes had a practice of meeting with ACCs individually and asking them what accomplishments should be included in their evaluations.  (*Id.* ¶ 76.)  Andes had followed that practice for Gordon's previous evaluations, and for the 2011 evaluations of other ACCs, but did not do so for Gordon's 2011 evaluation.  (*Id.* ¶ 79.)  In the 2011 evaluation, which Gordon received in August of that year, Gordon's performance evaluation score dropped to a "3.5" (from a "2" in 2010).  Four Defendants contributed to this evaluation: Andes; Leoussis; and Mark Palomino ("Palomino") and Gayle Sanders ("Sanders"), Unit Chief and Deputy Chief, respectively, of SLU.  (*Id.* ¶¶ 60-62.)

After Gordon received his 2011 performance evaluation, he took a one-year leave of absence from the Law Department and accepted an offer from the University of Ulsan to teach law in South Korea.  (*Id.* ¶¶ 80, 84.)  While he was in South Korea, he learned that two Caucasian attorneys in SLU had been promoted to Senior Counsel based on their 2011 performance evaluations.  (*Id.* ¶ 85.)  Both attorneys had spent less time in SLU than Gordon, and did not have "any particular outstanding achievements."  (*Id.* ¶ 88.)

On March 20, 2012, Gordon sent Andes an e-mail with a "draft copy of his detailed objections" to his 2011 performance evaluation to give Andes "an opportunity to explain his actions and or refute [Gordon's] objections." (*Id.* ¶ 99.) Andes refused to discuss or review the evaluation. (*Id.*)

On May 4, 2012, Gordon filed a complaint of discrimination with the EEOC. (*Id.* ¶ 100.) In the complaint, Gordon alleged, *inter alia*, that his 2011 performance evaluation constituted discrimination on the basis of his race. (*See* Dkt. No. 20 ("Rosenbaum Decl.") Ex. A.) The Law Department responded to the charge on August 16, 2012, alleging that Gordon had experienced "performance deficiencies" since the start of his career with the Law Department, and that the 2011 evaluation was the result of those deficiencies and not Gordon's race. (Compl. ¶ 101; Rosenbaum Decl. Ex. B.) The EEOC was unable to conclude that Gordon had established a violation of federal law on the part of the Law Department. (Compl. Ex. A.) Accordingly, the EEOC dismissed Gordon's complaint and issued a right-to-sue letter. (*Id.*)

Gordon returned from South Korea in August 2012, at which point he was transferred from SLU back to the allegedly less-prestigious Queens Tort Division. (Compl. ¶¶ 102, 113, 179.) At the request of Leoussis, Gordon was also placed on a "Corrective Action Plan." (*Id.* ¶ 103.) This Plan "plac[ed] added burdens on [Gordon] as a condition of continued employment and added the stigma of [Gordon] being an employee in need of 'corrective action.'" (*Id.* ¶ 108.)

In June 2013, after Gordon had spent one year in the Queens Tort Division, the Queens Borough Chief told Gordon that he was "on the top of the list to take a full time trial position." (*Id.* ¶ 110.) Subject to the availability of trial attorney positions in the various boroughs, the attorney at the top of the list is allowed to choose the borough in which he would like to litigate. (*Id.* ¶ 111.) In July 2013, Leoussis asked Gordon to choose a borough, but gave him the choice

of only the Bronx or Brooklyn.  These two boroughs, Gordon alleges, are "the less favored

boroughs" and also have "the greatest concentration of African-American ACCs in the Torts

Division of the Law Department."  (*Id.* ¶ 112.)  Leoussis told Gordon that there were no trial

positions open in Queens.  (*Id.* ¶ 115.)  Gordon accepted a trial position in the Bronx, but a few

weeks later, a trial position "suddenly" opened up in Queens.  (*Id.* ¶ 116.)  Gordon was not

informed of the opening, and the position was given to a Caucasian attorney who was "more

towards the bottom" of the trial attorney list than Gordon.  (*Id.* ¶¶ 116-17.)

   Gordon now brings suit, alleging sixteen causes of action.  He asserts claims for disparate

treatment, disparate impact, retaliation, and hostile work environment under Title VII, § 1981, §

1983, the SHRL, and the CHRL.  He also alleges a *Monell* claim, claims of conspiracy under §§

1983 and 1985 and failure to prevent conspiracy under § 1986, and a claim of aiding and abetting

discrimination under the SHRL.  He names as defendants the City of New York, several Doe

defendants, and six individuals employed by the Law Department: Leoussis, Palomino, Sanders,

Andes, and Cardozo—all discussed above—as well as David Santoro ("Santoro"), the Deputy

Chief of the Tort Division during the time period in question.  (*Id.* ¶ 14.)  Defendants move to

dismiss all claims under Federal Rule of Civil Procedure 12(b)(6).  (Dkt. No. 18.)

## II.    Legal Standard

   On a motion to dismiss pursuant to Rule 12(b)(6), a court must "accept all allegations in

the complaint as true and draw all inferences in the non-moving party's favor."  *LaFaro v. N.Y.*

*Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks

omitted).  To survive a motion to dismiss, a complaint must plead "enough facts to state a claim

to relief that is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A

claim has facial plausibility when the plaintiff pleads factual content that allows the court to

draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "This standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Vaughn v. Air Line Pilots Ass'n, Int'l*, 604 F.3d 703, 709 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 678) (internal quotation marks omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

In determining whether a plaintiff has pleaded facts sufficient to survive a motion to dismiss, a court will not consider mere conclusory allegations that lack a factual basis. *Hayden v. Paterson*, 594 F.3d 150, 160-61 (2d Cir. 2010). A plaintiff's complaint "must at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed." *EEOC v. Port Auth. of N.Y. & N.J.*, 768 F.3d 247, 254 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 680) (alterations and internal quotation marks omitted). In assessing the sufficiency of the complaint, a court may consider "any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are integral to the complaint." *Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) (citations and internal quotation marks omitted). "Integral" documents are those "either in plaintiffs' possession or of which plaintiffs had knowledge and relied on in bringing suit." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (internal quotation marks omitted). In order for a document to be "integral," however, a plaintiff must actually have relied on its terms and effect in drafting the complaint; "mere possession or notice is not enough." *Id.*

In the context of employment discrimination claims, a plaintiff need not allege "specific facts establishing a prima facie case" to survive a motion to dismiss.  *Boykin v. KeyCorp.*, 521 F.3d 202, 212 (2d Cir. 2008) (citing *Swierkiewicz v. Sorema, N.A.*, 534 U.S. 506, 508 (2002)) (internal quotation marks omitted).[2]  However, the complaint must be "facially plausible and allege sufficient facts to give the defendant fair notice of the basis for the claim," *Brown v. Daikin Am., Inc.*, 756 F.3d 219, 228 n.10 (2d Cir. 2014), and "[t]he elements [of a prima facie case can] help provide an outline of what is necessary to render [the plaintiff's] claims for relief plausible," *Sommersett v. City of New York*, No. 09 Civ. 5916 (LTS) (KNF), 2011 WL 2565301, at *5 (S.D.N.Y. June 28, 2011).  In discrimination cases, the plaintiff's burden at this stage is "very lenient, even *de minimis*."  *Deravin v. Kerik*, 335 F.3d 195, 200 (2d Cir. 2003) (internal quotation marks omitted).

Finally, although courts generally "construe a *pro se* litigant's pleadings and motions liberally," *In re Sims*, 534 F.3d 117, 133 (2d Cir. 2008), "the degree of solicitude may be lessened" where *pro se* parties are trained in law or skilled in litigation, *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010).  In fact, "a lawyer representing himself ordinarily receives no such solicitude at all."  *Id.*  Here, Gordon asserts that he graduated from New York University Law School in 2004, is "admitted to practice law" in New York State and in this district, and has been employed as an attorney for over ten years.  (Compl. ¶¶ 7, 16-19.)  Accordingly, the Court does not give Gordon's complaint the same liberal reading that it would give to a complaint by a *pro se* litigant with no legal training.

---

[2] The Second Circuit has affirmed the force of the *Swierkiewicz* rule after *Twombly and Iqbal*. *See Robinson v. Gucci Am.*, No. 11 Civ. 3742 (JPO), 2012 WL 259409, at *3 (S.D.N.Y. Jan. 27, 2012) (citing *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010); *Boykin*, 521 F.3d at 213-14).

III.    **Discussion**[3]

As a preliminary matter, Defendants contend that many of Gordon's claims are time-barred, at least in part.  (Dkt. No. 21 ("Def. Memo") at 8-10.)  In response, Gordon says that he does not intend to seek relief for the allegations that Defendants identify as time-barred.  (Dkt. No. 24 ("Pl. Memo") at 2-3.)  Accordingly, to the extent that the Complaint in fact asserts those allegations, Gordon has abandoned them, and the Court omits them from its analysis.

A.    **Disparate Treatment**

Defendants first move to dismiss Gordon's disparate treatment claims, which he brings under Title VII, § 1981, the SHRL, and the CHRL. (Compl. ¶¶ 123-130, 138-151, 181-84, 195-97; Def. Memo at 12-17.)

1.    **Title VII, § 1981, and the SHRL**

Disparate treatment claims brought under Title VII, § 1981, and the SHRL are analyzed under the same standard and approach.  *Ewing v. Coca Cola Bottling Co. of New York*, No. 00 Civ. 7020 (CM), 2001 WL 767070, at *5 (S.D.N.Y. June 25, 2001) (citing *Patterson v. McLean Credit Union*, 491 U.S. 164 (1989); *Gumbs v. Hall*, 51 F. Supp. 2d 265 (W.D.N.Y. 1995), *aff'd*, 205 F.3d 1323).  Accordingly, the Court addresses these claims together.  The claims are based on several theories, however, which the Court separates and considers in chronological order.

a.    **Failure to Promote in 2010-2011**

---

[3] Gordon's Title VII claims are directed against the City and the individual defendants in their official capacities.  (*See* Pl. Memo at 20.)  All other claims are directed against the City and the individual Defendants in their individual and official capacities, unless otherwise noted below.

Gordon first alleges that Defendants discriminated against him when they failed to promote him to Senior Counsel between August 2010 and his receiving the low performance evaluation in August 2011.[4]

To plead a prima facie case for discriminatory failure to promote, a plaintiff must demonstrate (1) that he is a member of a protected class; (2) that he applied for a promotion to a position for which he was qualified; (3) that he was rejected for the position; and (4) after this rejection, the position was filled by someone outside the protected class who was similarly or less well qualified than the plaintiff, or the employer kept the position open and continued to seek applicants.  *Yu v. N.Y.C. Hous. Dev. Corp.*, 494 F. App'x 122, 124-25 & n.4 (2d Cir. 2012) (summary order).

Here, Gordon has not satisfied the second of these elements, as he does not allege that he applied for promotion to Senior Counsel.  This element, however, is not always required; rather, its applicability depends on the facts of the particular case.  *See Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710 (2d Cir. 1998); *see also Harding v. Wachovia Capital Mkts., LLC*, No. 10 Civ. 3496 (JPO), 2012 WL 4471543, at *6 (S.D.N.Y. Sept. 12, 2012) ("[T]he Second Circuit has developed an exception to [the application] requirement where the job at issue was not posted or where the employee seeking promotion was not informed of the opportunity to apply." (citing *Mauro v. S. New England Telecomms., Inc.*, 208 F.3d 384, 387 (2d Cir. 2000)).  Where, as here, "there is no formal application process [for promotion]" to Senior Counsel and all ACCs who meet certain qualifications are considered for promotion, the Court "will not require [Gordon] to

---

[4] This claim is pleaded broadly in the Complaint, as a violation of Title VII, § 1981, the SHRL, and the CHRL. The Court narrows it, however, to an allegation under only § 1981, consistent with Gordon's statement that he does not intend to base his claims on any of the allegations that Defendants argue are time-barred.  (Pl. Memo at 2-3; Def. Memo at 8-10.)

show that he applied for the specific position he was denied." *Anderson v. City of New Rochelle*, No. 10 Civ. 4941 (ER), 2012 WL 3957742, at *7 n.12 (S.D.N.Y. Sept. 4, 2012).  (*See* Compl. ¶¶ 48-52; Rosenbaum Decl. Ex. B at 4 ("Attorneys do not 'apply' for promotion to Senior Counsel.").)

Gordon has adequately pleaded the remaining elements of a discriminatory failure to promote claim.  The Complaint alleges (1) that Gordon is African-American, and therefore a member of a protected class; (2) that Gordon was qualified for promotion to Senior Counsel between August 2010 and 2011, as the promotion required three years of experience and a "high evaluation score" and Gordon fulfilled both of those requirements (*id.* ¶¶ 51-52, 54-55, 58, 75)[5]; (3) that Gordon was not promoted to Senior Counsel; and (4) that similarly qualified non–African American attorneys were promoted to Senior Counsel (*id.* ¶ 125).  These allegations are sufficient to survive a motion to dismiss.

### b.      2011 Performance Evaluation

The gravamen of Gordon's complaint is that Defendants gave him an undeservedly low performance score on his 2011 evaluation because he is African American.  That score, according to Gordon, resulted in his not being promoted to Senior Counsel in 2012, his being placed on a "Corrective Action Plan," and his transfer from SLU to the Queens Tort Division.[6]

---

[5] Defendants argue that Gordon did not receive a high enough score, as "no ACC in SLU received a promotion to Senior Counsel during the period 2008 to 2012 with an overall performance rating of '2.'"  (Def. Memo at 16.)  This is a question of fact that the Court cannot decide at this stage of the litigation.

[6] Defendants appear to interpret the Complaint as alleging that Gordon's not being promoted to Senior Counsel in 2012 and his placement on a Corrective Action Plan were discriminatory employment actions, separate and apart from the 2011 performance evaluation.  (*See* Def. Memo at 12-13.)  The Court does not share this reading of the Complaint, but to the extent that Gordon intended to make these allegations, they are not dismissed.

In order to make out a prima facie case that a performance evaluation is discriminatory, Plaintiff must show that: "(1) he belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he was subject to an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination based on plaintiff's membership in that class." *Siddiqi v. N.Y.C. Health & Hospitals Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008).

Gordon has plausibly pleaded these four elements. First, as already stated above, the parties do not dispute that the Complaint adequately alleges Gordon's membership in a protected class. Second, the Complaint states that Gordon was performing his duties satisfactorily: he had received high scores on his previous performance evaluations and positive feedback from his supervisor. (Compl. ¶¶ 54-55, 58, 75.)

As for the third element, although negative performance evaluations, without accompanying adverse consequences, are not adverse employment actions, "there are times when a negative evaluation does constitute an adverse employment action, if it is accompanied by, or results in, a change in conditions of employment." *Valenti v. Massapequa Union Free School Dist.*, Nos. 03 Civ. 1193 (JFB) (MLO), 04 Civ. 5271 (JFB) (MLO), 2006 WL 2570871, at *9 (E.D.N.Y. Sept. 5, 2006); *see also Siddiqi*, 572 F. Supp. 2d at 367 ("A negative employment evaluation, if accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action."). The Court concludes that Gordon has alleged sufficient negative consequences from his 2011 performance evaluation— namely, his ineligibility for promotion, his receiving a probationary status, and his transfer from

an elite division of the Law Department to a less prestigious, non-elite division—such that his

negative performance evaluation allegedly constitutes an adverse employment action.[7]

Finally, the Complaint satisfies the fourth element of a prima facie case for employment

discrimination, as it states facts giving rise to an inference of discrimination. It alleges that two

Caucasian attorneys were promoted to Senior Counsel and, by implication, received higher

performance evaluation scores than Gordon did, despite the fact that they did not perform at a

higher level than he did. (Compl. ¶¶ 85-89.) *See Parrilla v. City of New York*, No. 09 Civ. 8314

(SAS), 2011 WL 611849, at *8 (S.D.N.Y. Feb. 16, 2011) ("Evidence showing that the plaintiff

was treated less favorably than other similarly situated employees outside the protected group is

one method of raising an inference of discrimination." (quoting *Mandell v. Cnty. Of Suffolk*, 316

F.3d 368, 379 (2d Cir. 2003) (brackets and internal quotation marks omitted)). Accordingly,

Gordon has adequately pleaded a claim for discriminatory treatment.

### c.    2013 Transfer

Finally, Gordon alleges that Defendants discriminated against him again in 2013, when

they gave him the choice of a full-time trial attorney position in Brooklyn or the Bronx, but not

Queens, only to subsequently give a Caucasian attorney the option of a trial attorney position in

Queens. (Compl. ¶¶ 112, 118.)

Defendants first argue that this claim should be dismissed to the extent that it is brought

under Title VII, as Gordon failed to exhaust it with the EEOC. (*See* Def. Memo at 10.)

---

[7] Gordon complained of these actions in his May 2012 EEOC complaint. (Rosenblaum Decl. Ex. A at 3-4 (referring to a "probationary status," the "evaluation that precluded [Gordon] from promotion to Senior Counsel [s]tatus," and the "attempt to . . . remove [Gordon] from the SLU division . . . [to] a less 'prestigious position' in a borough tort unit").) Therefore, to the extent that Defendants suggest that Gordon cannot base a Title VII disparate treatment claim on these actions because he did not raise them before the EEOC (*see* Def. Memo mat 10), that argument is without merit.

"A plaintiff may bring an employment discrimination action under Title VII . . . only after filing a timely charge with the EEOC," as "[e]xhaustion of remedies is a precondition to suit." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 82-83 (2d Cir. 2001).  Nonetheless, there are "three kinds of situations where claims not alleged in an EEOC charge are sufficiently related to the allegations in the charge that it would be unfair to civil rights plaintiffs to bar such claims in a civil action." *Butts v. City of New York Dep't of Hous. Pres. & Dev.*, 990 F.2d 1397, 1402 (2d Cir. 1993).  Those situations are where the later claim: (1) alleges retaliation by an employer against an employee for filing an EEOC charge; (2) alleges "further incidents of discrimination carried out in precisely the same manner alleged in the EEOC charge," or (3) "where the conduct complained of would fall within the scope of the EEOC investigation which could be reasonably expected to grow out of the initial charge of discrimination." *Id.* at 1402–03 (internal quotation marks omitted).

Gordon concedes that he failed to exhaust this particular discrimination claim with the EEOC.  (Pl. Memo at 3.)  He argues, however, that it is sufficiently related to the claims in his 2012 EEOC complaint such that he should not be barred from raising it here.  (*Id.*)  The Court agrees.  Gordon's EEOC charge alleged that Defendants gave him a low performance evaluation in 2011 as part of a discriminatory "attempt" to transfer him from the elite SLU to "a less 'prestigious position' in a borough tort unit."  (Rosenbaum Decl. Ex. A at 2-3.)  He now alleges discrimination carried out in precisely the same manner, namely the effective transfer to a "less desirable" unit—in this case, the Bronx borough office—because he is African American.  *See Hinton v. City Coll. Of New York*, No. 05 Civ. 8951 (GEL), 1008 WL 591802, at *14 (S.D.N.Y. Feb. 29, 2008) (citing *Almendral v. N.Y. State Off. Of Mental Health*, 743 F.2d 963, 967 (2d Cir. 1984), for the proposition that, "although 'precisely' must have meaning," it should not be read

"too narrowly" so as to allow an institution to "achieve the same result as that complained of to the EEOC . . . for the same illegal reasons . . . , but nonetheless prevent a plaintiff from raising [] functionally identical issues in their lawsuit based on the EEOC charge simply by slightly varying the exact means of discrimination"). Because Gordon's Title VII claim fits within the second exception to the EEOC exhaustion rule, the Court will consider it.

Turning to the merits, Defendants assert that the 2013 action cannot support a disparate treatment claim. They are wrong. Gordon claims, in effect, that he was denied a transfer to his choice location. As with other claims for discrimination, a claim for discrimination based on a transfer denial requires a showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position he sought; (3) the denial of the transfer constituted an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination. *See Mandell*, 316 F.3d at 377-78.

These elements are met here. First, the Complaint states that Gordon, an African-American man, was "qualified" to be a trial attorney in Queens. It states that "the Tort Division ranks attorneys according to seniority in terms of assigning full time trial positions," that "[t]he attorney at the top of the list is allowed to choose in which borough he/she wants to try cases," and that Gordon was told he was "at the top of the list." (Compl. ¶¶ 110-111.)

Second, the Complaint supports an inference that the denial of a position in Queens was an "adverse employment action." "A denial of a transfer may . . . constitute an adverse employment action, but [the Second Circuit] require[s] a plaintiff to proffer objective indicia of material disadvantage; subjective, personal disappointment is not enough." *Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163-64 (2d Cir. 2008) (brackets and internal quotation marks omitted). Here, Gordon alleges that Bronx and Brooklyn are "the less favored boroughs," as they handle

"street offenses" and "the working conditions . . . [are] not equal to but . . . much lower, more dangerous, and economically depressed than the working conditions near the financial district in Manhattan . . . or even in Queens." (Compl. ¶¶ 112-13, 161.) These allegations are sufficient to render the denial of the option to transfer to Queens "adverse," as "[s]afe working conditions are an objective indicator of desirability." *Guzman v. City of New York*, No. 06 Civ. 5832 (KAM) (LB), 2010 WL 4174622, at \*19 (S.D.N.Y. Sept. 30, 2010) (internal quotation marks omitted).

Finally, the circumstances surrounding the action at issue give rise to an inference of discrimination. Although the Complaint is not entirely clear, it appears to allege that the Queens location was available when it came time for Gordon to choose a location for a trial position. Despite the availability of this location, Gordon was not given the option of working in Queens. A few weeks later, a Caucasian attorney, who was "not at the top, but more towards the bottom, of the trial attorney list," was given an option of a full-time trial position in Queens. (Compl. ¶¶ 116-17.) These allegations are sufficient to plead a plausible claim of disparate treatment. *See Parrilla*, 2011 WL 611849, at \*8.

### 3.    The CHRL

Gordon also brings a discrimination claim under the CHRL. (*Id.* ¶¶ 195-97.) Such claims are analyzed under the same standard as Title VII, § 1983, and SHRL disparate treatment claims. *See Pilgrim v. McGraw-Hill Cos.*, 599 F. Supp. 2d 462, 468 (S.D.N.Y. 2009) ("[T]he standard for all Title VII, section 1981, [S]HRL and CHRL employment discrimination claims is the same."). The CHRL, however, serves "uniquely broad and remedial purposes, which go beyond those of counterpart [s]tate or federal civil rights laws." *Costantin v. N.Y.C. Fire Dep't*, No. 06 Civ. 4631 (GBD) (THK), 2009 WL 3053851, at \*11 (S.D.N.Y. Sept. 22, 2009) (internal quotation marks omitted). Accordingly, "claims under the [CHRL] must be given an

18

independent liberal construction analysis in all circumstances." *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009) (quoting *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 66-69 (1st Dep't 2009)) (internal quotation marks omitted).  Because the CHRL contains a lower standard than Title VII, § 1983, and the SHRL, Gordon's CHRL discrimination claim survives as well.

### B.    Disparate Impact

Defendants also move to dismiss Gordon's disparate impact claim, which Gordon brings under Title VII and the SHRL.  (Def. Memo at 19-20; Compl. ¶¶ 206-208.)  To establish a prima facie case of disparate impact under either of these statutes, a plaintiff "must show that a facially neutral employment policy or practice has a significant disparate impact."  *Brown*, 163 F.3d at 712 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 430-32 (1971)).

Here, the Complaint states that "the evaluation practices" of Defendants "resulted in a disparate impact, such that . . . no African-American ACCs were promoted while they were in SLU during the relevant time periods, whereas upon information and belief at least 30% to 40% of Caucasian, similarly situated ACCs were promoted to Senior Counsel while they were in SLU."  (Compl. ¶ 207.)  It further asserts that this "statistical disparity is indicative of discrimination," and that, as a result of such discrimination, Gordon was, among other things, deprived of equal employment opportunities.  (*Id.* ¶¶ 207-08.)

Defendants argue that these allegations are insufficient to state a disparate impact claim because Gordon has failed to identify a *neutral policy* that is alleged to have a disproportionate impact on African Americans.  (Def. Memo at 19-20.)  The Court agrees.  The "evaluation practices" Gordon refers to are not facially neutral.  As pleaded elsewhere in the Complaint, they are practices of "manipulat[ing] and custom tailor[ing] evaluations to systematically exclude

from equal employment opportunities and financial and professional benefits certain employees based on their membership in a protected class." (Compl. ¶ 156.) "Rather than identify a neutral employment policy with a statistically significant adverse impact, plaintiff argues . . . that he was subjected to deliberate discriminatory conduct," and therefore "[h]is arguments better resonate in support of [his] claim for disparate treatment." *Rodriguez v. Beechmont Bus Serv., Inc.*, 173 F. Supp. 2d 139, 148 (S.D.N.Y. 2001). This claim is dismissed.

### C.     Retaliation

Next, Defendants move to dismiss Gordon's retaliation claims, which are brought under Title VII, § 1981, the SHRL, and the CHRL. (Def. Memo at 18-19; Compl. ¶¶ 131-137, 152-153, 185-87, 198-200.)

### 1.     Title VII, § 1981, and the SHRL

A prima facie claim for retaliation under Title VII, § 1981, and the SHRL requires a showing (1) that the plaintiff was engaged in a protected activity; (2) that the defendant knew of that protected activity; (3) that the defendant took adverse employment action against the plaintiff; and (4) that there is a causal connection between the protected activity and the adverse action. *See Paulino v. N.Y. Printing Pressman's Union, Local Two*, 301 F. App'x 34, 37 (2d Cir. 2008) (summary order) (Title VII, § 1981); *Bermudez v. City of New York*, 783 F. Supp. 2d 560, 587 (S.D.N.Y. 2011) (SHRL). Protected activity is activity that "protest[s] or oppose[s] statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000). An adverse employment action for the purposes of a retaliation claim is one that "a reasonable employee would have found . . . materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Senno v. Elmsford Union Free School Dist.*, 812 F. Supp. 2d 454, 472

(S.D.N.Y. 2011) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67-69 (2006))

(internal quotation marks omitted). This does not include "petty slights or minor annoyances

that often take place at work and that all employees experience"; rather, "[t]he antiretaliation

provision protects an individual not from all retaliation, but from retaliation that produces an

injury or harm." *White*, 548 U.S. at 67-68.

Gordon alleges that he was retaliated against by Defendants for engaging in two

protected activities. First, he claims that Defendants retaliated against him for his 2006 EEOC

complaint. (Compl. ¶¶ 132-134.) Defendants argue that the 2006 complaint cannot form the

basis of a retaliation claim, as it is not "protected activity." (Def. Memo at 18.) The Court

agrees. Although Gordon dubs the complaint one "of discrimination" (Compl. ¶ 35), his

description of it is not consistent with this label. The 2006 EEOC complaint, as detailed by

Gordon, alleged retaliation for his 2005 letter to his supervisor, which in turn concerned "the

'slip-shod' nature of MTU, the lack of proper training and guidance, and the effects such

[problems] had on efficiency," as well as "suggestions on how to remedy the situation." (Compl.

¶¶ 24, 35.)

Gordon also asserts that Defendants retaliated against him for filing 2012 EEOC

complaint by placing him on a Corrective Action Plan and by transferring him, in August 2012,

from SLU to the Queens Tort Division (*id.* ¶ 134), a division that is less prestigious than SLU

and, for him, less convenient (*id.* ¶¶ 39-41, 102, 179).[8] Gordon's 2012 EEOC charge, unlike his

2005 letter, is "protected activity," as it complains of racial discrimination. (*See Rosenbaum*

---

[8] Defendants insist that this claim cannot be maintained under Title VII because Gordon failed to
exhaust his remedies by filing a complaint with the EEOC. (Def. Memo at 10.) This argument
fails, as "a claim alleging retaliation by an employer against an employee for filing an EEOC
charge" is "reasonably related to the claims asserted in an EEOC complaint." *Deravin v. Kerik*,
335 F.3d 195, 201 n.3 (2d Cir. 2003).

Decl. Ex. A.) Defendants do not dispute that they knew of this protected activity; nor could they, as the Law Department responded to the EEOC charge.  (*See id.* Ex. B.)

The remaining elements of a retaliation claim are also satisfied here.  First, a transfer to a less prestigious office—in this case, to the Queens Tort Division—may materially impact the quality of one's work and prospects for career advancement, and accordingly may constitute an adverse employment action.  *See Kessler v. Westchester Cnty. Dept. of Soc. Servs.*, 461 F.3d 199, 209-10 (2d Cir. 2006) (holding that a reasonable juror could find that a transfer to an office where, among other things, lower-level work is performed is an adverse employment action); *Galabya v. N.Y.C. Bd. of Educ.*, 202 F.3d 636, 641 (2d Cir. 2000) (stating that the plaintiff had not shown an adverse employment action where he did not produce evidence to show that the transfer was "to an assignment that was materially less prestigious, materially less suited to his skills and expertise, or materially less conducive to career advancement").

As for the Corrective Action Plan, although "excessive scrutiny" normally "does not rise to the level of an adverse employment action," *Nidzon v. Konica Minolta Bus. Solutions, USA, Inc.*, 752 F. Supp. 2d 336, 350 (S.D.N.Y. 2010), Gordon alleges specific negative consequences from this scrutiny: stigma and the "publish[ing] by implication [of] the defamatory material contained in Plaintiff's 2011 evaluation beyond the original parties involved."  (Compl. ¶¶ 105, 203).  If a Corrective Action Plan subjects an employee to stigma and a negative reputation among coworkers, it could dissuade a reasonable worker from making a similar charge of discrimination.  It therefore qualifies as "adverse."  *See Hicks v. Baines*, 593 F.3d 159, 162 (2d Cir. 2010).

Defendants insist that this claim should be dismissed on the fourth element, because Gordon has failed to allege a plausible causal connection between his 2012 EEOC charge and the

two events he complains of, namely the Corrective Action Plan and his transfer to Queens.  (Def.

Memo at 19.)  Gordon cannot make this connection, Defendants argue, because both the Plan

and the transfer resulted from the 2011 performance evaluation, which preceded the 2012 EEOC

charge.  (*Id.*)  However, the question of whether these two acts directly resulted from Gordon's

2011 performance evaluation or were retaliation for his 2012 EEOC charge, or both, is an issue

of fact that the Court cannot resolve on a motion to dismiss.

Moreover, Gordon has pleaded a plausible causal connection between the 2012 EEOC

charge and the alleged retaliatory acts.  Courts recognize that most retaliation "is not carried out

so openly as to provide direct proof of it."  *Sanders v. N.Y.C. Hum. Res. Admin.*, 361 F.3d 749,

755 (2d Cir. 2004).  Therefore, "the causal connection needed for proof of a retaliation claim can

be established indirectly by showing that the protected activity was closely followed in time by

the adverse action."  *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 2001) (internal quotation

marks omitted).  The Second Circuit has not established how long is too long for a causal

connection to be established, but it has suggested that relatively brief time spans support an

inference of causation.  *See Nagle v. Marron*, 663 F.3d 100, 111 (2d Cir. 2011) ("While we have

not 'drawn a bright line' defining maximum time period that can give rise to an inference of

causation, six weeks fits comfortably within any line we might draw." (citation omitted)).  Here,

three months passed between Gordon's filing the EEOC complaint in May 2012 and his transfer

to Queens and placement on a Corrective Action Plan in August 2012.  Three months is a

sufficiently short period of time to support an inference of causation.  *See, e.g.*, *Summa v.

Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) ("This Court has recently held that even gaps of

four months can support a finding of causation.")  This is especially so here, as Gordon was not

working at the Law Department between May and August of 2012, and thus the actions, taken

upon his return, occurred "at the first actual opportunity to retaliate." *Id.*[9]

Accordingly, Gordon's claim that Defendants retaliated against him in response to his

2012 EEOC discrimination complaint survives Defendants' motion to dismiss.

## 2.   CHRL

"[T]he retaliation inquiry under the CHRL is 'broader' than its federal counterpart."

*Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 723 (2d Cir. 2010).  The only

difference is that, under the CHRL, a plaintiff need not establish that the action was materially

adverse.  Rather, a plaintiff need only show that the retaliatory act was "reasonably likely to

deter a person from engaging in [action opposing his employer's discrimination]." *Gorokhovsky*

*v. N.Y.C. Housing Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order).  This difference

does not change the above outcome.  Gordon's CHRL retaliation claim survives to the same

extent that it survives under the other statutes.

## D.   Hostile Work Environment

Next, Defendants move to dismiss Gordon's hostile work environment claim, which he

brings under the CHRL against the Defendants in their individual capacities, and not in their

capacities as city officials.  (Compl. ¶¶ 201-205; Def. Memo at 17-18.)

"The elements of a claim for hostile working environment under . . . [the] CHRL are

substantially similar to those under Title VII." *Murdaugh v. City of New York*, No. 10 Civ. 7218

(HB), 2011 WL 798844, at *5 (S.D.N.Y. Mar. 8, 2011) (citing *Forrest v. Jewish Guild for the*

*Blind*, 819 N.E.2d 998 (N.Y. 2004)).  To state a claim for a hostile work environment under Title

---

[9] To the extent that Gordon intends to allege that Defendants' failure, in July 2013, to give him the option of working in Queens was retaliation for his May 2012 EEOC complaint (*see* Compl. ¶ 119), this allegation may go forward as well.

24

VII, "a plaintiff must plead facts that would tend to show that the complained of conduct: (1) is objectively severe or pervasive—that is, creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's [protected class]." *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007) (internal quotation marks and ellipsis omitted).

The standard under the CHRL is somewhat lower than that under Title VII, however, as the "CHRL permits liability for harassment that does not rise to the level of 'severe' or 'pervasive.'"[10] *Carter v. Verizon*, No. 13 Civ. 7579 (KPF), 2015 WL 247344, at *8 (S.D.N.Y. Jan. 20, 2015); *see also Farrugia v. N. Shore Univ. Hosp.*, 820 N.Y.S.2d 718, 724 (Sup. Ct. 2006) (stating that the CHRL was "intended to be more protective than the state and federal counterpart"). Rather, a plaintiff need only demonstrate "differential treatment—that she [was] treated 'less well'—because of discriminatory intent." *Mihalik v. Credit Agricole Cheuvreux N. Am., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (citing *Williams v. N.Y.C. Hous. Auth.*, 61 A.D.3d 62, 78 (N.Y. App. Div. 1st Dep't 2009)). "In a hostile work environment claim under the NYCHRL, even a single comment may be actionable in appropriate circumstances." *Gorokhovsky v. N.Y.C. Housing Auth.*, 552 F. App'x 100, 102 (2d Cir. 2014) (summary order) (quoting *Mihalik*, 715 F.3d at 114) (internal quotation marks omitted). The CHRL, however, is "not a general civility code," *Mihalik*, 715 F.3d at 113 (citing *Williams*, 61 A.D.3d at 79), and a claim under the CHRL should be dismissed if the plaintiff alleges conduct that "cannot be said to fall within the broad range of conduct that falls between severe and pervasive on the one hand

---

[10] Accordingly, Defendants' argument that Gordon's hostile work environment claim fails because he has not alleged conditions that are "severe or pervasive" is without merit. (*See* Def. Memo at 18.)

and a petty slight or trivial inconvenience on the other," *Hernandez v. Kaisman*, 103 A.D.3d 106, 114–15 (N.Y. App. Div. 1st Dep't 2012) (internal quotation marks omitted).

Gordon's hostile work environment claim is supported by the same allegations that underlie his claims for disparate treatment and retaliation. Gordon complains of the following conduct: (1) the "negative, false, and manipulated [August 2011 performance] evaluation"; (2) Andes's "constant comments and suggestions that [Gordon] 'did not belong in SLU' or that [Gordon] was better off only writing 'simple motions'"; (3) "the stigma of being under a 'Corrective Action Plan'" in 2012; (4) the fact that the Plan was administered by "at least three supervisors in Queens Tort" who would not have otherwise known of the 2011 evaluation; and (5) his "'demotion' to Queens Tort" in 2012. (Compl. ¶ 203.)[11]

Defendants argue that Gordon has not stated a claim for hostile work environment because Andes's comments were "race neutral." (Def. Memo at 18.) Even without the comments, however, the remaining alleged conduct—Gordon's low 2011 performance evaluation, the Corrective Action Plan, and the "demotion" to Queens Tort—is sufficient to state a claim for hostile work environment under the CHRL. This alleged conduct, while perhaps not "severe and pervasive," is more than just a "trivial inconvenience." Moreover, Gordon alleges that he subjectively perceived the conduct to be abusive; he states that he suffered "mental and

---

[11] Gordon also states that his supervisors created a hostile work environment for all attorneys by "threaten[ing] attorneys . . . with the loss of their job[s]" and "command[ing]" attorneys to "clean the halls and remove very heavy and dirty boxes from the hallway." (Compl. ¶ 204.) He alleges that when attorneys protested, Sanders responded, "in this economy, you should be lucky that you have a job," and that other supervisors made comments that communicated the general message that the Law Department was "ready to fire trouble makers." (*Id.*) These allegations are removed from consideration because, as pleaded, they do not appear to be related to Gordon's status as a member of a protected class. *Alfano v. Costello*, 294 F.3d 365, 377 (2d Cir. 2002).

physical distress" and "humiliation" as a result.  (Compl. ¶¶ 203, 205.)  Finally, as explained

above, Gordon has alleged that these actions were taken against him because he is African

American.  Accordingly, Gordon's complaint, when given the "independent liberal construction"

due to CHRL hostile work environment claims, *Loeffler*, 582 F.3d at 278 (internal quotation

marks omitted), states a claim to relief that is plausible on its face.

      E.    *Monell* **Claim**

Gordon also brings a claim against the City under 42 U.S.C. § 1983.  (Compl. ¶¶ 154-

164.)  Defendants move to dismiss this claim with no more than a paragraph of explanation, in

which they state, in a conclusory fashion, that Gordon has not satisfied the claim's elements.

(Def. Memo at 22-23.)

A local government may not be sued under § 1983 for an injury inflicted solely by its

employees or agents; rather, it is responsible under that statute only when a constitutional or

statutory violation was the result of an official policy or custom.  *Monell v. Dep't of Soc. Servs.*,

436 U.S. 658, 694 (1978).  Accordingly, to recover against a municipality under § 1983, a

plaintiff must prove: (1) "the existence of a municipal policy or custom" beyond merely

employing the misbehaving individuals; and (2) a causal connection between the policy and the

alleged civil rights violation.  *Vippolis v. Vill. of Haverstraw*, 768 F.2d 40, 44 (2d Cir. 1985).  To

satisfy the first requirement on a motion to dismiss, a plaintiff must allege one of the following:

> (1) a formal policy which is officially endorsed by the municipality; (2) actions taken or
> decisions made by government officials responsible for establishing municipal policies
> which caused the alleged violation of the plaintiff's civil rights; (3) a practice so
> persistent and widespread that it constitutes a "custom or usage" and implies the
> constructive knowledge of policy-making officials; or (4) a failure by official policy-
> makers to properly train or supervise subordinates to such an extent that it amounts to
> deliberate indifference to the rights of those with whom municipal employees will come
> into contact.

*Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 390 (S.D.N.Y. 2013).  Gordon asserts two theories of *Monell* liability under § 1983 against the City, both under the third of these bases.

First, Gordon alleges that the City does not use employee evaluations as an "objective, true, and accurate measure of an employee's actual performance," but instead has a "practice" of "manipulat[ing] and custom tailor[ing] evaluations to systematically exclude from equal employment opportunities and financial and professional benefits certain employees based on their membership in a protected class."  (Compl. ¶¶ 156, 159.)  He asserts that this policy was so widespread that Defendant Cardozo, whose job it was to approve promotions to Senior Counsel, "knew or should have known" of complaints about this practice.  (*Id.* ¶ 160.)  Gordon supports this allegation with the facts discussed above—namely that he and another African-American attorney were discriminated against in their employment evaluations and were therefore not promoted to Senior Counsel; that Caucasian attorneys were not discriminated against in their evaluations, and therefore *were* promoted to Senior Counsel; and that "[t]he only ACCs to transfer to other Torts Units from SLU with promotions or raises during [Gordon's] tenure in SLU were Caucasians."  (*Id.* ¶¶ 44-46, 82-83, 85-89.)  Gordon further asserts that this widespread City practice caused the Fourteenth Amendment injury he complains of, namely discrimination on the basis of race.  These allegations are sufficient to state a *Monell* claim against the city.

Second, Gordon claims that "[i]t was . . . the policy, custom, and practice of Defendants to 'steer' minority ACCs of color" to positions in the Bronx and Brooklyn, "where the working conditions in terms of environment were not equal to but were much lower, more dangerous, and economically depressed than the working conditions" in Manhattan and Queens.  (*Id.* ¶ 161.)  He further alleges that such a policy caused him a Fourteenth Amendment injury, when, in 2013, he

28

was not given the option of working in the Queens office, but rather only working in Brooklyn or the Bronx.  (*Id.*)  To support this claim, he alleges that, based on his experience of ten years in the Law Department, the Bronx and Brooklyn "have the greatest concentration of African-American ACCs."  (*Id.* ¶ 112.)  These allegations also make out a sufficiently plausible claim of *Monell* liability against the City.

The Court notes that while "[i]t may well be the case that the [actions of which plaintiff complains were] made and implemented by several rogue [individuals], . . . there is no way for this Court to determine whether a policy is in place until [Gordon] is permitted to take discovery."  *Cantey v. City of New York*, No. 10 Civ. 4043 (JPO), 2012 WL 6771342, at *5 (S.D.N.Y. Dec. 11, 2012) (citing *Jones v. Westchester Cnty. Dep't of Corr. Med. Dept.*, 557 F. Supp. 2d 408, 417 (S.D.N.Y. 2008)).  Defendants' motion to dismiss Gordon's *Monell* claim is denied.

### F.    Conspiracy

Defendants also move to dismiss Gordon's conspiracy claims.  (Def. Memo at 23-24.) Gordon alleges that certain Defendants engaged in a conspiracy to discriminate against him, in violation of 42 U.S.C. §§ 1983 and 1985, and that certain other Defendants failed to act to prevent such a conspiracy, in violation of § 1986.  (Compl. ¶¶ 165-180.)  Specifically, he asserts that Andes, Palomino, Sanders, and Leoussis conspired to doctor his 2011 performance evaluation, to create the 2012 Correction Action Plan, to transfer him to the Queens Tort Division in August 2012, and to reassign him as a trial attorney in the Bronx in 2013.  (*Id.* ¶¶ 167-68, 174-75.)  He further states that some or all of Defendants "knew or should have known of the discriminatory acts," and yet failed to prevent them.  (*Id.* ¶¶ 169-71, 178-79.)

Defendants are correct that these claims fail.  A § 1983 conspiracy claim requires an allegation that a state actor conspired with a *private* actor to violate the plaintiff's constitutional rights.  *See Ciambriello v. Cnty. of Nassau*, 292 F.3d 307, 324 (2d Cir. 2002) (stating that, in order to survive a motion to dismiss on a § 1983 conspiracy claim, a plaintiff must allege, *inter alia*, "an agreement between a state actor and a private party").  Here, Gordon alleges only that various state actors conspired to violate his rights.  Accordingly, his § 1983 claim fails.

Gordon's § 1985 conspiracy claim is barred by the intra-corporate conspiracy doctrine. That doctrine prohibits claims against employees of the same entity acting within the scope of employment, because they "are considered a single entity and are legally incapable of conspiring with each other." *Biswas v. City of New York*, 973 F. Supp. 2d 504, 534-35 (S.D.N.Y. 2013). This doctrine applies here, as the Complaint alleges that Andes, Palomino, Sanders, and Leoussis—all employees of the Law Department—acted within the scope of their employment when they conspired to violate Gordon's constitutional rights.  Specifically, it alleges that they evaluated his work, placed him on a probationary action plan, and transferred him between offices—all tasks that are within the scope of his job as his supervisors and managers.[12]

There is an exception to the intra-corporate conspiracy doctrine, however, "when individual employees are pursuing interests wholly separate and apart from the entity." *Anemone v. Metro. Transp. Auth.*, 419 F. Supp. 2d 602, 604 (S.D.N.Y. 2006).  Gordon argues that this

---

[12] Gordon argues that the individuals were acting outside the scope of their employment because they were violating his constitutional rights, and "[v]iolating a person's constitutional rights can never be held to be 'within the scope of an employee[']s duties or responsibilities.'"  (Pl. Memo at 22-23.)  This argument has no merit; "if such [allegations] sufficed to avoid dismissal under the intracorporate conspiracy doctrine, then the limited exception to the . . . doctrine would swallow the rule." *Johnson v. Cnty. of Nassau*, No. 10 Civ. 6061 (JFB) (GRB), 2014 WL 4700025, at *22 (E.D.N.Y. Sept. 22, 2014) (internal quotation marks omitted).

exception applies here because "Andes was in part motivated to commit unlawful acts in order to preserve his job which paid him a salary over $100,000 per year under circumstances where tacit and overt threats of job loss were made within SLU." (Pl. Memo at 24.)  This allegation, however, does not appear in the Complaint, or in the documents incorporated into the Complaint by reference.  Rather, it appears in a document that is attached to the affirmation that Gordon filed with his brief opposing the motion to dismiss.  (*See* Dkt. No. 25 ("Gordon Aff.") Ex. D at 9.)  "It is well established that 'a complaint may not be amended by the briefs in opposition to a motion to dismiss.'"  *Chamberlain*, 986 F. Supp. 2d at 390 n.19 (quoting *Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998)).

Moreover, even were the Court to consider these new allegations, Gordon's argument fails.  The pertinent document here, Gordon's reply to the Law Department's response to his 2012 EEOC complaint, includes the suggestion that Andes followed the policy of his superiors because he could "ill afford to run afoul" of them during "such threatening economic times." (Gordon Aff. Ex. D at 9.)  Following an employer's policy so as to keep one's job, however, is an interest aligned with the interests of the employer.  It is not "wholly separate and apart from the entity" in question, and therefore the exception to the intra-corporate conspiracy doctrine does not apply.

Because "a § 1986 claim must be predicated on a valid § 1985 claim," Gordon's § 1986 claim fails as well.  *Brown v. City of Oneonta*, 221 F.3d 329, 341 (2d Cir. 1999).

### G.    Individual Liability

Finally, Defendants move to dismiss all claims against the individual defendants.  (Def. Memo at 20-22.)  Defendants' argument for dismissal appears to be based entirely on their other arguments for dismissal:  that is, they assert that because Gordon has not plausibly alleged any

statutory or constitutional violations, he has not alleged any statutory or constitutional violations against the individual defendants.  (*See id.*)  This argument fails in light of the Court's determination that Gordon has, in fact, alleged several plausible claims for relief.

Moreover, Gordon has specifically pleaded that each Defendant was personally involved in the discriminatory actions, either by directly performing the actions, or aiding and abetting the performance of the actions.  (*See* Compl. ¶¶ 188-194.)  He alleges, among other things, that Andes, Santoro, Palomino, Sanders, and Leoussis, as supervisors in SLU, were responsible for his discriminatory performance evaluation (*Id.* ¶¶ 61-62, 190); that Leoussis placed him on the Corrective Action Plan (*id.* ¶ 103); and that all Defendants, as supervisors at SLU or the Tort Division, were responsible for his transfer from SLU to the Queens Tort Division (*id.* ¶¶ 109, 133-34).[13]

## IV.    Conclusion

For the foregoing reasons, Defendants' motion to dismiss the complaint is GRANTED as to Claims Seven (§ 1983 conspiracy), Eight (§ 1985 conspiracy), Nine (§ 1986 failure to prevent conspiracy), and Sixteen (disparate impact), and DENIED as to all other claims.  The Clerk of Court is directed to close the motion at Docket Number 18.

SO ORDERED.

Dated:  June 2, 2015
      New York, New York

                                       J. PAUL OETKEN
                             United States District Judge

COPY MAILED TO *PRO SE* PARTY

---

[13] Defendants also argue that the Title VII claims against the individual defendants must be dismissed because Title VII does not provide for individual liability.  (Def. Memo at 20.)  The Court agrees with Gordon, however, that this argument is moot because Gordon "did not plead any claims against the individual Defendants in their individual capacity pursuant to Title VII." (Pl. Memo at 20.)