UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - -:

ROBERT W. GORDON, ESQ.,                     :    14 Civ. 6115 (JPO) (JCF)
                                            :
              Plaintiff,                    :        MEMORANDUM
                                            :        AND   ORDER
        - against -                         :
                                            :
THE CITY OF NEW YORK, MARC ANDES,           :
MARK PALOMINO, GAYLE SANDERS, FAY           :
LEOUSSIS, MICHAEL A. CARDOZO, DAVID:
SANTORO, JOHN DOE(S) AND JANE               :
DOE(S) (names currently unknown),           :
each in his/her official and                :
individual capacities,                      :
                                            :
              Defendants.                   :
- - - - - - - - - - - - - - - - - - -:

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

```
+---------------------------------+
| USDS SDNY                       |
| DOCUMENT                        |
| ELECTRONICALLY FILED            |
| DOC #: _____        |
| DATE FILED:  9/2/16             |
+---------------------------------+
```

        In this employment discrimination action against various
employees of the New York City Law Department (the "Law
Department") and the City of New York (collectively, the "City"),
the plaintiff, Robert W. Gordon, seeks to amend his complaint to
allege that a number of employment practices utilized at the Law
Department had a disparate impact on African-American attorneys.
The plaintiff's motion is granted.

Background

        The factual background, as alleged in the original complaint,
is set out in a prior opinion of the Honorable J. Paul Oetken,
U.S.D.J., see Gordon v. City of New York, No. 14 Civ. 6115, 2015 WL
3473500 (S.D.N.Y. June 2, 2015); a truncated review of the alleged
facts is sufficient here.

        Mr. Gordon joined the Law Department in 2004 as an Assistant
Corporation Counsel ("ACC") in the Manhattan Trial Unit of the

1

Torts Division.  Id. at *1.  After he complained about training and efficiency problems in the department, he received a score of "4" on his 2005 performance evaluation -- the second lowest score on the five-point evaluation scale -- assertedly in retaliation for his letter of complaint.  Id.  Mr. Gordon was subsequently transferred to the Queens Tort Division, where he received a performance rating of "2" on his 2006 evaluation.  Id. at *2.  In 2007, he was transferred from the Queens Tort Division to the Special Litigation Unit, reportedly an "elite" unit of the Torts Division.  Id.  In 2008, the Law Department introduced the "enhanced" Senior Counsel Program, which lowered the tenure requirements for promotion to the position of Senior Counsel from five years with the Law Department to three years.  Id.; (Complaint, ¶ 51).  Although Mr. Gordon had been employed at the Law Department for more than three years at that time, he was not promoted.  Id. at *3.  He was passed over again in 2009 and 2010, although he again received performance ratings of "2" in those years and "continued to receive positive feedback" from his supervisor.  Id.

Things changed after the plaintiff's 2010 evaluation. Superiors of his supervisor apparently believed that Mr. Gordon's evaluations were too high.  Id.  Subsequently, Mr. Gordon's supervisor called his work "sub-standard" and suggested that the plaintiff would be better suited for a "borough unit" where he could focus on "simple motions," rather than "the complex motions [addressed] in [the Special Litigation Unit]."  Id.  The plaintiff

received a performance rating of "3.5" in 2011.   Id.

After his 2011 evaluation, Mr Gordon took a one-year leave of absence to teach law at a university in South Korea.   Id. at *4. While overseas, Mr. Gordon learned that two Caucasian ACCs who had less seniority within the Special Litigation Unit than he did had been promoted to Senior Counsel.   Id. He outlined his objections to his Law Department supervisor, who "refused to discuss or review the [2011] evaluation."   Id.   Mr. Gordon thereafter filed a complaint of discrimination with the EEOC.   Id. When he returned to the Law Department in 2012, he was transferred back to the Queens Tort Division and placed on a "Corrective Action Plan" by supervisors.   Id.

In 2013, the Queens Borough Chief told the plaintiff that he was likely to be offered a full-time trial position.   Id. However, when the offer came, it was for a position in Brooklyn or the Bronx, two "less favored boroughs."   Id.   After he accepted a position in the Bronx, "a trial position 'suddenly' opened up in Queens" and was filled by a Caucasian attorney.   Id.

The original complaint's sixteen causes of action included claims for disparate treatment pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq.; 42 U.S.C. § 1981; the New York State Human Rights Law ("NYSHRL"), N.Y. Exec. Law § 290 et seq.; and the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin. Code § 8-101 et seq.; as well as claims

disparate impact under Title VII and the NYSHRL.[1]  Gordon, 2015 WL
3473500, at *6, 11.  Specifically, he alleged that the defendants
discriminated against him when they (1) "failed to promote him to
Senior Counsel between August 2010 and his receiving the low
performance evaluation in August 2011," (2) "gave him an
undeservedly low performance score on his 2011 evaluation," and (3)
"gave him the choice of a full-time trial attorney position in
Brooklyn or the Bronx, but not Queens."  Id. at *7-8.  He further
asserted that "'the evaluation practices' of [the] [d]efendants
'resulted in a disparate impact, such that . . . no African-
American ACCs were promoted while they were in [the Special
Litigation Unit] during the relevant time periods, whereas . . . at
least 30% to 40% of Caucasian, similarly situated ACCs were
promoted to Senior Counsel."  Id. at *11 (first ellipses in
original) (quoting Complaint, ¶ 207).  According to the plaintiff,
the Law Department's "subjective promotional practices" and its
"use of non-diverse managers to make promotion and selection
recommendations" caused the discrepancy.  (Memorandum of Law in
Support of Plaintiff's Motion for Leave to File and Serve an
Amended Complaint at 11-12; Complaint at ¶¶ 83, 92, 207).

Judge Oetken denied the City's motion to dismiss as to the
disparate treatment claims, but granted it as to the disparate
impact claims.[2]  Gordon, 2015 WL 3473500, at *7-11.  However, he

_____

[1] Mr. Gordon originally filed this action pro se, Gordon, 2015
WL 3473500, at *1, but is now represented by counsel.

[2] Judge Oetken also dismissed claims for conspiracy under 42
U.S.C. §§ 1983 and 1985, and failure to prevent conspiracy under 42

agreed with the defendants that Mr. Gordon had "failed to identify a <u>neutral policy</u> that is alleged to have a disproportionate impact on African Americans." <u>Id.</u> at *11.  As Judge Oetken explained:

> The "evaluation practices" Gordon refers to are not facially neutral.  As pleaded elsewhere in the Complaint, they are practices of "manipulat[ing] and custom tailor[ing] evaluations to systematically exclude from equal employment opportunities and financial and professional benefits certain employees based on their membership in a protected class."  (Compl. ¶ 156.)  "Rather than identify a neutral employment policy with a statistically significant adverse impact, plaintiff argues . . . that he was subjected to deliberate discriminatory conduct," and therefore "[h]is arguments better resonate in support of [his] claim for disparate treatment."  <u>Rodriguez v. Beechmont Bus [Service], Inc.</u>, 173 F. Supp. 2d 139, 148 (S.D.N.Y. 2001).

<u>Id.</u> (alterations in original).

The plaintiff's proposed amended complaint attempts to plead disparate impact claims under Title VII, the NYSHRL, and the NYCHRL.  Mr. Gordon alleges seven "race-neutral policies that have a disparate impact on the success and promotion of African-American ACCs working for the Law Department."  ([Proposed] Amended Complaint ("Proposed Complaint"), attached as Exh. 1 to Declaration of Samuel O. Maduegbuna dated May 27, 2016, ¶ 171).

> (1) Managers are able to "use discretion to raise or lower numerical [evaluation] scores that deviate from the numerical scoring guides based on whether managers want to aid or 'encourage' a specific employee";
>
> (2) Managers "include unidentified criteria in addition to an ACC's numerical evaluation score when making promotional recommendations";

---

U.S.C. § 1986.  <u>Gordon</u>, 2015 WL 3473500, at *17-18.  In addition to the disparate treatment claims, claims for retaliation and hostile work environment, as well as for municipal liability, survived. <u>Id.</u> at *13, 15-16.

(3) Managers use "a floating or varying numerical cut-off score in which employees that rate below a qualifying score in their performance evaluation can be promoted using managerial discretion";

(4) Managers engage in "cronyism in which favored employees and friends receive higher evaluation scores and recommendation for promotion";

(5) Non-diverse managers make promotion recommendations;

(6) Final decision-makers in the Law Department do not conduct blind review of promotional recommendations; and

(7) Managers have "allow[ed] 19 non-African American attorneys to be promoted before attaining 5 years of Law Department experience while no African Americans have been accepted for the Enhanced [Senior Counsel] program and those African-American attorneys with 5 years or more experience . . . have lost out on deserved promotions" to non African-American attorneys with less experience.

(Proposed Complaint, ¶¶ 173-79).

Discussion

Rule 15 of the Federal Rules of Civil Procedure provides that courts should "freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2); see also Foman v. Davis, 371 U.S. 178, 182 (1962); Aetna Casualty and Surety Co. v. Aniero Concrete Co., 404 F.3d 566, 603-04 (2d Cir. 2005). "This permissive standard is consistent with [the Second Circuit's] 'strong preference for resolving disputes on the merits.'" Williams v. Citigroup Inc., 659 F.3d 208, 212-13 (2d Cir. 2011) (quoting New York v. Green, 420 F.3d 99, 104 (2d Cir. 2005)). Motions to amend should therefore be denied only for good reasons, including undue delay, bad faith or dilatory motive, undue prejudice to the non-moving party, or futility. See Burch v. Pioneer Credit Recovery, Inc., 551 F.3d 122, 126 (2d Cir. 2008)

(citing <u>Foman</u>, 371 U.S. at 182); <u>McCarthy v. Dun & Bradstreet Corp.</u>, 482 F.3d 184, 200 (2d Cir. 2007).  The party opposing amendment has the burden of establishing that amendment would be futile or otherwise inappropriate.  <u>Allison v. Clos-ette Too, L.L.C.</u>, No. 14 Civ. 1618, 2015 WL 136102, at *2 (S.D.N.Y. Jan. 9, 2015); <u>Ferring B.V. v. Allergan, Inc.</u>, 4 F. Supp. 3d 612, 618 (S.D.N.Y. 2014); <u>Charney v. Zimbalist</u>, No. 07 Civ 6272, 2014 WL 963734, at *1 (S.D.N.Y. March 12, 2014).  The court has broad discretion over motions to amend.  <u>See</u> <u>McCarthy</u>, 482 F.3d at 200.

A.   <u>Law of the Case</u>

The City eschews the conventional Rule 15 analysis, couching their opposition as a straightforward application of the law of the case doctrine.  The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case."  <u>Arizona v. California</u>, 460 U.S. 605, 618 (1983).  "Application of the doctrine is 'discretionary and does not limit a court's power to reconsider its own decisions prior to final judgment.'"  <u>U.S. Bank National Association ex rel. Lima Acquisition LP v. PHL Variable Insurance Co.</u>, Nos. 12 Civ. 6811, 13 Civ. 1580, 2014 WL 998358, at *3 (S.D.N.Y. March 14, 2014) (quoting <u>DiLaura v. Power Authority of New York</u>, 982 F.2d 73, 76 (2d Cir. 1992)).  At the same time, while "[a] court has the power to revisit prior decisions of its own or of a coordinate court in any circumstance, [] as a rule courts should be loathe to do so in the absence of extraordinary circumstances such as where the initial decision was

'clearly erroneous and would work a manifest injustice,'" Christianson v. Colt Industries Operating Corp., 486 U.S. 800, 817 (1988) (quoting Arizona, 460 U.S. at 618 n.8), or where there has been a change in controlling law or new evidence has become available, United States v. Plugh, 648 F.3d 118, 123-24 (2d Cir. 2011). "Additionally, the law of the case doctrine 'only forecloses consideration of issues that have already been decided.'" U.S. Bank, 2014 WL 998358, at *4 (quoting Steinfeld v. Marks, No. 96 Civ. 552, 1997 WL 563340, at *3 (S.D.N.Y. Sept. 8, 1997)); see also Gary Friedrich Enterprises, LLC v. Marvel Enterprises, Inc., No. 08 Civ. 1533, 2008 WL 4129640, at *3 (S.D.N.Y. Sept. 4, 2008) (doctrine applies when issues presented are "identical to those previously addressed"). So precisely what issues did Judge Oetken decide when he dismissed the plaintiff's disparate impact claims?

In its motion to dismiss, the City noted that, in support of his disparate impact claim, Mr. Gordon "merely allege[d] that '[t]he evaluation practices of the [d]efendants resulted in a disparate impact, such that, but not limited to, no African-Americans ACCs were promoted while they were in [the Special Litigation Unit] during the relevant time periods, whereas . . . at least 30% to 40% of Caucasian, similarly situated ACC's [sic] were promoted to Senior Counsel while they were in [the unit].'" (Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint ("Def. MTD Memo.") at 19 (quoting Complaint, ¶ 207)). They then pointed to three allegations about the evaluation process

8

from the original complaint -- that the Law Department (1) intentionally and artificially lowered Mr. Gordon's 2005 performance rating (Complaint, ¶ 25); (2) intentionally manipulated evaluations in order to exclude members of a protected class from employment opportunities (Complaint, ¶ 156); and (3) intentionally required early draft evaluations in order to gain the opportunity to manipulate the evaluations of members of a protected class based on "invidious discriminatory animus" (Complaint, ¶ 191) -- to argue that the plaintiff had "not contend[ed] that the 'evaluation practices' about which he complains are facially neutral." (Def. MTD Memo. at 19-20). Finally, the City asserted that Mr. Gordon could not "establish a statistical disparity premised upon one person being the universe for statistical comparison." (Def. MTD Memo. at 20). In response, the plaintiff argued that statistical evidence was not needed at the pleading stage and that, even if it were, the complaint adequately alleged a statistically significant disparity. (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint at 18-19).

That is the context in which Judge Oetken dismissed the plaintiff's disparate impact claims. He noted that the complaint alleged a statistical disparity indicating discrimination that, in turn, deprived Mr. Gordon of equal employment opportunities. Gordon, 2015 WL 3473500, at *11. However, he focused on the City's argument that the plaintiff "failed to identify a neutral policy that is alleged to have a disproportionate impact on African Americans. Id. He then pointed to the complaint's allegation that

the Law Department intentionally manipulated evaluations in order
to exclude members of a protected class from employment
opportunities (Complaint, ¶ 156), to determine that Mr. Gordon had
alleged only a disparate treatment claim, and not a disparate
impact claim. Id. That is, Judge Oetken ruled only that the
original complaint had not pleaded a disparate impact claim because
the facts as presented focused on intentional discrimination and
its effects; he did not hold that those or similar facts are
incapable of supporting a disparate impact claim if presented
differently.

In his proposed amended complaint, Mr. Gordon has added
several allegations that characterize certain Law Department
evaluation practices as neutral procedures that cause a disparate
impact on African-American ACCs. (Proposed Complaint, ¶¶ 2, 48-57,
77-83, 87-92, 125, 166-92). As the proposed amended complaint is
not functionally identical to the original complaint -- perhaps
most obviously because the support for a disparate impact claim is
significantly clearer in the new pleading -- the law of the case
doctrine is a flawed vehicle for the City's motion. Compare Gurvey
v. Cowan, Leibowitz & Latman, P.C., No. 06 Civ. 1202, 2015 WL
4460859, at *3, 6 (S.D.N.Y. July 21, 2015) (denying motion to amend
pursuant to law of the case doctrine where "there is no material
difference" between amended complaint and previous complaint) with
Kregler v. City of New York, 821 F. Supp. 2d 651, 658 (S.D.N.Y.
2011) (finding that law of the case doctrine does not control where
amended complaint added detail and advanced different theory of

liability).

B.   <u>Futility</u>

The flaw is not necessarily fatal, however.  A main thrust of
the City's brief is that the new allegations in the proposed
complaint are just as deficient as those in the original complaint.
That is, the City, in effect, argues that the amendment is futile
because the new allegations could not survive a motion under Rule
12(b)(6) of the Federal Rules of Civil Procedure.

1.   <u>Facially Neutral Practices</u>

"To make out a prima facie disparate impact case, a plaintiff
[] must '(1) identify a specific employment practice or policy; (2)
demonstrate that a disparity exists; and (3) establish a causal
relationship between the two.'"  <u>Barrett v. Forest Laboratories,
Inc.</u>, 39 F. Supp. 3d 407, 428 (S.D.N.Y. 2014) (quoting <u>Chin v. Port
Authority of New York & New Jersey</u>, 685 F.3d 135, 151 (2d Cir.
2012)).  A plaintiff need not "plead facts sufficient to establish
a prima facie case" in his complaint in order to survive a motion
to dismiss.  <u>Jenkins v. New York City Transit Authority</u>, 646 F.
Supp. 2d 464, 469 (S.D.N.Y. 2009).  However, the plaintiff should
identify a "facially neutral" policy or practice -- that is, a
policy or practice that applies equally to individuals regardless
of their race, color, religion, sex, or national origin, and was
"adopted without discriminatory intent," <u>Watson v. Fort Worth Bank
and Trust</u>, 487 U.S. 977, 990 (1988) -- that, in fact, causes a
disparate impact on a protected class.  <u>See</u> <u>Barrett</u>, 39 F. Supp. 3d
at 428-29; <u>Briscoe v. City of New Haven</u>, 967 F. Supp. 2d 563, 589

(D. Conn. 2013) ("One of the forms that proscribed discrimination can take is an employment practice, taken in good faith and for non-discriminatory reasons, which nonetheless has a disparate impact upon persons of a protected group, such as African Americans.").

The City contends that most of the plaintiff's disparate impact allegations are merely disparate treatment allegations in fancy dress. That is, it argues that the only way that many of the seven practices or policies that the plaintiff identifies could have a discriminatory effect is through the application of intentional discrimination. The first two alleged practices -- that evaluation scores are raised and lowered based on non-articulated criteria, such as a desire to "encourage" certain ACCs -- are, according to the City, "simply an attempt to recast as 'neutral practices' [the] plaintiff's core claim that the Law Department intentionally manipulates the preparation of employee evaluations and promotion recommendations to discriminate on the basis of race." (Memorandum of Law in Opposition to Plaintiff's Motion for Leave to Amend the Complaint ("Def. Amend. Memo.") at 8). The City makes similar arguments regarding Mr. Gordon's allegations of cronyism, the Law Department's use of non-diverse managers to make promotions recommendations, and the failure of the Law Department to conduct blind reviews of promotion recommendations. (Def. Amend. Memo. at 9-10).

The same conduct can form the basis of a disparate treatment claim and a disparate impact claim, as the two theories "are simply

12

alternative doctrinal premises for a statutory violation." Maresco v. Evans Chemetics Division of W.R. Grace & Co., 964 F.2d 106, 115 (2d Cir. 1992); accord Wright v. Stern, 450 F. Supp. 2d 335, 369 (S.D.N.Y. 2006). "There is nothing inconsistent in acting with intent to discriminate while adopting a facially neutral policy that has a disparate impact; the two are not mutually exclusive." Wright, 450 F. Supp. 2d at 369. Moreover, since its adoption, Rule 8(e)(2) of the Federal Rules of Civil Procedure has allowed a litigant to plead different causes of action or defenses in the alternative. 5 Charles E. Wright and Arthur R. Miller, Federal Practice and Procedure § 1282 (3d ed. 2007) (noting that drafters of Rule 8(e)(2) permitted party to "plead alternatively . . . within a single count or defense, or assert separate claims or defenses in an alternative or multiple manner").

To be sure, in order to proceed under both disparate treatment and disparate impact theories, the "allegations must be sufficient to support both theories." Zawacki v. Realogy Corp., 628 F. Supp. 2d 274, 281 (D. Conn. 2009). Allegations that employment practices "[are] nothing more than a cover for behind-the-scenes, intentional discrimination" against a protected group will not suffice. Id. However, a "neutral" employment practice need not be an objective employment practice. That is, even an employment practice that includes the opportunity for a manager to subjectively evaluate an individual can serve as the basis for a disparate impact claim. The Supreme Court made this clear decades ago in Watson:

> We are [] persuaded that disparate impact analysis is in
> principle no less applicable to subjective employment

> criteria than to objective or standardized tests. . . .
> [A] facially neutral practice, adopted without
> discriminatory intent, may have effects that are
> indistinguishable from intentionally discriminatory
> practices. It is true, to be sure, that an employer's
> policy of leaving promotion decisions to the unchecked
> discretion of lower level supervisors should itself raise
> no inference of discriminatory conduct. Especially in
> relatively small businesses . . . , it may be customary
> and quite reasonable simply to delegate employment
> decisions to those employees who are most familiar with
> the jobs to be filled and with the candidates for those
> jobs.   It does not follow, however, that the particular
> supervisors to whom this discretion is delegated always
> act without discriminatory intent.  Furthermore, even if
> one assumed that any such discrimination can be
> adequately policed through disparate treatment analysis,
> the problem of subconscious stereotypes and prejudices
> would remain.

Watson, 487 U.S. at 990; see also Wal-Mart Stores, Inc. v. Dukes,

564 U.S. 338, 355 (2011) ("[W]e have recognized that, 'in

appropriate cases,' giving discretion to lower-level supervisors

can be the basis of Title VII liability under a disparate-impact

theory -- since 'an employer's undisciplined system of subjective

decisionmaking [can have] precisely the same effects as a system

pervaded by impermissible intentional discrimination.'" (alteration

in original) (quoting Watson, 487 U.S. at 990-91)); Hung Ping Wang

v. Hoffman, 694 F.2d 1146, 1147 (9th Cir. 1982) ("This is both a

disparate impact and a disparate treatment case under Title VII.

First, [the plaintiff] contends that the promotion selection

process permitted a discriminatory impact on minority groups

because it is predominantly subjective and provides inadequate

objective guidelines.  Second, [he] contends that application of

the selection process to him resulted in discriminatory treatment."

(internal citation omitted)).

Examined as supplements or alternatives to his allegations of disparate treatment, Mr. Gordon's claims of disparate impact are sufficient to overcome the City's masquerade argument. For example, nothing in the allegations regarding modification of evaluation scores for non-articulated criteria requires that the adjustments were made in order to discriminate against individuals because they were members of a protected class. (Proposed Complaint, ¶¶ 48-57). The disparate effects of the Law Department's employment procedures could easily be caused by, for example, "subconscious stereotypes and prejudices," Watson, 487 U.S. at 990, and, fairly read, the Proposed Complaint allows that interpretation. Similarly, the allegations of cronyism, by which "favored employees and friends" received higher evaluation scores resulting in a disparate impact on African-American ACCs is not merely an attempt to recast disparate treatment as disparate impact. Indeed, courts have recognized the cronyism can form the basis of a disparate impact claim, such as where it results in Caucasian employees receiving "preferential treatment in terms of opportunities, titles, and compensation." Hagan v. City of New York, 39 F. Supp. 3d 481, 489-90, 499 (S.D.N.Y. 2014) ("It is well established that cronyism can form the basis of a disparate impact claim where the plaintiff is able to show a pattern of favoritism that closes a protected class out of jobs or contracts." (quoting Harris v. Hays, 452 F.3d 714, 721 (8th Cir. 2006))). Mr. Gordon quite clearly alleges that cronyism in the Law Department "has a disparate impact on African-American attorneys because the

15

reviewing managers are overwhelmingly Caucasian and provide higher scores to their friends who tend to be non-minorities." (Proposed Complaint, ¶ 57).

The City also asserts that Mr. Gordon's claim based on a "floating or varying numerical cut-off score in which employees that rate below a qualifying score . . . can be promoted using managerial discretion" must fail because he "does not cite to [sic] any evidence in the record to support this contention" and because some evidence adduced in discovery appears to contradict the allegation. (Def. Amend. Memo. at 8). That argument is more appropriate to a summary judgment motion than a motion to amend in which the allegations in the complaint are to be taken as true.[3] See, e.g., Da Cruz v. Towmasters of New Jersey, Inc., 217 F.R.D. 126, 128-29 & n.1 (E.D.N.Y. 2003). Similarly, the City points to deposition testimony from the former Corporation Counsel for the City of New York that assertedly undercuts Mr. Gordon's claim that the Enhanced Senior Counsel Program (by which ACCs with fewer than five years experience were eligible for promotion) disparately impacted African-American ACCs. (Def. Amend. Memo. at 8-9). To the extent that the contention requires recourse to evidence

---

[3] If discovery were complete, a summary judgment standard would be appropriate to evaluate a motion to amend. See, e.g., Summit Health, Inc. v. APS Healthcare Bethesda, Inc., 993 F. Supp. 2d 379, 403 (S.D.N.Y. 2014). However, this motion was filed prior to the close of discovery. Moreover, I have neither considered nor reviewed any of the evidence submitted in connection with this motion.

adduced in discovery, it is also premature.[4]

Finally, the City asserts that the plaintiff's allegations of
a "failure to conduct blind review of promotional recommendations
at the final level of decision making within the Corporation
Counsel's office" (Proposed Complaint, ¶ 178) are insufficient
because "[t]his is not even alleged to be a current practice --
rather it is a failure to engage in a practice -- and thus cannot
be asserted as a putative existing neutral practice." (Def. Amend.
Memo. at 10).  This argument is frivolous.  The practice at issue
is the Law Department's final decision-making process regarding
promotions, and the point is that the managers who perform that
review know the identities of the candidates who have been
recommended for promotion.  This can cause a disparate impact
through favoritism or unconscious racism or any number of other

---

[4] The City's substantive argument on this point is
bewildering.  It asserts that the Enhanced Senior Counsel Program
"had a limited existence of two years, 2008 and 2009, after which
it could no longer continue because of budget reductions." (Def.
Memo. at 10-11).  The City then appears to assert that Mr. Gordon
was eligible for promotion under the program in both of those
years. (Def. Amend. Memo. at 11).  It does not contend that any
disparate impact claim based on the program at issue is time-
barred, even though the plaintiff has already disavowed reliance on
Title VII claims accruing prior to July 16, 2011, and NYSHRL and
NYCHRL claims accruing prior to August 5, 2011.  Gordon, 2015 WL
3473500, at *6 ("Gordon says that he does not intend to seek relief
for the allegations that [the] [d]efendants identify as time-
barred."); (Def. MTD Memo. at 8-9).  The import of these facts is
therefore lost on me.  And the City's insistence that "no attorney
during that period received a promotion . . . with less than an
overall rating of '1.5'" (Def. Amend. Memo. at 11) seems to miss
the point of Mr. Gordon's disparate impact arguments, which include
contentions that African-American ACCs received unfairly low
evaluation scores and non-African-American ACCS received unfairly
high evaluation scores because of unintentional managerial
discrimination or a failure to cabin managers' discretion
effectively.

behaviors that are not intentionally discriminatory.

     2.  <u>Causation</u>

The City also argues that the Proposed Complaint "fails to plausibly allege a causal relationship between the[] [identified] policies and what happened to [Mr. Gordon]."[5] (Def. Amend. Memo. at 11). They first assert that Mr. Gordon "is really claiming that his failure to receive a promotion to Senior Counsel prior to 2014 . . . is due to the intentionally manipulated system which [he] contends resulted in his failure to receive [a sufficiently high] evaluation rating." (Def. Amend. Memo. at 11-12). As explained above, Mr. Gordon's disparate impact allegations are not merely disparate treatment claims in different clothing, so the City's suggestion again fails.

Next, the City attacks the statistical allegations Mr. Gordon includes in his Proposed Complaint, asserting that the "sample size is too small to be statistically significant" (Def. Amend. Memo. at 13) and that the populations compared are inapt because rather than comparing "the total number of African-American attorneys in [the Special Litigation Unit] or in [the] Torts [Division] as a whole promoted as compared to White attorneys in [the Special Litigation Unit] or in [the] Torts [Division] as a whole" (Def. Amend. Memo. at 12), the plaintiff should compare "the racial composition of attorneys eligible for Senior Counsel promotion as compared with

---

[5] This is, in itself, an odd way to introduce the argument, as a disparate impact claim is concerned with an employment practice's effect on a group, not its impact on an individual. <u>See</u> <u>Briscoe</u>, 967 F. Supp. 2d at 590.

those actually promoted" (Def. Amend. Memo. at 14).

A disparate impact claim need not allege "that an employer's policy has had a statistically significant, disproportionate, and negative effect on one protected group as compared to others" in order to survive a motion to dismiss; rather, statistical support for such a claim is unnecessary. Jenkins, 646 F. Supp. 2d at 469; see also Barrett, 39 F. Supp. 3d at 436 & n.11. Indeed, an allegation on information and belief that a neutral practice denied equal employment opportunities to a small number of members of a protected class compared to similarly-situated colleagues suffices. See Barrett, 39 F. Supp. 3d at 436 ("The allegations that ten [p]laintiffs received lower base pay than similarly-situated male colleagues are sufficient to plead a gender-based disparity."); Jenkins, 646 F. Supp. 2d at 470 (allegation that plaintiff was terminated because her religion prevented compliance with policy requiring bus operators to wear trousers states disparate impact claim).

To be sure, it is generally inadequate merely to assert that "there is a bottom line racial imbalance in the work force" without connecting it to any employment policy. Brown v. Coach Stores, Inc., 163 F.3d 706, 712 (2d Cir. 1998); see also Brown v. Coach Stores, 30 F. Supp. 2d 611, 613 (S.D.N.Y. 1997) (dismissing complaint that alleged merely a racially-imbalanced work force at corporation without connecting imbalance to any specific employment practice). But here, Mr. Gordon does more than that. He identifies seven employment practices and asserts that they impact

African-American ACCs negatively in comparison with non-African-American ACCs both in the Special Litigation Unit and in the Torts Division overall. (Proposed Complaint, ¶¶ 171-179). He backs this up with more specific allegations of racial imbalance: for example, he asserts that between 2004 and 2012, in the Special Litigation Unit comprising six African-American ACCs and eighty-two non-African-American ACCs, nineteen non-African-American ACCs were promoted and no African-American ACCs were promoted. (Proposed Complaint, ¶ 181). Extending that period two years to 2014, twenty-one non-African-American ACCs and one African-American ACC were promoted. (Proposed Complaint, ¶ 182). These allegations are significantly more robust than a mere contention of "a bottom line racial imbalance in the work force" unconnected to any employment policy.[6]  Brown, 163 F.3d at 712.  The allegations state a disparate impact claim under Title VII and the NYSHRL, which "are analyzed using the same standards," Darrell v. Consolidated Edison Co. of New York, No. 01 Civ. 8130, 2004 WL 1117889, at *10

---

[6] Most of the cases the City cites in support of its argument concern either summary judgment motions or claims that had already gone to trial.  (Def. Amend. Memo. at 12-14 (citing, in order, Tsombanidis v. West Haven Fire Department, 352 F.3d 565 (2d Cir. 2003) (reviewing decision after bench trial); Brown, 163 F.2d at 706 (reviewing decision on motion to dismiss); Lowe v. Commack Union Free School District, 886 F.2d 1364 (2d Cir. 1989) (reviewing judgment after jury trial); Vidal v. Metro-North Commuter Rail Co., No. 12 CV 248, 2014 WL 3868027 (D. Conn. Aug. 6, 2014) (decision on motion for summary judgment); Teasdale v. City of New York, No. 08 CV 1684, 2013 WL 5300699 (E.D.N.Y. Sept. 18, 2013) (decision on motion for summary judgment); Smith v. Xerox Corp., 196 F.3d 358 (2d Cir. 1999) (reviewing grant of summary judgment); Chin, 685 F.3d at 135 (reviewing judgment after jury verdict)).  The City will have its opportunity to make arguments based on the evidence at the proper time.

(S.D.N.Y. May 18, 2004), and under the "more lenient standard applied to claims brought under the NYCHRL," Teasdale v. New York City Fire Department, FDNY, 574 F. App'x 50, 52 (2d Cir. 2014).

Conclusion

For the foregoing reasons, the plaintiff's motion to amend his complaint (Docket no. 62) is granted.  With five days of the date of this order, the plaintiff shall file the Amended Complaint.

SO ORDERED.

JAMES C. FRANCIS IV
UNITED STATES MAGISTRATE JUDGE

Dated: New York, New York
       September 2, 2016

Copies transmitted this date:

Samuel O. Maduegbuna, Esq.
William W. Cowles, II, Esq.
Maduegbuna Cooper LLP
30 Wall St., 8th Floor
New York, NY 10005

Bruce Rosenbaum, Esq.
New York City Law Department
100 Church St.
New York, NY 10007

21