UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ROBERT W. GORDON, ESQ.,<br>                              Plaintiff,<br><br>                    -v-<br><br>THE CITY OF NEW YORK, MARC<br>ANDES, MARK PALOMINO, GAYLE<br>SANDERS, FAY LEOUSSIS, MICHAEL<br>A. CARDOZO, DAVID SANTORO, JOHN<br>DOE(S) AND JANE DOE(S) (names<br>currently unknown) each in his/her official<br>and individual capacities,<br>                              Defendants. | 14-CV-6115 (JPO)<br><br>OPINION AND ORDER |

J. PAUL OETKEN, District Judge:

        This case involves claims against the City of New York ("the City") and several of its

officials pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et*

*seq.*; 42 U.S.C. §§ 1981 and 1983; the New York State Human Rights Law ("NYSHRL"), N.Y.

Exec. Law § 290 *et seq.*; the New York City Human Rights Law ("NYCHRL"), N.Y.C. Admin.

Code § 8-101 *et seq.*; and the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C.

§ 2601 *et seq.*  Plaintiff Robert W. Gordon ("Gordon"), an African-American attorney formerly

employed by the New York City Law Department ("the Law Department"), claims that the City

of New York and six employees of the Law Department (collectively, "Defendants")

discriminated against him on the basis of race and employed facially neutral practices that have a

disparate impact on African Americans.  Gordon further alleges that he was subjected to a hostile

work environment and retaliated against for filing a complaint with the Equal Employment

Opportunity Commission ("EEOC") identifying these unlawful practices.  Defendants have

moved for summary judgment on all of Gordon's claims.

# I.    Background

The following facts are drawn primarily from the parties' Rule 56.1 statements and are not subject to genuine dispute unless otherwise noted.

The Defendants in this action are the City of New York and six officials employed in the City's Law Department.  The Law Department represents the City, the Mayor, other elected officials, and the City's agencies in affirmative and defensive civil litigation.  (Dkt. No. 108 ("Compl.") ¶ 18.)  The head of the Law Department is the City's Corporation Counsel.  The Law Department consists of seventeen legal divisions, including Administrative Law, Special Federal Litigation, General Litigation, and Tort.  (*See* Dkt. No. 140 (Plaintiff's Statement of Facts ("PSF")) ¶ 35; Compl. ¶ 20.)  The divisions are further separated into units.  (*See* PSF ¶ 1.)  As relevant here, the Tort Division consists of localized borough units, and four centralized special units.  (*See* PSF ¶ 31; Compl. ¶ 20.)  One of its centralized units is the Special Litigation Unit ("SLU"), which "handles higher exposure and more complex tort cases" (PSF ¶ 52), and employed the Plaintiff in this case from 2007 to 2012.

Line attorneys in the Law Department—known as "Assistant Corporation Counsel" ("ACC")—have their performance evaluated on an annual basis.  (*See, e.g.*, PSF ¶¶ 1, 61; Dkt. Nos. 126-6, 126-7, 126-8.)  In the evaluations, supervisors provide written comments in ten areas of performance, including "legal knowledge, analytical ability and research skills," "judgment," and "productivity and efficiency."  (Dkt. No. 126-6 at 3–6.)  ACCs receive a grade for each area, and an overall rating.  The ratings range from "1"—the best score, awarded when performance "[c]onsistently exceeds highest expectations by a wide margin"—to a rating of "5"—the worst score, given when performance is "[s]ignificantly below the generally expected performance level for assistants of comparable experience."  (Dkt. No. 126-6 at 7.)  Immediate managers draft

the evaluation, and it can be adjusted with the input of higher-level officials.  (*See* PSF ¶¶ 229–230; Dkt. No. 138-16 at 214:18–217:12; Dkt. No. 87-3 at 72:22–73:15.)

Evaluation scores are influential in determining whether an ACC receives a promotion. In January 2000, the Law Department implemented a Senior Counsel program, whereby ACCs could be promoted to Senior Counsel upon being nominated by their Division Chief and approved by the Corporation Counsel.  (PSF ¶ 55; Dkt. No. 126-31.)  Generally, promotions to Senior Counsel were limited to attorneys with at least five years of experience.  (PSF ¶ 58; Dkt. No. 138-14 at 1.)  Effective September 2008, the Senior Counsel program was expanded to ACCs with three or four years of experience who were "very highly qualified" and received "high evaluation score[s]."  (Dkt. No. 138-14 at 1–2; *see also* PSF ¶ 192.)

The individual Defendants in this action are current or former officials at the Law Department, who mainly managed the Tort Division.  Defendant Michael A. Cardozo ("Cardozo") served as the City's Corporation Counsel from 2002 until 2013.  (Compl. ¶ 24.) Defendant Fay Leoussis ("Leoussis") has served as Chief of the Tort Division from 2001 to the present.  (PSF ¶ 197.)  Defendant David Santoro ("Santoro") was the Deputy Chief of the Tort Division from June 1988 until November 2013.  (Compl. ¶ 30.)  Defendants Mark Palomino ("Palomino") and Gayle Sanders ("Sanders") served as the Unit Chief and Deputy Unit Chief, respectively, of SLU during the relevant time period.  (Compl. ¶ 27–28.)  And Defendant Marc Andes ("Andes") was Plaintiff's direct supervisor in SLU from 2007 through 2011.  (PSF ¶ 53; Compl. ¶ 26.)

Plaintiff Robert Gordon is a "black, African-American male."  (Compl. ¶ 11.)  He graduated *magna cum laude* from Morehouse College in 1993, and he received his J.D. from New York University School of Law in May 2004.  (PSF ¶¶ 142, 144.)  In August 2004, Gordon

joined the Law Department as an ACC and was assigned to the Tort Division in the Law Department's Manhattan Trial Unit ("MTU"). (PSF ¶ 1.)

In that position, Gordon was responsible for conducting compliance conferences, undertaking written motions practice, conducting depositions, arguing motions, and performing various other tasks. (PSF ¶¶ 3–4.) In July 2005, Gordon communicated to his supervisor that he was "drowning in motions" (PSF ¶ 7; Dkt. No. 126-17), and the following month, he wrote that "there is too much going on at one time for me to handle" (Dkt. No. 126-19 at 1). Forwarding Gordon's e-mail to other managers, his immediate supervisor wrote that she had "spent countless hours with [Gordon] concerning these issues" and commented that "[h]e cannot multitask and a lot of time is wasted in different ways." (PSF ¶ 10; Dkt. No. 126-19 at 1.) Soon thereafter, in August 2005, Gordon wrote letters to his immediate supervisor and to the Deputy Borough Chief, expressing his difficulty with the volume of cases, pointing out problems in how MTU was run—such as "inefficient systems," "disorganized files," and a lack of "clear guidance"— and offering various suggestions for improvement. (Dkt. No. 138-4 at 5–10; *see also* PSF ¶¶ 13–17, 151–155.)

Two months later, Gordon received a score of "4" on his 2005 annual evaluation, indicating performance "[b]elow the generally expected performance level for assistants of comparable experience." (PSF ¶¶ 24–25, 156.) At a subsequent meeting with Division Chief Fay Leoussis and other supervisors to discuss the evaluation, Gordon asserted that the negative rating was a result of his August 2005 letter; Gordon recalls the Deputy Borough Chief responding "yes, [the letter] had something to do with that." (PSF ¶ 158.) Gordon was subsequently placed on a corrective action plan in December 2005. (PSF ¶¶ 26, 162.) Action plans are assigned to ACCs to assist in improving job performance, and they provide a

"structured approach" to work assignments and "closer supervision." (PSF ¶¶ 26–28.) Gordon filed a complaint with the Law Department's internal Equal Employment Opportunity ("EEO") office in January 2006, alleging that the poor performance rating was given in retaliation for the August 2005 letter. (PSF ¶¶ 30, 166.) In response to the complaint, the EEO Officer suggested that Gordon transfer to a different office. (PSF ¶ 31.)

In April 2006, Gordon transferred to the Tort Division's Queens Borough Office. (PSF ¶ 38.) Two months later, Leoussis informed Gordon that his "performance ha[d] improved in all areas" and he was no longer subject to "close supervision" under the action plan. (Dkt. No. 126-26; PSF ¶ 39.) Gordon received an overall rating of "2.5" on his 2006 performance evaluation. (PSF ¶ 40; Dkt. No. 126-4 at 10.) The evaluation observed that Gordon's knowledge and skills were improving and noted areas for continued improvement, such as "overall efficiency" and "organizational skills." (PSF ¶¶ 41–44; Dkt. No. 126-4 at 3–4, 10.) After another year in Queens, Gordon received an overall rating of "2" on his 2007 performance evaluation, indicating that he was "[c]learly above the generally expected performance level" and producing work that was "consistently very good." (PSF ¶¶ 180–181; Dkt. No. 138-9 at 8.)

In March 2007, Gordon requested a change in assignment or transfer to a number of different offices, including the SLU. (PSF ¶ 48.) Gordon was interviewed for a position in SLU by Defendant Marc Andes, "who highly recommended that [Gordon] be" hired. (PSF ¶ 49.) Gordon's transfer was approved, and he transferred to SLU in August 2007 and was assigned to a team led by Andes. (PSF ¶¶ 51, 53.) At the time, of the fifty full-time attorneys in SLU, only three were African American; none of the three was a supervisor or Senior Counsel. (PSF ¶ 183.) Only three months before Gordon started at SLU, another African-American attorney in the unit—Melissa Pressley—filed an internal EEO complaint charging Andes and SLU Unit

Chief Mark Palomino with race discrimination.  (PSF ¶ 184.)  And another African-American attorney in the Law Department—Laura Bonas Benjamin—had previously overheard Andes make a comment about "black people not knowing what to do if you gave then a million dollars."  (PSF ¶ 185; Dkt. No. 138-12 ¶ 12.)[1]

For Gordon's first three years in SLU, he received performance evaluations with an overall rating of "2," translating to "above average" performance.  (PSF ¶ 61; Dkt. Nos. 126-6 at 7, 126-7 at 6, 126-8 at 6.)  Each evaluation noted potential areas for improvement, including organizational skills, efficiency, and being a more forceful advocate.  (PSF ¶¶ 62–70.)[2]  In one case—Gordon's 2008 evaluation—his immediate managers had initially proposed a "2.5" rating, but after reviewing his evaluation Leoussis suggested that his managers raise it to a "2," which they did.  (PSF ¶¶ 229–230.)  And in December 2009, Gordon received a "Division Chief Award," having been nominated by Andes.  (PSF ¶¶ 200–201.)  Although eligible for promotion to Senior Counsel, and having received performance ratings of "2," Gordon was not nominated for promotion in 2009 or 2010.  (PSF ¶¶ 198, 211.)

Sometime between October 2010 and January 2011, Andes and Gordon had a conversation about his performance.  According to Gordon, Andes relayed that one of his managers had faulted Andes for "grading [Gordon] too high" on past performance evaluations.

---

[1]	Andes disputes having made the remark.  (Dkt. No. 146-1 at 192:11–17.)  Bonas Benjamin had also brought an EEOC complaint and lawsuit for race discrimination and retaliation against the City's New York Health and Hospitals Corp. ("HHC"), as well as two attorneys in HHC's Medical Litigation Unit, which until April 2007 had been a part of the Law Department called the Medical Malpractice Unit.  *See* Amended Complaint at 3–4, *Bonas Benjamin v. N.Y. Health & Hosps. Corp.*, No. 11 Civ. 5096 (S.D.N.Y. Nov. 17, 2011), ECF No. 3.  (*See* PSF ¶ 187.)

[2]	Gordon admits that the evaluations state the need for improvement in various areas, but he disputes the truth of such statements.  (PSF ¶ 62.)

(PSF ¶ 212.)  Andes, though, remembers the conversation differently.  According to his testimony, no one had told him that his past evaluations of Gordon were too high, and in his conversation with Gordon he said only that he was having trouble justifying a high score for a future evaluation.  (PSF ¶¶ 213–214; Dkt. No. 138-20 at 247:9–248:10, 249:6–22.)  Andes also testified, however, that his previous performance evaluations of Gordon from 2008 to 2010 had been "inflated" and "dishonest."  (Dkt. 138-20 at 460:17–21.)

After that conversation, Gordon alleges that Andes began "nit picking" and "trying to find things wrong with" his work.  (PSF ¶¶ 215–216.)  In January 2011, Andes sent Palomino and Deputy Unit Chief Gayle Sanders a memo updating them on Gordon's progress.  (PSF ¶¶ 72, 217; Dkt. No. 138-22.)  The memo stated that as Gordon's "caseload grows in number and complexity, he exhibits increasing difficulty adapting to the demands of litigating high-exposure cases with aggressive adversaries."  (Dkt. No. 138-22 at 1.)  Gordon disputes that his caseload was growing in number or complexity, and that his performance was declining.  (PSF ¶ 72.)

Sometime in February 2011, Gordon recalls a conversation in which Andes called his work "sub-standard" and Gordon asked what could be done to correct it.  (PSF ¶ 223–224.)  The exact wording of Andes's response is disputed.  Gordon alleges that Andes replied, "There are some things that you just can't teach some people."  (PSF ¶ 225.)  In contrast, Andes recalls saying "there are certain things that can't be taught."  (Dkt. No. 146-1 at 198:6–13.)  Around that time, Gordon also recalls Andes saying, "Maybe it would be more appropriate for you to go to a borough unit," and, "You are better at sticking to simple motions rather than the complex motions here in SLU."  (PSF ¶ 227.)  Andes does not deny making similar statements, but he disputes the exact wording.  (Dkt. No. 138-20 at 200:21–201:2, 201:25–202:8, 202:21–203:15.)

In July 2011, Gordon was granted a leave of absence to teach in South Korea for a year, to begin on August 12, 2011. (PSF ¶¶ 233–234.) Shortly before his departure, Palomino emailed Gordon his 2011 performance evaluation, on which Gordon received an overall score of "3.5." (PSF ¶¶ 82–83, 235.)[3] The evaluation stated that Gordon's performance had "declined," and noted deficiencies in various areas, including legal analysis, judgment, productivity, and efficiency. (Dkt. No 126-9 at 2, 4, 6; PSF ¶¶ 79–81.) The evaluation informed Gordon that he could not be guaranteed a position in SLU upon his return, and that he would be given an action plan to complete at that time. (PSF ¶¶ 84–85; Dkt. No 126-9 at 6.) As a result of the 2011 evaluation cycle, SLU promoted two white attorneys—Tzipora Teichman and Louis Gerber—to Senior Counsel. (PSF ¶¶ 238, 278, 290.)

In March 2012, while on sabbatical, Gordon wrote and submitted an objection to his 2011 performance evaluation. (PSF ¶¶ 241–243; Dkt. No. 138-24.) Gordon took issue with several aspects of the evaluation, contending that it falsely portrayed him as confused (PSF ¶¶ 254–255; Dkt. No. 138-24 at 14–16), misrepresented his actions (PSF ¶ 266; Dkt. No. 138-24 at 25–27), and omitted examples of successful work that should have been included. (PSF ¶¶ 248–252, 259–265; Dkt. No. 138-24 at 10–11, 16–18.)[4] After receiving no response from the Law

---

[3] An earlier draft of the 2011 evaluation gave Gordon an overall score of "3," but the rating was lowered during editing. (PSF ¶ 82; s*ee* Dkt. No. 138-67 (draft evaluation); Dkt. No. 138-68 (final evaluation).) Leoussis does not directly recall the score being changed, but she acknowledges the possibility. (Dkt. No. 138-16 at 215:21–216:20.)

[4] Before the Court, Gordon continues to dispute the accuracy of the statements in the 2011 performance evaluation. (PSF ¶¶ 79–81.) In support, he offers the testimony of two attorneys against whom he litigated complex tort cases in 2011, one of whom described Gordon "as one of the more professional and capable attorneys that [the attorney had] litigated against in [his] many years dealing with the City," and the other of whom called his work "outstanding." (PSF ¶¶ 269–270, 276.)

Department, Gordon filed a charge of discrimination with the EEOC based on the negative 2011 evaluation on May 4, 2012.  (PSF ¶¶ 86, 244.)

When Gordon returned from South Korea in August 2012, he was transferred back to the Queens Borough Office.  (PSF ¶¶ 87, 315.)  Upon his start in Queens, Leoussis placed Gordon on an action plan over his objection.  (PSF ¶ 317; Dkt. No. 138-52 at 3–4.)  Gordon's new supervisor in Queens requested that Gordon not be given an action plan because it was unnecessary, but Leoussis did not revisit her decision.  (PSF ¶¶ 323–325; Dkt. No. 138-43 at 75:16–77:2.)  Gordon completed the action plan in November 2012, over a week ahead of schedule.  (PSF ¶¶ 88, 330; Dkt. No. 138-43 at 203:12–204:9.)  On his 2013 performance evaluation, premised on his work in Queens, Gordon received an overall rating of "2.5."  (PSF ¶ 93; Dkt. No. 126-11 at 7.)

After returning to the Queens Borough Office, Gordon's name was on the list for a full-time trial attorney assignment.  (Dkt. No. 126-49 at 205:24–206:4.)  In determining which attorneys will be given back-to-back trial positions, the Tort Division maintains lists of pre-trial attorneys interested in becoming full-time trial attorneys, ranked in order of seniority.  (Dkt. No. 126-49 at 204:10–205:10.)  Around March 22, 2013, Gordon had a conversation with the Borough Office Chief in Queens, in which he expressed his openness to accepting a full-time trial position.  (PSF ¶¶ 89–90.)  Gordon gave his borough preferences as Queens or the Bronx, followed by Brooklyn.  (PSF ¶¶ 90, 333; Dkt. No. 126-49 at 208:6–17.)  There were no full-time trial positions available in Queens as of March 9, 2013.  (PSF ¶ 91; Dkt. No. 126-51.)  On March 23, 2013, Leoussis sent an e-mail confirming that Gordon would be transferred to a full-time trial position in the Bronx.  (PSF ¶ 92; Dkt. No. 126-50 at 2.)  After Gordon accepted a position in the Bronx Borough Office but before he actually transferred, a trial position became available in

Queens.  (PSF ¶ 348; Dkt. No. 138-43 at 212:23–213:9.)  Gordon was not offered the new

position in Queens, and it went to a white attorney on the trial list.  (PSF ¶¶ 349–350; Dkt. No.

138-16 at 309:8–310:24.)  Around September 2013, Gordon transferred to a full-time trial

position at the Bronx Borough Office.  (PSF ¶ 96.)

On his 2014 performance evaluation, Gordon received an overall rating of "1.5," and it

was noted that "the trial judges" before whom he appeared had "complimented his courtroom

skills."  (PSF ¶ 97; Dkt. No. 126-12 at 3, 6.)  On the basis of this evaluation, Gordon was

subsequently promoted to "Senior Counsel."  (PSF ¶ 98.)  On his 2015 performance evaluation,

Gordon received an overall rating of "1."  (PSF ¶ 99; Dkt. No. 126-13 at 6.)

After transferring to the Bronx, Gordon's health declined.  (PSF ¶¶ 355–363.)  He

received a medical accommodation and transferred to a Bronx pre-trial unit in early 2016.  (PSF

¶¶ 364–365.)  On May 12, 2016, Gordon suffered a panic attack in a meeting with his supervisor,

during which he "became visibly upset, began to hyperventilate and cry, dropped to the floor and

punched a cabinet several times."  (PSF ¶¶ 104, 366–368.)  Starting the following day, Gordon

took leave from work, using his accrued sick leave and annual leave.  (PSF ¶¶ 105, 121–122,

369.)  Gordon filed a claim for workers' compensation and submitted certificates of disability

from doctors indicating that Gordon had injured his wrist and would not be able to return to work

until after July 31, 2016.  (PSF ¶¶ 106–107.)

On June 13, 2016, Gordon and the Law Department's Director of Human Resources

exchanged e-mails regarding how to apply for FMLA leave.  (PSF ¶¶ 111–112.)  On June 30,

2016, Gordon submitted a form from his healthcare provider in support of his FMLA application.

(PSF ¶ 113.)  On July 20, 2016, the Law Department personnel office prepared a draft letter

approving Gordon's FMLA request.  (PSF ¶ 115.)  However, Gordon was never informed of a

decision to approve or deny his FMLA request.  (PSF ¶ 115; Dkt. No. 138-42 at 90:13–90:23.)

The City asserts that the personnel office was struggling to approve the FMLA request in the

City's Payroll Management System because the workers' compensation request had frozen his

personnel record, and that the office was "exploring how to overcome this problem" when

Gordon resigned.  (PSF ¶¶ 116–118.)  Gordon disputes the truthfulness of these assertions.  (*Id.*)

At the time Gordon went on leave, he calculated that he had accrued enough sick leave

and annual leave to be paid through August 2, 2016.  (PSF ¶ 122.)  However, the City calculated

his leave differently, and determined that Gordon had exhausted his leave on July 24, 2016.

(PSF ¶¶ 119, 121.)  Due to the City's leave calculation, and the fact that Gordon's FMLA request

had not been approved in the Payroll Management System, the Department of Citywide

Administrative Services canceled Gordon's health benefits as of July 24, 2016, and sent Gordon

a notice of cancellation on August 1, 2016.  (PSF ¶ 122; Dkt. No. 126-67.)

On July 29, 2016, Gordon e-mailed Sosimo Fabian, a Law Department EEO Officer,

communicating that a doctor had cleared Gordon to return to work on August 1, 2016, and

inquiring whether his FMLA request had been approved.  (PSF ¶¶ 123–124.)  Fabian responded

on August 2 that the department was "looking into [Gordon's] situation."  (PSF ¶ 125.)  On

August 5, Gordon informed Fabian that his health benefits had been cut off and inquired how

that had happened.  (PSF ¶ 126.)  Fabian forwarded the communication to Human Resources

personnel and Gordon's supervisor.  (PSF ¶ 128.)  At some point while Gordon was on leave,

before July 29, 2016, he applied and interviewed for a position at a law firm.  (PSF ¶¶ 137–138.)

Gordon resigned from the Law Department on August 9, 2016, and began working at the law

firm the following day.  (PSF ¶¶ 140, 370.)

Gordon received a "right to sue" letter from the EEOC in June 2014, and filed the instant action in August 2014. (Dkt. No. 138-66 at 43, 47.) Defendants now move for summary judgment on all of Gordon's claims. (Dkt. No. 124.) Additionally, Plaintiff has objected to an order of the magistrate judge denying his motion to compel certain discovery related to his disparate-impact claim. (Dkt. No. 86; *see also* Dkt. No. 87 at 1.) For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part, and Plaintiff's motion to compel is granted.

## II.     Motion for Summary Judgment

### A.     Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party. *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009).

On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, *i.e.*, that reasonable jurors could differ about the evidence." *Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.*, No. 12 Civ. 5262, 2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014) (citing Fed. R. Civ. P. 56(c); *Anderson*, 477 U.S. at 250–51). The court views all "evidence in the light most favorable to the non-moving party," and summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64

F.3d 77, 79 (2d Cir. 1995) (second quoting *Lund's, Inc. v. Chem. Bank*, 870 F.2d 840, 844 (2d Cir. 1989)).

**B.     Discussion**

Gordon first alleges that Defendants violated federal, state, and municipal law by discriminating against him based on his race.  The discrimination causes of action break down into six subcategories: disparate treatment, retaliation, individual liability, hostile work environment, *Monell* liability, and disparate impact.  Second, Gordon alleges that the City violated the Family and Medical Leave Act.  Each claim is addressed in turn.

**1.     Disparate Treatment**

Gordon claims that Defendants' actions in connection with his 2011 performance evaluation, the failure to promote him to Senior Counsel prior to 2014, and his 2013 transfer to the Bronx were unlawfully discriminatory.  (Dkt. No. 141 at 6–8.)  Gordon's disparate treatment claims arise under Title VII, 42 U.S.C. § 1981, the NYSHRL, and the NYCHRL.  (Compl. ¶¶ 215–222, 231–235, 261–264, 275–277.)  Because "[t]he burden[s] of proof and production for employment discrimination claims under Title VII, § 1981 . . . and the NYSHRL are identical," the Court addresses these claims together.  *Bowen-Hooks v. City of N.Y.*, 13 F. Supp. 3d 179, 210 n.19 (E.D.N.Y. 2014).  The Court then addresses Gordon's claims under the NYCHRL.

**i.     Title VII, § 1981, and the NYSHRL**

"Title VII, § 1981, and NYSHRL discrimination claims are governed at the summary judgment stage by the burden-shifting analysis first established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973)."  *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (citations omitted).  "Under this framework, a plaintiff must first establish a *prima facie* case of discrimination."  *Ruiz v. Cty. of Rockland*, 609 F.3d 486, 491 (2d Cir. 2010).  If the plaintiff satisfies his *prima facie* burden of production, then "the burden shifts to the defendant to

articulate 'some legitimate, nondiscriminatory reason' for its action." *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008) (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for race discrimination." *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014) (per curiam).

"To avoid summary judgment . . ., 'the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the "motivating" factors.'" *Holcomb*, 521 F.3d at 138 (quoting *Cronin v. Aetna Life Ins. Co.*, 46 F.3d 196, 203 (2d Cir. 1995)). Although "[d]irect evidence of discrimination, 'a smoking gun,' is typically unavailable, . . . [i]t is well settled . . . that . . . plaintiffs are entitled to rely on circumstantial evidence." *Id.* at 141 (internal citation omitted). The ultimate question is whether the plaintiff has proffered sufficient evidence from which "a reasonable juror could conclude that [Defendants'] explanations were a pretext for a prohibited reason." *Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013).

Gordon challenges three distinct employment actions as having been motivated by racial discrimination: (a) his negative 2011 performance evaluation; (b) the failure to promote him to Senior Counsel in 2010 or 2011; and (c) his 2013 transfer to the Bronx. The Court considers each in turn.

### a. *2011 Performance Evaluation*

The gravamen of Gordon's disparate-treatment claim is that Defendants gave him an undeservedly low score on his 2011 performance evaluation because he is African American.

That score resulted in a corrective action plan and his 2012 transfer from SLU to Queens.  (PSF ¶¶ 83–85, 87.)

In order to make out a *prima facie* case that a performance evaluation is discriminatory, a plaintiff must show that: "(1) he belongs to a protected class; (2) he was performing his duties satisfactorily; (3) he was subject to an adverse employment action; and (4) that the action occurred in circumstances giving rise to an inference of discrimination based on plaintiff's membership in that class."  *Siddiqi v. N.Y.C. Health & Hosps. Corp.*, 572 F. Supp. 2d 353, 367 (S.D.N.Y. 2008).

The only element that Defendants contest with respect to Gordon's performance evaluation is the fourth:  whether the action occurred "under circumstances giving rise to an inference of race or color discrimination."  (Dkt. No. 127 at 7.)[5]  To satisfy this element, Gordon contends that white attorneys with "lesser accomplishments and skills" nevertheless were "evaluated more charitably" and received higher evaluation scores than Gordon.  (Dkt. No. 141 at 8.)

------

[5]    The parties argue about the significance of a number of additional pieces of evidence that, in Gordon's view, bolster his *prima facie* case while also providing evidence of pretext at the third step of the *McDonnell Douglas* framework.  (Dkt. No. 127 at 7–15; Dkt. No. 141 at 10–24.)   A "showing of an inference of discrimination or retaliation in the prima facie case" and the "satisfaction of the subsequent requirement that a proffered legitimate reason for an employment action be shown to be pretextual . . . tend to collapse as a practical matter under the *McDonnell Douglas* framework."  *Collins v. N.Y.C. Transit Auth.*, 305 F.3d 113, 118 n.1 (2d Cir. 2002).  The Court thus addresses Gordon's additional evidence—and Defendants' response to it—in its pretext analysis below.  *See D'Agostino v. LA Fitness Int'l, LLC*, 901 F. Supp. 2d 413, 422 n.4 (E.D.N.Y. 2012) (noting that where "many of the parties' arguments regarding pretext could apply with equal force to the fourth prong of the *prima facie* case," and given "the 'de minimis' burden placed on a plaintiff to establish a *prima facie* case, it is more appropriate to assume that Plaintiff has established her *prima facie* case and address [the parties'] arguments in [the] discussion of pretext").

"[A] showing that the employer treated plaintiff 'less favorably than a similarly situated employee outside his protected group'—is a recognized method of raising an inference of discrimination for purposes of making out a *prima facie* case." *Mandell v. Cty. of Suffolk*, 316 F.3d 368, 379 (2d Cir. 2003) (quoting *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)). To rely on this basis, a plaintiff "must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Graham*, 230 F.3d at 39 (quoting *Shumway v. United Parcel Serv.*, 118 F.3d 60, 64 (2d Cir. 1997)). "'Ordinarily, the question whether two employees are similarly situated is a question of fact for the jury,' but 'a court can properly grant summary judgment where it is clear that no reasonable jury could find the similarly situated prong met.'" *Broich v. Inc. Vill. of Southampton*, 462 F. App'x 39, 42 (2d Cir. 2012) (summary order) (citation omitted) (first quoting *Mandell*, 316 F.3d at 379) (second quoting *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d 494, 499 n.2 (2d Cir. 2001)).

In support of his claim that he was evaluated more harshly than other attorneys, Gordon points to various alleged inaccuracies in his 2011 evaluation (Dkt. No. 141 at 14–15), and identifies ways in which other attorneys were graded favorably, such as receiving praise without any mention of specific examples and by having their deficiencies downplayed (Dkt. No. 141 at 17–19). Defendants counter that the white attorneys Gordon identifies "are not appropriate comparators" (Dkt. No. 127 at 12), and that the evaluations of Gordon and the other attorneys accurately reflected their respective levels of performance (Dkt. No. 149 at 8–9, 10–11).

Under the circumstances of this case, it is not "clear that no reasonable jury could find the similarly situated prong met." *Broich*, 462 F. App'x at 42 (quoting *Harlen Assocs.*, 273 F.3d at 499 n.2). Gordon (class of 2004) had more years of experience than either Teichman (class of 2006) or Gerber (class of 2007), two of his more favorably evaluated white comparators. (Dkt.

No 126-9 at 1; Dkt. No. 138-37 at 22; Dkt. No. 138-38 at 22.) He offers evidence of his various successes in the year leading up to his 2011 evaluation and testimony of opponents' high regard for his abilities. (Dkt. No. 138-1 ¶ 42; Dkt. Nos. 138-33, 138-34.) And to the extent that Gordon's performance had not been perfect in past years, neither had that of his comparators. (PSF ¶¶ 291, 294–296.)

Furthermore, Gordon has adduced evidence that raises a genuine issue of material fact as to whether he was evaluated more harshly in SLU than the white attorneys identified. For example, he has demonstrated that the overall evaluation rating of white attorneys was sometimes higher than the average of their various skill-category ratings, whereas his 2011 overall score was lower than the average of his component scores. (PSF ¶ 293; *Compare* Dkt. No. 126-9 at 2–6, *with* Dkt. No. 138-38 at 11–15.) And Gordon has offered evidence that, whereas some of his accomplishments were omitted from the 2011 evaluation, occasionally white attorneys were praised for routine actions, received accolades without specific substantiating examples, or had criticism omitted from their final evaluations. (PSF ¶¶ 264, 284–85, 288, 292, 301; *see, e.g.*, Dkt. No. 138-37 at 11, 24.)

Because Gordon has established a *prima facie* case of disparate treatment, the burden shifts to Defendants to offer a legitimate, non-discriminatory reason for giving Gordon a negative performance evaluation in 2011. *See Holcomb*, 521 F.3d at 138. Defendants assert that Gordon earned a low rating in 2011 based on issues with his work performance that had persisted throughout his career with the Law Department, which were exacerbated as his caseload increased in complexity and difficulty. (Dkt. No. 127 at 15–16.) Gordon does not dispute that Defendants' rationale satisfies this step. (Dkt. No. 141 at 10–11.)

The Court now proceeds "to the third step of the *McDonnell Douglas* analysis to determine whether plaintiff has shown [Defendants'] legitimate reason[s] for the adverse employment action [were] pretext." *Pineda v. Byrne Dairy, Inc.*, 212 F. Supp. 3d 467, 475 (S.D.N.Y. 2016) (footnote omitted). "[P]laintiffs are entitled to rely on circumstantial evidence" at this stage, *Holcomb*, 521 F.3d at 141, and must show that "the prohibited factor was at least one of the 'motivating' factors" in the employer's decision, *id.* at 138 (quoting *Cronin*, 46 F.3d at 203). "A plaintiff's evidence at the third step . . . must be viewed as a whole rather than in a piecemeal fashion." *Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 76 (2d Cir. 2016).

The Court concludes that Gordon has adduced sufficient evidence of pretext for a reasonable juror to find in his favor, and thus his disparate treatment claims based on the 2011 evaluation survive summary judgment. First, Gordon has raised a genuine issue of material fact as to whether the score in his 2011 performance evaluation is accurate and reliable. (*See* Dkt. No. 141 at 11–12.) Gordon's direct supervisor, Defendant Andes, testified that he had given Gordon artificially high ratings in the past that did not accurately reflect his true performance level. (Dkt. No. 146-1 at 459:19–460:21.) Defendants respond that insofar as Andes's testimony shows Gordon's performance evaluations were not accurate, it shows only that Andes in the years leading up to 2011 had been rating Gordon "more kindly than he deserved." (Dkt. No. 149 at 7–8.) But the abrupt shift in Gordon's ratings, combined with Andes's admission that he sometimes fudged the numbers, could lead a rational juror to the opposite conclusion: that it was the later, harsher evaluation that was inaccurate, rather than the series of earlier, more positive evaluations.

Gordon also identified a number of alleged errors and omissions in his 2011 evaluation (Dkt. No. 141 at 14–15), including the omission of a good result in a case which Andes admitted

"should have been included in his performance evaluation" (Dkt. No. 138-20 at 404:4–14).

Defendants counter that Gordon's subjective disagreement with his 2011 score is insufficient alone to show that Defendants' justifications are pretextual.  (Dkt. No. 127 at 19.)  Indeed, a "plaintiff's subjective disagreement with [his performance] reviews is not a viable basis for a discrimination claim." *Sotomayor v. City of New York*, 862 F. Supp. 2d 226, 259 (E.D.N.Y. 2012) (alteration in original) (quoting *Valentine v. Standard & Poor's*, 50 F. Supp. 2d 262, 284 (S.D.N.Y. 1999)).  Here, however, Gordon does not rely on subjective disagreement alone to dispute the accuracy of the evaluation:  he points to (1) a concession from Andes that the evaluation contained at least one important omission, (2) a list of the evaluation's specific alleged misrepresentations, and (3) evidence that white attorneys were subject to more generous standards.

Second, Gordon had a history of receiving favorable performance ratings, before and after the 2011 evaluation.  From 2007 to 2010, Gordon received an overall rating of "2" on his annual evaluation.  (PSF ¶ 61; Dkt. No. 126-5 at 8.)  In 2013, Gordon received a score of "2.5." (PSF ¶ 93.)  In 2014, Gordon received a score of "1.5."  (PSF ¶ 97.)  And in 2015, he received a score of "1."  (PSF ¶ 99.)  The "3.5" score in 2011 substantially deviates from those other testaments to his above-average performance.  Such "evidence of previously good job performance" in an employee's record "may be used to show that the claimed non-discriminatory reason [for an adverse employment action] is pretextual." *Sklaver v. Casso-Solar Corp.*, No. 02 Civ. 9928, 2004 WL 1381264, at *8 (S.D.N.Y. May 15, 2004).  Defendants argue that regardless of what scores Gordon had received on prior evaluations, the record reflects that his evaluation in 2011 was entirely consistent with the performance issues he had exhibited over the years, which allegedly produced his 2011 evaluation score.  (Dkt. No. 127 at 20; Dkt.

No. 149 at 9.)  Gordon responds that Leoussis's testimony that she had personally reviewed and approved some of his favorable pre-2011 evaluations raises a genuine issue as to whether his earlier scores were inflated or accurately reflected above-average performance.  (Dkt. No. 141 at 13–14.)  And Gordon raises questions about the accuracy of the deficiencies alleged in earlier evaluations.  (Dkt. No. 141 at 16–17.)  On the whole, a reasonable jury could infer that the anomalously low 2011 evaluation score was the result of discriminatory animus.

Third, Gordon has adduced evidence, though controverted, that Andes has a history of making racially insensitive remarks.  (Dkt. No. 141 at 13.)  For example, Gordon testified that in response to a question about how he could remedy alleged performance issues, Andes responded, "Well, there's some things that you can't teach some people," which, Gordon testified, "has a racial implication."  (Dkt. No. 138-2 at 99:2–10; *but see* Dkt. No. 146-1 at 198:6–13.)  And another Law Department employee averred to having heard Andes remark about "black people not knowing what to do if you gave them a million dollars."  (Dkt. No. 138-12 ¶ 12; *but see* Dkt. No. 146-1 at 192:11–193:11.)  Defendants respond that these statements are mere "stray remarks from which racial animus cannot be inferred."  (Dkt. No. 127 at 21.)

"In determining whether remarks are probative of discriminatory intent, a court properly considers '(1) who made the remark (*i.e.*, a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (*i.e.*, whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (*i.e.*, whether it was related to the decision-making process).'"  *Wesley-Dickson v. Warwick Valley Cent. Sch. Dist.*, 586 F. App'x 739, 742 (2d Cir. 2014) (summary order) (quoting *Henry v. Wyeth Pharm., Inc.*, 616 F.3d 134, 149 (2d Cir. 2010)).

Defendants are correct that the "million dollars" statement has limited probative value here:  the remark was made years before (factor 2) and was unrelated to Gordon's evaluation (factor 4).  But it nonetheless provides context for the second statement.  The "some people" comment was made:  by a supervisor with influence over Gordon's performance evaluation (factor 1); in February 2011, a few months before the evaluation (factor 2); while discussing Gordon's performance with him (factor 4).  These three factors weigh in favor of the probativeness of the "some people" statement.

With respect to factor 3—whether a reasonable juror could view the remark as discriminatory—courts consider whether the remark "(1) makes a reference to a Title VII-protected class *and* (2) provides some indication that membership in such a class is disapproved of."  *Jalal v. Columbia Univ. in the City of N.Y.*, 4 F. Supp. 2d 224, 236 (S.D.N.Y. 1998).  The remark indicated that being among "some people"—who are unable to learn to perform at the necessary level—was undesirable.  But Defendants emphasize that the remark was "race-neutral."  (Dkt. No. 127 at 21.)  They are correct that "some people" does not *expressly* refer to a protected class, but it is also true that "[a] facially neutral remark may be derogatory in the context in which it is made."  *Sotomayor*, 862 F. Supp. 2d at 260.  In the context in which the "some people" remark was made, and in light of the alleged "million dollar" remark, a reasonable jury could conclude that the statement evidenced discriminatory animus.

Defendants nonetheless argue that any inference of discriminatory animus that these remarks might raise on Andes's part is counterbalanced by the fact that Andes supported Gordon's hiring into SLU, and recommended Gordon for an award.  (Dkt. No. 127 at 22.)  Defendants are invoking what is known as the "same-actor inference": "that it is difficult to infer that the person who hires an employee in a protected class would 'suddenly develop an aversion

to members of that class.'" *Copeland v. Rosen*, 38 F. Supp. 2d 298, 305 (S.D.N.Y. 1999)

(quoting *Ruane v. Continental Cas. Co.,* No. 96 Civ. 7153, 1998 WL 292103, at *8 (S.D.N.Y.

June 3, 1998)).  While the inference is "plausible" under certain circumstances, courts have also

recognized the possibility that some supervisors would "purposefully hire members of a

protected class . . .  in the hope that the act of hiring will be the focus of attention and will allay

any suspicions about other discriminatory acts." *Id*.  Gordon asserts that the same-actor

inference is weakened by the circumstances here, because Andes's "initial favorable treatment"

of Gordon may have been an attempt to cover for other allegations of race discrimination.  (Dkt.

No. 141 at 25–26.)  The Court agrees that whatever force the "same-actor inference" might have

here does not necessarily vitiate the probative weight a reasonable juror could assign Andes's

alleged remarks.

Fourth, Gordon relies again on the existence of similarly situated white attorneys whom

he alleges were evaluated more favorably.  (Dkt. No. 141 at 17–21.)  At the third step of the

*McDonnell Douglas* framework, "[t]hat an evaluation is tainted by discriminatory motives can be

shown if [plaintiff] can point to [a] similarly situated employee who was evaluated differently."

*Sotomayor*, 862 F. Supp. 2d at 259.  As discussed above, Gordon has raised genuine issues of

material fact as to whether these comparators were similarly situated and treated more

favorably.[6]

Fifth and finally, Gordon points to the composition of and history of discrimination in

SLU.  (Dkt. No. 141 at 21–22.)  Gordon has adduced evidence that SLU has historically had few

---

[6]        Defendants briefly argue that the existence of non-African-American attorneys in
SLU who were placed on action plans undercuts Gordon's claim of pretext.  (Dkt. No. 127 at
22.)  The Court notes that the negative evaluation is the adverse action Gordon challenges, *not*
being given the action plan.  Regardless, whether the existence of those other attorneys
undermines an inference of pretext is a question of fact for the jury.

African-American attorneys. When he joined in 2007, for example, he was one of only three African Americans in a fifty-person unit. (PSF ¶ 183.) And during his tenure, there were no African-American Senior Counsel (PSF ¶ 378), and at most only a single racial-minority supervisor (*compare* Dkt. No. 141 at 21, *with* Dkt. No. 149 at 12). Defendants concede that throughout Gordon's tenure in SLU—from 2007 to 2011—there were only three other African-American attorneys employed in total. (Dkt. No. 149 at 12.)

Defendants contend that "plaintiff's statistics do not permit an inference of discriminatory animus to be drawn on this record." (Dkt. No. 149 at 12.) But the cases Defendants cite for support stand only for the proposition that statistics *alone* are insufficient to support a disparate treatment claim. *See, e.g.*, *Lee v. Poughkeepsie City Sch. Dist.*, No. 06 Civ. 4660, 2008 WL 852790, at *9 n.7 (S.D.N.Y. Mar. 31, 2008) ("Plaintiff cannot establish that Defendant was motivated by discriminatory intent by appealing to statistics *alone*." (emphasis added)). (Dkt. No. 127 at 8–9; Dkt. No. 149 at 12.) Nevertheless, in assessing pretext under the third step of *McDonnell Douglas*, "[t]he finder of fact may properly consider the dearth of [employees from a protected class] as one component of its cumulative inquiry." *Walsh*, 828 F.3d at 77. The consistently low level of African-American attorneys and supervisors in SLU is thus another "individual evidentiary brick[]" supporting an inference of discriminatory animus. *Id.* at 76.

Gordon also points to other allegations of race discrimination made against SLU and its supervisors by three other African-American attorneys. (Dkt. No. 141 at 23–24.) Such "allegations of systemic discrimination against other minority employees may be considered, and they bolster [a plaintiff's] claim that she personally was the victim of discrimination." *Hagan v. City of New York*, 39 F. Supp. 3d 481, 497 (S.D.N.Y. 2014). Defendants contend that these

allegations lack probative value, given that they all either concerned different sorts of discrimination or different supervisory staff, or else never resulted in any final factual determination that discrimination had occurred. (Dkt. No. 127 at 13–14; Dkt. No. 149 at 13–14.) The Court disagrees and concludes that these other complaints of race discrimination against SLU at least slightly bolster an inference of discriminatory animus when viewed in the context of the record as a whole.

Gordon has done enough to raise a genuine question as to whether the 2011 performance evaluation was "made in good faith." *Brenner v. City of N.Y. Dep't of Educ.*, 132 F. Supp. 3d 407, 419 (E.D.N.Y. 2015). Overall, Gordon has proffered sufficient evidence from which "a reasonable juror could conclude that" Defendants' explanations for giving Gordon a negative 2011 performance rating "were a pretext for a prohibited reason." *Kwan*, 737 F.3d at 846.

### b. *Failure to Promote in 2010 or 2011*

Gordon next alleges that Defendants discriminated against him when they failed to promote him to Senior Counsel between August 2010 and the point at which he received the low performance evaluation in August 2011.[7] (Dkt. No. 141 at 6–7.)

To establish a *prima facie* case of discriminatory failure to promote, "[a] plaintiff must allege that (1) she is a member of a protected class; (2) she 'applied and was qualified for a job for which the employer was seeking applicants'; (3) she was rejected for the position; and (4) the position remained open and the employer continued to seek applicants having the plaintiff's

---

[7] As noted in an earlier opinion in this case, Gordon has disavowed any challenge to the failure to promote him prior to 2010, given Defendants' argument that any such challenge would be time-barred. *Gordon v. City of New York*, No. 14 Civ. 6115, 2015 WL 3473500, at *7 n.4 (S.D.N.Y. June 2, 2015).

qualifications." *Brown v. Coach Stores, Inc.*, 163 F.3d 706, 709 (2d Cir. 1998) (quoting *McDonnell Douglas*, 411 U.S. at 802).

In challenging Gordon's *prima facie* case, Defendants focus exclusively on the second element, contending that Gordon "did not meet the qualification requirements to be promoted to Senior Counsel in either 2010 or in 2011." (Dkt. No. 127 at 6.) Specifically, Defendants assert that in order to be qualified for promotion in 2010 or 2011, attorneys needed to receive an overall rating of "1.5" or better on their annual performance evaluation, whereas Gordon received ratings of "2" in 2010, and "3.5" in 2011. (Dkt. No. 127 at 7.) Gordon responds that he satisfied the minimum requirements for promotion: at least three years of experience and a "high evaluation score." (Dkt. No. 141 at 7; PSF ¶ 58.)

In order to satisfy the qualifications requirement in alleging a *prima facie* case of discriminatory failure to promote, "all that is required is that the plaintiff establish basic eligibility for the position at issue." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 92 (2d Cir. 2001). "[T]he qualification necessary to shift the burden to defendant for an explanation of the adverse job action is minimal; plaintiff must show only that he 'possesses the basic skills necessary for performance of [the] job.'" *Id.* (alteration in original) (quoting *Owens v. N.Y.C. Hous. Auth.*, 934 F.2d 405, 409 (2d Cir. 1991)).

Gordon has established basic eligibility to be promoted to Senior Counsel. Although Cardozo testified that he believed an attorney needed to receive a performance rating of "1" or "1.5" to be promoted to Senior Counsel, the record contains no evidence of a formal promotion cut-off score. (PSF ¶¶ 59, 195; Dkt. No. 126-33 at 86:25–87:21; *see* Dkt. No. 138-14.) And from 2004 to 2007, at least eighteen attorneys in the Tort Division had been promoted with an overall evaluation score of "2." (PSF ¶ 196; Dkt. No. 138-15 at 2–3.) Gordon was thus qualified

for a promotion to Senior Counsel after having received an overall rating of "2" in 2010. Because Defendants do not otherwise challenge Gordon's *prima facie* case, the Court proceeds to the next step of the *McDonnell Douglas* analysis.

To offer a legitimate non-discriminatory reason for not promoting Gordon in 2010 and 2011, in satisfaction of the second prong of the *McDonnell Douglas* framework, Defendants assert that Gordon's performance evaluation score was not high enough to merit a promotion. Specifically, Defendants argue that only attorneys with scores of "1" and "1.5" were promoted in the Tort Division during 2010 and 2011, whereas Gordon had achieved scores of "2" and "3.5" those years. (Dkt. No. 127 at 7; Dkt. No. 126-72 at 2.) Gordon again does not dispute that Defendants have offered a legitimate rationale for their decision. (Dkt. No. 141 at 10–11.)

Finally, on the third prong of *McDonnell Douglas*, the parties' briefing largely discusses whether the evidence pertaining to pretext is sufficient without differentiating between the claims involving the 2011 evaluation and the failure to promote. (*See* Dkt. No. 141 at 24; Dkt. No. 127 at 22.) For good reason: promotion in the Tort Division is based substantially on an attorney's performance evaluations (*see* PSF ¶¶ 56, 59), and depends on the recommendations of supervisors (*see* PSF ¶¶ 98, 199). The evidence of pretext discussed above in the context of Gordon's 2011 evaluation claim—particularly regarding the accuracy of his evaluation, preferential treatment of white attorneys, and the alleged remarks of his supervisor—thus applies to the promotion claim as well.[8] Therefore, the Court again concludes that Gordon has proffered

---

[8] Much of the evidence of pretext involves the circumstances surrounding the 2011 performance evaluation, received in August 2011. (PSF ¶ 235.) This evidence is clearly relevant to the failure to promote Gordon soon thereafter, in September 2011. (*See* PSF ¶ 238, 240.) Gordon also challenges the failure to promote him a year earlier, in September 2010 (Compl. ¶ 98; Dkt. No. 141 at 6), but the parties do not differentiate their pretext arguments between the two years. It is possible that some evidence of pretext might be less probative as to the 2010

sufficient evidence from which "a reasonable juror could conclude that" Defendants' explanations in declining to promote Gordon "were a pretext for a prohibited reason." *Kwan*, 737 F.3d at 846.

c. *2013 Transfer to the Bronx*

Finally, Gordon alleges that Defendants discriminated against him again in 2013, when they gave him the choice of a full-time trial attorney position in the Bronx, but not Queens, only to subsequently give a full-time trial position in Queens to a white attorney. (Dkt. No. 141 at 8–10.)

To establish a *prima facie* case for discrimination based on a transfer denial "requires a showing that: (1) the plaintiff is a member of a protected class; (2) the plaintiff was qualified for the position he sought; (3) the denial of the transfer constituted an adverse employment action; and (4) the circumstances of the adverse employment action give rise to an inference of discrimination." *Gordon*, 2015 WL 3473500, at *9. Defendants challenge Gordon's ability to satisfy two elements here: whether he suffered an adverse action, and whether the circumstances give rise to an inference of discrimination. (Dkt. No. 127 at 7.)

Defendants contend that no adverse employment action occurred here, because Leoussis merely failed to advise Gordon of an opening in Queens after he had already accepted a position in the Bronx,[9] and Gordon received the same pay and benefits in the Bronx position. (Dkt. No. 127 at 7.) Gordon responds that denying him the option of Queens and transferring him to the Bronx was adverse, because "the working conditions in the Bronx were less safe than Queens

_____

promotional decision. But nevertheless, based on the record a reasonable jury could still conclude that the failure to promote Gordon in 2010 was the product of discrimination.

[9]     To the extent that Defendants are challenging the way this claim should be framed—as a failure to consult rather than a challenge to the transfer itself—this argument is more appropriately situated at the second step of *McDonnell Douglas*.

and more difficult for trial attorneys." (Dkt. No. 141 at 9.) The Court agrees. "A denial of a transfer may . . . constitute an adverse employment action," if there exist "objective indicia of material disadvantage." *Beyer v. Cty. of Nassau*, 524 F.3d 160, 164 (2d Cir. 2008). "Safe working conditions are an 'objective indicator of desirability'" of a transfer location. *Guzman v. City of New York*, No. 06 Civ. 5832, 2010 WL 4174622, at *19 (E.D.N.Y. Sept. 30, 2010) (quoting *Beyer*, 524 F.3d at 165). Defendants do not dispute Gordon's testimony about the relative conditions of the Queens and Bronx offices. (PSF ¶¶ 343–347; Dkt. No. 138-2 at 147:6–148:1.)

On the fourth prong, Gordon points to the fact that he was not offered a spot in Queens, then shortly thereafter a spot there was given to a white attorney who was further down the list of priority for trial positions. (Dkt. No. 141 at 9.) Evidence that Gordon "was treated 'less favorably than other similarly situated employees outside [the] protected group'"—*i.e.*, was denied a transfer to Queens that was offered to a less-qualified white employee—is sufficient to "rais[e] an inference of discrimination." *Parrilla v. City of New York*, No. 09 Civ. 8314, 2011 WL 611849, at *8 (S.D.N.Y. Feb. 16, 2011) (alteration in original) (quoting *Mandell*, 316 F.3d at 379).

The burden thus shifts to Defendants to offer a legitimate non-discriminatory reason for not giving Gordon the option to transfer to Queens. Defendants assert that the position in Queens opened up after Gordon had accepted a transfer to the Bronx, and that positions are not usually offered to attorneys who have already accepted transfers. (Dkt. No. 127 at 18.) Again, Gordon does not dispute that this is a legitimate rationale in satisfaction of the second step of *McDonnell Douglas*. (Dkt. No. 141 at 10–11.)

The Court thus proceeds to the third prong: whether Gordon has offered sufficient evidence that the rationale behind the decision not to allow him to transfer to Queens was pretextual. In his opposition to summary judgment, Gordon's affirmative arguments regarding pretext focus on performance evaluations (Dkt. No. 141 at 11–21) and discrimination and demographics within SLU (Dkt. No. 141 at 13, 21–24). Nowhere does Gordon specifically mention evidence of pretext in the circumstances surrounding the 2013 transfer. His brief does assert that "being denied the option to work as a trial attorney in the Queens borough unit" was based on the allegedly discriminatory 2011 performance evaluation. (Dkt. No. 141 at 10.) But Gordon does not explain this assertion, and the Court sees no basis for it. Rather, the Court views the 2013 transfer issue as largely distinct from the allegations regarding the failure to promote and the 2011 evaluation.

What the Court is left with are allegations that (i) Plaintiff accepted a trial position in the Bronx, (ii) afterwards a position in Queens became available, (iii) Plaintiff was not offered the new position in Queens (consistent with standard division practice), and (iv) the position was offered to a white attorney next on the list of employees awaiting a full-time position. On the basis of these facts, the Court concludes that Gordon's evidence would not "permit a rational finder of fact to infer that the [employer's] employment decision" regarding the 2013 transfer "was more likely than not based in whole or in part on discrimination." *Kirkland*, 760 F.3d at 225 (alteration in original) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 138 (2d Cir. 2003)).

The Defendants' motion for summary judgment on Gordon's disparate treatment claims under state and federal law is thus granted as to claims regarding the 2013 transfer, but denied as to claims regarding the 2011 performance evaluation and the failure to promote Gordon.

### ii.     NYCHRL

Plaintiff's NYCHRL disparate treatment claim must be construed "independently from and more liberally than" his state and federal claims. *Ben-Levy v. Bloomberg, L.P.*, 518 F. App'x 17, 19–20 (2d Cir. 2013) (summary order) (quoting *Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 278 (2d Cir. 2009)). The NYCHRL analysis, which is guided by the Second Circuit's decision in *Mihalik v. Credit Agricole Cheuvreux North America, Inc.*, 715 F.3d 102 (2d Cir. 2013), "mirrors the *McDonnell Douglas* framework, but accords Plaintiff a lesser burden of showing only that Defendants' actions were based, in part, on discrimination." *Allen v. A.R.E.B.A. Casriel, Inc.*, No. 15 Civ. 9965, 2017 WL 4046127, at *12 (S.D.N.Y. Sept. 12, 2017). The plaintiff must introduce sufficient evidence to show that her employer treated her "less well," and did so "at least in part for a discriminatory reason." *Id.* at *9 (quoting *Mihalik*, 715 F.3d at 110 n.8). "The burden then shifts to Defendants to present 'legitimate non-discriminatory motives to show the conduct was not caused by discrimination, but [they are] entitled to summary judgment on this basis only if the record establishes as a matter of law that "discrimination played *no* role" in its actions.'" *Id.* at *12 (alteration in original) (quoting *Mihalik*, 715 F.3d at 110 n.8).

Because Gordon's claims regarding the failure to promote him and the 2011 performance evaluation satisfy the standards for federal and state disparate treatment clams, they also survive under the more generous standard of the NYSCHRL. Regarding the 2013 transfer to the Bronx, however, the Court concludes that Plaintiff has not introduced sufficient evidence that he was treated "less well, at least in part for a discriminatory reason." *Mihalik*, 715 F.3d at 110 n.8. Rather, the evidence demonstrates only that Leoussis treated Gordon the same as any other attorney who had already been assigned a full-time trial position. (Dkt. No. 126-76 at 310:8–16.)

Therefore, Defendants' motion for summary judgment on Gordon's disparate treatment claims under the NYCHRL is granted as to the 2013 transfer and otherwise denied.

## 2. Retaliation

Gordon also claims that Defendants retaliated against him in violation of Title VII, Section 1981, the NYSHRL, and the NYCHRL. (Compl. ¶¶ 223–230, 245–247, 265–267, 278–280.) Gordon's state and federal retaliation claims are analyzed under the *McDonnell Douglas* framework:

> First, the plaintiff must establish a *prima facie* case of retaliation by showing: "(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action." . . .
>
> If the plaintiff sustains this initial burden, "a presumption of retaliation arises." The defendant must then "articulate a legitimate, non-retaliatory reason for the adverse employment action."

*Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010) (internal citations omitted) (quoting *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005)). The burden then shifts back to the employee to show that the employer's reason is pretextual, and that "his or her protected activity was a but-for cause of the alleged adverse action." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 362 (2013).[10]

---

[10] The Second Circuit has not yet held whether *Nassar*'s but-for standard applies to Section 1981, NYSHRL, and NYCHRL claims, or whether those claims are governed by the pre-*Nassar* "motivating factor" standard. *See Kwan*, 737 F.3d at 847 n.7 (declining to decide whether *Nassar* applies to NYSHRL claims); *Georges v. Peters*, 581 F. App'x 80, 81 (2d Cir. 2014) (summary order) (applying *Nassar* to a Section 1981 claim without analysis); *Misas v. North Shore-Long Island Jewish Health Sys.*, No. 14 Civ. 8787, 2017 WL 1535112, at *9 n.8 (S.D.N.Y. Apr. 27, 2017) (suggesting that causation under NYCHRL is assessed more liberally than under *Nassar*). The Court need not decide the question here, however, because Plaintiff fails to establish that his 2012 EEOC complaint was even a "motivating factor" in the alleged retaliatory employment actions.

Retaliation claims under the NYCHRL are also analyzed under the *McDonnell Douglas* burden-shifting framework. *See Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 361 (S.D.N.Y. 2012). Relief under the NYCHRL is broader, however, because "rather than requiring a plaintiff to show an 'adverse employment action,' it only requires him to show that something happened that was 'reasonably likely to deter a person from engaging in protected activity.'" *Id.* at 362 (quoting *Rozenfeld v. Dep't of Design & Constr. of the City of N.Y.*, 875 F. Supp. 2d 189, 208 (E.D.N.Y. 2012)). But "[o]therwise, *a prima facie* case of retaliation faces the same requirements under the NYCHRL as under" state and federal antidiscrimination laws. *Id.*

Gordon bases his claim on three potential adverse employment actions: (1) the 2012 transfer from SLU to Queens; (2) the 2012 action plan; and (3) the 2013 transfer from Queens to the Bronx. (Dkt. No. 141 at 28–29.) For each of these actions, the first two prongs of the *prima facie* case are satisfied; Defendants do not dispute that Gordon's May 2012 EEOC charge constitutes protected activity, or that they knew of the charge. (Dkt. No. 127 at 23–24; PSF ¶ 86.) But Defendants dispute whether some of these actions were in fact "adverse," whether the causation prong is satisfied, and whether Gordon can satisfy the third step of *McDonnell Douglas* by demonstrating pretext.

### i. 2012 Transfer to Queens and Action Plan

Gordon first alleges that the August 2012 transfer from SLU to Queens after he returned from South Korea, and the assignment to a corrective action plan in Queens, were unlawful adverse actions. In response, Defendants challenge the existence of a causal connection between these actions and the May 2012 EEOC complaint. Specifically, Defendants contend that these

actions were not caused by the 2012 complaint because they were decided or "set in motion by" an earlier action: "the 2011 assessment." (Dkt. No. 149 at 15; *see* Dkt. No. 127 at 23–24.)[11]

"[A] plaintiff can indirectly establish a causal connection to support a discrimination or retaliation claim by showing that the protected activity was closely followed in time by the adverse employment action." *Augustine v. Cornell Univ.*, No. 14 Civ. 7807, 2018 WL 1474402, at *11 (S.D.N.Y. Mar. 26, 2018) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010)), *appeal filed* No. 18-1185 (2d Cir. Apr. 24, 2018). But "where the 'gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise.'" *Trower v. Mount Sinai Hosp.*, No. 16 Civ. 4322, 2018 WL 4283724, at *14 (S.D.N.Y. Sept. 6, 2018) (quoting *Slattery*, 248 F.3d at 95).

Here, Gordon himself admits that the 2011 evaluation "formed the basis for all the other alleged discriminatory and adverse actions" against him, including the 2012 transfer and action plan. (Dkt. No. 141 at 10.) The 2011 performance evaluation clearly informed Gordon that "he [would] be given an Action Plan and [would] be expected to meet the Plan's requirements" after returning from South Korea. (Dkt. No. 126-9 at 6.) The decision to assign Gordon an action plan was thus made in August 2011, months before the May 2012 EEOC complaint. Therefore, Gordon cannot satisfy the causal connection prong of the *prima facie* case with regards to the action plan.

Moreover, the 2011 evaluation clearly indicated that "a return to SLU [could not] be guaranteed" after Gordon's leave of absence. (*Id.*) Division Chief Leoussis testified that she

---

[11]     Defendants also argue that these actions were not "adverse," because Gordon was neither harmed nor deterred from pursuing this lawsuit. (Dkt. No. 127 at 24; Dkt. No. 149 at 16.) The Court need not address these arguments, however, because these retaliation claims fail to satisfy the causation requirement.

transferred Gordon to Queens when he returned in August 2012 because she did not "believe that his performance was where it needed to be to stay in SLU." (Dkt. No. 126-76 at 267:25–268:7.) Nevertheless, Gordon argues that the indication of a potential transfer in the 2011 evaluation does not undermine the temporal inference of retaliation, because the *final* decision to transfer him was not made until after he returned from leave. (Dkt. No. 141 at 28.) The Court disagrees.

"Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (per curiam). The August 2012 transfer was the culmination of actions that began with the 2011 evaluation, before the May 2012 EEOC complaint was filed. And other than a temporal proximity of three months, Gordon points to no evidence that would suggest a causal relationship between the EEOC complaint and the transfer. Because "timing is the only basis for [Gordon's] claim of retaliation," and the actions leading to Gordon's transfer "began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise" under the circumstances of this case. *Slattery*, 248 F.3d at 95. Therefore, Gordon cannot establish a *prima facie* case of retaliation, whether on his state and federal causes of action or under NYCHRL's more liberal standard, based on the 2012 transfer from SLU to Queens.[12]

---

[12] For the same reasons, Gordon would be unable to succeed on his retaliation claim based on the 2012 transfer under the third step of the *McDonnell Douglas* framework. *See Landolfi v. Am. Ass'n of Retired Persons*, No. 13 Civ. 7333, 2015 WL 5820710, at *8 (S.D.N.Y. Sept. 28, 2015) (noting that the temporal proximity between protected behavior and a previously contemplated adverse employment action is insufficient on its own under *Slattery* at both the *prima facie* causation stage and the pretext stage); *Kwan*, 737 F.3d at 847 ("Temporal proximity alone is insufficient to defeat summary judgment at the pretext stage.").

Overall, Defendants are entitled to summary judgment on the question whether Gordon's 2012 transfer and action plan were retaliatory.

### ii.     2013 Transfer to the Bronx

Finally, Gordon contends that the circumstances surrounding his 2013 transfer from Queens to the Bronx constitute an adverse action.  Defendants argue that Gordon fails to demonstrate a causal connection between the transfer and his May 2012 EEOC complaint, because the transfer happened approximately a year later.  (Dkt. No. 127 at 24.)[13]

Courts in this circuit have "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Gorman-Bakos v. Cornell Coop. Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001).  But even a gap of three months has previously been found to be too long to find causation based on temporal proximity alone.  *See Anglisano v. N.Y.C. Dep't of Educ.*, No. 14 Civ. 3677, 2015 WL 5821786, at *8–9 (E.D.N.Y. Sept. 30, 2015).

Here, the alleged adverse action occurred sometime between ten and sixteen months after the EEOC complaint was filed.  (*See* PSF ¶¶ 86, 92, 96.)  Gordon argues that the causal connection is established notwithstanding this temporal gap, because the transfer was Leoussis's first opportunity to retaliate against him.  (Dkt. No. 141 at 29.)  However, by the terms of Gordon's own arguments, this is not true.  (*See* Dkt. No. 141 at 28–30 (challenging earlier actions approved by Leoussis—namely, his August 2012 transfer and action plan—as

---

[13]     Again, Defendants briefly argue that the 2013 transfer was not "adverse" because Gordon did not suffer harm, and was not deterred from pursuing his discrimination claims.  (Dkt. No. 127 at 24; Dkt. No. 149 at 16.)  The Court need not address these arguments, however, because this retaliation claim is resolved on the basis of causation.

retaliatory).)  And even if it were, the length of the temporal gap, combined with the lack of any other evidence of causation, would still be insufficient under the circumstances to establish a *prima facie* case of retaliation based on the 2013 transfer under federal, state, or municipal law. Defendants are thus entitled to summary judgment on the issue of whether Gordon's 2013 transfer to the Bronx was retaliatory.

### 3.    Individual Liability:  Disparate Treatment and Retaliation

Gordon also brings claims against the individual defendants in their individual capacities for disparate treatment and retaliation under Section 1981, the NYSHRL, and the NYCHRL. (Compl. ¶¶ 236–247, 261–280.)  Defendants move for summary judgment on these claims as well, asserting that Gordon has not established the individuals' personal involvement.  (Dkt. No. 127 at 25.)

Section 1981 "hold[s] individuals liable for discriminatory and retaliatory conduct if there is 'some affirmative link to causally connect the actor with the discrimination action,' such that the claim is 'predicated on the actor's personal involvement.'"  *Hagan*, 39 F. Supp. 3d at 514 (quoting *Whidbee v. Garzarelli Food Specialties, Inc*., 223 F.3d 62, 75 (2d Cir. 2000)).  In addition to "direct participation," personal involvement includes:

> an official's (1) failure to take corrective action after learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering the unlawful conduct, (3) gross negligence in supervising subordinates who commit unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on information regarding the unlawful conduct of subordinates.

*Hagan*, 39 F. Supp. 3d at 514 (quoting *Hayut v. State Univ. of N.Y.*, 352 F.3d 733, 753 (2d Cir. 2003)).  Similarly, the NYSHRL and NYCHRL "provide for individual liability for persons who 'aid, abet, incite, compel, or coerce the doing of any of the acts forbidden [thereunder], or attempt to do so.'"  *Id.* (alteration in original) (quoting N.Y. Exec. Law § 296(6); N.Y.C. Admin. Code § 8–107(6)).

For the underlying claims on which the Court has granted summary judgment to the City, summary judgment as to the individual defendants is also appropriate. *See Chen v. City Univ. of N.Y.*, No. 11 Civ. 0320, 2014 WL 1285595, at *12 (S.D.N.Y. Mar. 31, 2014) ("Aiding and abetting is only a viable theory when an underlying violation has taken place." (citation omitted)). Therefore, the claims against the individual defendants for retaliation must be dismissed. To the extent that Gordon seeks to establish individual liability on the remaining claims, he can rely only on allegations pertaining to the viable claims of disparate treatment: failure to promote him, and the negative 2011 performance evaluation. The Court will address the allegations against each individual defendant in turn.

### i.    Andes

The majority of Gordon's disparate treatment allegations are made against Andes, his direct supervisor. Gordon has adduced evidence that Andes personally drafted the 2011 evaluation that a reasonable juror could determine was the product of racial discrimination. (PSF ¶¶ 246–268.) Moreover, evidence that Andes made racially insensitive remarks (PSF ¶¶ 185, 225), nit-picked Gordon's work but refused to assist in correcting deficiencies (PSF ¶¶ 215, 226), and evaluated white attorneys under a more forgiving standard (PSF ¶¶ 278–289) could lead a reasonable juror to conclude that it was Andes's own racial animus that resulted in the discrimination.

### ii.    Palomino and Sanders

SLU Unit Chief Palomino and Deputy Chief Sanders are also alleged to have been personally involved in manipulating Gordon's performance evaluations. (Dkt. No. 141 at 39.) Gordon has adduced evidence that they were directly involved in the process that resulted in Gordon's 2011 evaluation (PSF ¶ 82; Dkt. No. 126-9 at 1), and in the process that allowed

similarly situated white attorneys to receive better evaluation scores (PSF ¶¶ 282, 288, 291, 311). Additionally, Gordon offered testimony, although controverted, that Sanders told Andes he was rating Gordon too highly in previous years, contributing to the lower score in 2011 (PSF ¶¶ 212–214; Dkt. No. 138-20 at 247:9–250:17); and that Palomino provided assurances about a trial strategy for which Gordon was later penalized in the 2011 evaluation (PSF ¶ 266). Again, this evidence sufficiently establishes Palomino and Sanders's personal involvement for Gordon's individual disparate treatment claims against them to survive summary judgment.

### iii. Leoussis

Leoussis, as Chief of the Tort Division, is also claimed to have been personally involved in manipulating Gordon's performance evaluations. (Dkt. No. 141 at 39.) Her testimony establishes that she was involved in reviewing Gordon's 2011 evaluation and deciding on his final overall rating. (PSF ¶ 228; Dkt. No. 138-16 at 88:15–89:8, 214:8–216:20.) Additionally, as the official responsible for nominating attorneys from the Tort Division for promotion, Leoussis would be directly responsible for nominating allegedly less-qualified white attorneys over Gordon. (*See* PSF ¶ 55, 290, 310, 313.) Again, this evidence sufficiently establishes Leoussis's personal involvement for the individual disparate treatment claims against her to survive Defendants' motion for summary judgment.

### iv. Cardozo

Gordon contends that Cardozo, as the Corporation Counsel, was personally involved in approving discriminatory evaluations and promoting less-qualified white attorneys to Senior Counsel despite his awareness of claims of race discrimination claims in SLU. (Dkt. No. 141 at 39–40; PSF ¶¶ 55, 238–240.) While the Court agrees that Cardozo can be presumed to have had knowledge that three African-American attorneys in SLU filed complaints of race discrimination

within the five years prior to Gordon's 2011 evaluation, none of the complaints actually resulted in a finding of discriminatory treatment. (PSF ¶¶ 184, 380–385.) Moreover, Cardozo is not alleged to have been directly involved in producing Gordon's low evaluation score, or declining to promote Gordon, nor is he alleged to have had any knowledge of the underlying facts that might create a suspicion that Gordon was being discriminated against. The Court concludes that Gordon has not adduced sufficient evidence from which a reasonable jury could conclude that Cardozo "fail[ed] to take corrective action after learning of a subordinate's unlawful conduct," or was deliberately indifferent to such "unlawful conduct." *Hagan*, 39 F. Supp. 3d at 514 (quoting *Hayut*, 352 F.3d at 753). Thus, summary judgment is appropriate as to the disparate treatment claims against Cardozo under Section 1981, the NYSHRL, and the NYCHRL.

### v. Santoro

Finally, Gordon does not mention Defendant Santoro, Deputy Chief of the Tort Division, in defending his claims against the individual defendants from summary judgment. (*See* Dkt. No. 141 at 39–40.) And the only allegations pertaining to Santoro in Gordon's Rule 56.1 statement describe meetings Santoro attended in 2005, which are not directly related to the substance of the disparate treatment claims. (PSF ¶¶ 7(g), 158, 162.) As such, Gordon has failed to adduce evidence establishing Santoro's personal involvement in the alleged discrimination. Summary judgment is therefore appropriate as to the disparate treatment claims against Santoro under Section 1981, the NYSHRL, and the NYCHRL.

### 4. Hostile Work Environment

Gordon also claims that he was subjected to a hostile work environment by Defendants Andes, Sanders, Palomino, Leoussis, Cardozo, and Santoro in their individual capacities, in violation of the NYCHRL. (Compl. ¶¶ 281–285; Dkt. No. 141 at 31–33.)

"Courts have applied largely the same standard to hostile work environment claims under NYCHRL as they have to disparate impact claims under NYCHRL." *Mikolaenko v. N.Y. Univ.*, No. 16 Civ. 413, 2017 WL 4174928, at *11 (S.D.N.Y. Sept. 7, 2017). Under this standard, "a plaintiff must show that he or she was treated less well 'because of' a protected status." *Forrester v. Corizon Health, Inc.*, 278 F. Supp. 3d 618, 626 (E.D.N.Y. 2017) (quoting N.Y.C. Admin. Code § 8-107(1)), *appeal filed* No. 17-3592 (2d Cir. Nov. 3, 2017). "[D]efendants can still avoid liability," however, "if they prove that the conduct complained of consists of nothing more than what a reasonable victim of discrimination would consider petty slights and inconveniences." *Wilson v. N.Y.P. Holdings, Inc.*, No. 05 Civ. 10355, 2009 WL 873206, at *29 (S.D.N.Y. Mar. 31, 2009) (quoting *Williams v. N.Y.C. Hous. Auth.*, 872 N.Y.S.2d 27, 41 (App. Div. 1st Dep't 2009)). "[T]he employer has the burden of proving the conduct's triviality under the NYCHRL." *Mihalik*, 715 F.3d at 111.

Gordon offers the same evidence supporting his disparate treatment and retaliation claims to establish his hostile work environment claim. (Dkt. No. 141 at 32.) Defendants contend that the adverse treatment alleged by Gordon amounts only to petty slights. (Dkt. No. 127 at 23.) The Court concludes that the triviality "defense is [not] clear as a matter of law" here, but rather a reasonable jury could conclude that racial discrimination sufficiently severe to deprive Gordon of a promotion to Senior Counsel in 2010 and 2011 and to result in an adverse evaluation that triggered his transfer and subjection to an action plan "amounted to . . . more than a petty slight." *Mihalik*, 715 F.3d at 111. Therefore, for largely the same reasons his NYCHRL disparate treatment claims survive summary judgment, Gordon's hostile work environment claims survive as well. However, for the reasons stated above, Gordon has established personal involvement for only some of the individual defendants. Accordingly, the motion for summary judgment on the

hostile work environment claim is granted as to Defendants Cardozo and Santoro, and denied as to Defendants Andes, Sanders, Palomino, and Leoussis.

### 5. *Monell* Claim

Gordon also alleges municipal liability under 42 U.S.C. § 1983 against the City of New York and the individual defendants in their official capacities in connection with Law Department performance review, promotion, and attorney assignment policies that allegedly violate the Fourth and Fourteenth Amendments of the U.S. Constitution. *See Monell v. Dep't of Soc. Servs. of the City of N.Y.*, 436 U.S. 658 (1978). (Compl. ¶¶ 248–260.)

"[T]o hold a city liable under [Section] 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Guerrero v. City of New York*, No. 16 Civ. 516, 2017 WL 2271467, at *2 (S.D.N.Y. May 23, 2017) (quoting *Betts v. Rodriquez*, No. 15 Civ. 3836, 2016 WL 7192088, at *5 (S.D.N.Y. Dec. 12, 2016)). To allege a policy or custom under the first step, a plaintiff must establish either:

> (1) the existence of a formal policy officially endorsed by the municipality; (2) actions taken or decisions made by municipal officials with final decision making authority, which caused the alleged violation of plaintiff's civil rights; (3) a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials; *or* (4) a failure by policymakers to properly train or supervise their subordinates, amounting to "deliberate indifference" to the rights of those who come in contact with the municipal employees.

*Betts v. Shearman*, No. 12 Civ. 3195, 2013 WL 311124, at *15 (S.D.N.Y. Jan. 24, 2013) (quoting *Saenz v. Lucas*, No. 07 Civ. 10534, 2008 WL 2735867, at *5 (S.D.N.Y. July 9, 2008)).

Defendants argue that Gordon has failed to establish an underlying policy or custom. (Dkt. No. 127 at 27.) In his Second Amended Complaint, Gordon alleged that he was injured by City policies or customs of "manipulat[ing] and custom tailor[ing] evaluations to systematically

exclude from equal employment opportunities and financial and professional benefits certain employees based on their membership in a protected class"[14] (Compl. ¶ 250), and "'steer[ing]' minority ACC's of color to the outer borough units in the Bronx and Brooklyn" (Compl. ¶ 257). However, the only examples of these practices Gordon offers involve his own allegedly discriminatory treatment that is at issue in this case.  "As a matter of law, one incident of unconstitutional conduct by a city employee cannot be a basis for finding an agency-wide custom."  *Davis v. City of New York*, 228 F. Supp. 2d 327, 346 n.35 (S.D.N.Y. 2002); *see Arroyo v. City of New York*, No. 14 Civ. 9953, 2016 WL 8677162, at *7 (S.D.N.Y. July 8, 2016) (granting summary judgment to municipal defendant where plaintiff's only evidence of "a citywide policy" was "the single incident" of her own treatment) .  Therefore, Gordon has failed to establish the existence of "a practice so persistent and widespread that it constitutes a custom of which constructive knowledge can be implied on the part of the policymaking officials." *Betts*, 2013 WL 311124, at *15 (quoting *Saenz*, 2008 WL 2735867, at *5).

Gordon nonetheless contends that he has established a policy or custom under another theory:  that discriminatory acts were caused by "actions taken or decisions made by municipal officials with final decision making authority."  *Id.*  Specifically, he contends that Leoussis held "exclusive authority over personnel decisions involving Tort Division employees," and so her actions approving Gordon's 2011 evaluation and failing to nominate Gordon to Senior Counsel can be imputed to the City.  (Dkt. No. 141 at 40.)

---

[14]     Gordon also alleges a policy or custom of manipulating performance evaluations as a form of retaliation.  However, any challenge to an alleged policy of unlawful retaliation is barred because Gordon's underlying claims of retaliation were unsuccessful.  *See Wright v. City of Syracuse*, 611 F. App'x 8, 12 (2d Cir. 2015) (summary order) (holding that where a plaintiff "failed to establish individual liability on his" underlying claims, "his claim of liability against the City for these purported violations fails as a matter of law").

"A municipality may be liable for a single unconstitutional act of an official if that official has final policy-making authority." *Pisano v. Mancone*, No. 08 Civ. 1045, 2011 WL 1097554, at *16 (S.D.N.Y. Mar. 18, 2011). "Whether the official in question possessed final policymaking authority is a legal question, which is to be answered on the basis of state law." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (citations omitted). "An individual may possess such authority through an express legislative grant or by a delegation of authority from those who possessed it through an express legislative grant." *Chin v. N.Y.C. Hous. Auth.*, 575 F. Supp. 2d 554, 562 (S.D.N.Y. 2008). "The critical characteristic of final policymakers when employment is at issue is whether the municipal official has authority to formulate the rules governing personnel decisions rather than authority to make decisions pursuant to those rules— e.g., the hiring and firing of subordinates." *Id.*

Defendants contend that Gordon has not established that Leoussis—the Chief of the Tort Division—was the final policymaker for the Law Department. (Dkt. No. 149 at 16–17.) The Court agrees. At most, Gordon's evidence demonstrates that Leoussis made final personnel *decisions* within the Tort Division. (Dkt. No. 141 at 40.) Gordon offers no basis to conclude that Leoussis had the authority to formulate final personnel *policy* under state law, or that she was delegated that authority from whichever official possessed it. Under such circumstances, where plaintiffs cannot establish that the decisionmaker at issue is the final policymaker, summary judgment for the municipality on this theory is appropriate. *See, e.g.*, *Chin*, 575 F. Supp. 2d at 565–66; *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 641–42 (S.D.N.Y. 2015). The Court thus grants Defendants' motion for summary judgment as to Gordon's *Monell* claim.

### 6.    Disparate Impact

Gordon also claims that seven of the Law Department and Tort Division's "race-neutral evaluation and promotional policies" disparately impacted African-American attorneys, in violation of Title VII, 42 U.S.C. § 2000e-2(k)(1)(A);  the NYSHRL; and the NYCHRL.  (Compl. ¶¶ 286–288.)

"Disparate impact occurs when an employer uses an employment practice that has a disproportionately adverse effect on protected groups."  *United States v. Brennan*, 650 F.3d 65, 90 (2d Cir. 2011).  To establish a *prima facie* case of disparate impact under Title VII and the NYSHRL, "a plaintiff must: '(1) identify a [facially neutral] policy or practice; (2) demonstrate that a disparity exists; and (3) establish a causal relationship between the two.'"  *Hagan*, 39 F. Supp. 3d at 499 (alteration in original) (quoting *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 160 (2d Cir. 2001)); *see Brown v. City of New York*, No. 16 Civ. 1106, 2017 WL 1102677, at *3 (E.D.N.Y. Mar. 23, 2017) ("[D]isparate impact claims under the NYSHRL are analyzed as they would be under Title VII . . . .").  Similarly, under the NYCHRL, a disparate impact claim is established "where a plaintiff demonstrates that a defendant's policy or practice 'results in a disparate impact to the detriment of any group protected' under the City Human Rights Law."  *Levin v. Yeshiva Univ.*, 96 N.Y.2d 484, 491 (2001) (quoting N.Y.C. Admin. Code § 8-107(17)(a)(1)).

Gordon requests that the Court hold Defendants' summary judgment motion in abeyance as it pertains to the disparate impact claims, so that if the pending motion to compel is granted, Plaintiff's expert can complete the requisite disparate impact report and statistical analyses. (Dkt. No. 141 at 34–35.)  Defendants respond that no delay is necessary, because regardless of such analyses, Plaintiff cannot satisfy the first prong of the *prima facie* case by establishing the existence of the supposed seven neutral policies upon which he bases his claim.  (Dkt. No. 149 at

17–18.)  The Court agrees that the discovery Gordon seeks would certainly affect his ability to satisfy the second and third prongs of the *prima facie* case—disparity and causation.  But the data could also be relevant to Gordon's ability to establish certain of the alleged policies, such as the existence of "a floating or varying numerical cut-off score" for promotions.  (Compl. ¶ 175.)

As the Court concludes later in this opinion, Gordon is entitled to the requested disclosure. (*See infra* at Part III.)  Because discovery on Gordon's disparate impact claims therefore remains ongoing, the Court cannot at present hold that there is no genuine dispute of material fact as to those claims.  Rather than assess Defendants' motion for summary judgment on these claims without the assistance of a fully developed record, or risk ruling on the disparate impact claims in a piecemeal fashion, the proper course is for Defendants to renew their motion for summary judgment after Plaintiff has had the opportunity to analyze the information sought and fully respond to Defendants' arguments.  Accordingly, Defendants' motion for summary judgment on the disparate impact claims is denied without prejudice to renewal upon completion of Plaintiff's statistical analyses and expert report.

### 7.    FMLA Claims

Finally, Gordon claims that the City unlawfully interfered in his attempt to take leave under the FMLA and retaliated against him for attempting to take such leave.  (Compl. ¶¶ 289–296, 297–304.)  "The FMLA's self-care provision entitles an eligible employee to twelve workweeks per year of unpaid leave for 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'"  *Ross v. New York*, No. 15 Civ. 3286, 2016 WL 626561, at *8 (S.D.N.Y. Feb. 16, 2016) (quoting 29 U.S.C. § 2612(a)(1)(D)).  The FMLA makes it unlawful for an "employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" an FMLA-protected right, or "to discharge or in

any other manner discriminate against any individual for opposing" an employer's interference with FMLA-protected rights. 29 U.S.C. § 2615(a)(1)–(2).

### i. Interference

In order to prevail on an FMLA interference claim, a plaintiff must show: "(1) [that he] is an 'eligible employee' under the FMLA; (2) that the employer is an employer as defined in the FMLA; (3) that [he] was entitled to leave under the FMLA; (4) that [he] gave notice to the employer of [his] intention to take leave; [and] (5) that [he] was denied benefits to which [he] was entitled under the FMLA." *Ross*, 2016 WL 626561, at *8 (quoting *Mendillo v. Prudential Ins. Co. of Am.*, 156 F. Supp. 3d 317, 346 (D. Conn. 2016)).

The only element disputed by Defendants is the fifth: whether Gordon was denied benefits to which he was entitled. Gordon's health benefits were cancelled on July 24, 2016, after Gordon exhausted his accrued leave. (PSF ¶¶ 121–122; Dkt. No. 126-67.) According to Defendants, this inadvertent cancellation was due to the Law Department's inability to approve Gordon's FMLA leave in the City's payroll system, and Gordon resigned before the problem could be remedied. (Dkt. No. 127 at 38–39; PSF ¶¶ 115–118.) Gordon was without health benefits from July 24, 2016 until his resignation on August 9, 2016. (PSF ¶ 139.)

The FMLA requires that "during any period that an eligible employee takes" FMLA leave, "the employer shall maintain coverage under any 'group health plan' . . . for the duration of such leave." 29 U.S.C.A. § 2614(c)(1). By failing to properly approve Gordon's FMLA request and allowing his health coverage to lapse, the City violated this provision and denied Gordon health benefits to which he was entitled.[15]

---

[15] Gordon also asserts that the City impeded his exercise of FMLA rights by failing to notify him of an action on his FMLA leave request within five days. (Dkt. No. 141 at 36; Dkt. No. 149 at 18.) Because the Court concludes that the claim survives summary judgment based

Defendants nonetheless contend that a mere temporary cancellation of benefits such as this cannot establish an FMLA interference claim. However, the one case upon which they rely in making this argument does not actually support that proposition. *See Spaulding v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3041, 2015 WL 12645530, at *32 (E.D.N.Y. Feb. 19, 2015) (Scanlon, M.J.) (holding that temporary cancellation of medical benefits did not make out FMLA interference claim because plaintiff was not entitled to the cancelled benefits at that time); *Spaulding v. N.Y.C. Dep't of Educ.*, No. 12 Civ. 3041, 2015 WL 5560286, at *6 (E.D.N.Y. Sept. 21, 2015) (adopting Report and Recommendation of the Magistrate on this point). The Court sees no reason why a temporary denial of benefits to which a plaintiff is entitled could not make out an FMLA interference clam.

Because a reasonable jury could find interference with Gordon's rights under the FMLA, Defendants' motion for summary judgment on this claim is denied.

### ii. Retaliation

FMLA retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See Graziadio v. Culinary Inst. of Am.*, 817 F.3d 415, 429 (2d Cir. 2016). To establish a *prima facie* case, "a plaintiff must show that [1] he exercised FMLA-protected rights, [2] was qualified for his position, and [3] suffered adverse employment action [4] 'under circumstances giving rise to an inference of retaliatory intent.'" *Ross*, 2016 WL 626561, at *8 (quoting *Potenza v. City of New York*, 365 F.3d 165, 168 (2d Cir. 2004) (per curiam)). "If the plaintiff makes out a prima facie case, the defendant must demonstrate a legitimate, non-discriminatory reason for its actions; if the defendant does so, the plaintiff must then show

---

on the cancellation of health benefits, it need not address whether the failure to make and notify Gordon of a timely decision alone would be sufficient to establish interference.

that defendant's proffered explanation is pretextual." *Graziadio*, 817 F.3d at 429. Ultimately, a plaintiff need only show that FMLA leave was a "negative factor" in the employer's decision to take an adverse action. *Woods v. START Treatment & Recovery Ctrs., Inc.*, 864 F.3d 158, 169 (2d Cir. 2017).

Defendants contest Gordons's ability to raise an inference of discrimination on the fourth prong of the *prima facie* case and to demonstrate pretext on the final step of the *McDonnell Douglas* framework. They argue that no reasonable jury could find that "his application for FMLA leave was a negative factor in the cancellation of his health benefits" (Dkt. No. 127 at 40), specifically pointing to the fact that a different agency—City Administrative Services— generated an automatic cancellation of benefits due to the Law Department's inability to formally enter the FMLA leave on Gordon's personnel record. (Dkt. No. 127 at 40; PSF ¶ 122.)

Gordon counters that because there is no evidence that the Law Department tried to remedy its difficulty inputting Gordon's FMLA leave, a juror could infer that the Law Department allowed his health benefits to lapse with retaliatory intent. (Dkt. No. 141 at 38–39.) The Court disagrees. Defendants have adduced evidence that the Law Department was attempting to grant the request, and was in the process of "trying to figure out how [inputting the FMLA leave] could be accomplished" when Gordon resigned. (Dkt. No. 126-63 at 87:25–88:25; PSF ¶ 115; Dkt. No. 126-64 at 3.) In contrast, Gordon has offered no evidence that the Law Department knew Gordon's health benefits would lapse, much less that the Department intended that result, motivated by the request for FMLA leave. His failure to "identify specific facts demonstrating a genuine issue for trial" is dispositive here. *Clopay Plastic Prods. Co.*, 2014 WL 4652548, at *3; *see also Woods v. Ruffino*, 8 F. App'x 41, 42 (2d Cir. 2001) (summary order)

("Reliance upon conclusory statements or mere allegations is not sufficient to defeat summary judgment.").

Because no reasonable jury could conclude that Gordon's FMLA request was a motivating factor in the cancellation of his health benefits, Defendants' motion for summary judgment on the FMLA retaliation claim is granted.

## III.     Objections to Order Denying Motion to Compel Discovery

Gordon also objects to Magistrate Judge Francis's December 9, 2016 Order denying in part Gordon's motion to compel discovery. (*See* Dkt. No. 85.) Gordon contests Judge Francis's decision (1) to limit discovery to 2004 to 2015 promotional data from SLU only—as opposed to the Law Department more generally—and (2) to decline to compel the disclosure of documents pertaining to the Law Department's efforts to screen for disparate impact discrimination. (Dkt. No. 85 at 1–3; Dkt. No. 87 at 1.) For the reasons that follow, Plaintiff's objections to Magistrate Judge Francis's Order are sustained.

### A.     Legal Standard

Pursuant to Federal Rule of Civil Procedure 72(a), a district judge "must consider timely objections [to a nondispositive matter decided by a magistrate judge] and modify or set aside any part of the order that is clearly erroneous or contrary to law." Fed. R. Civ. P. 72(a). "A magistrate judge's decision is clearly erroneous only if the district court is left with the definite and firm conviction that a mistake has been committed." *Indergit v. Rite Aid Corp.*, No. 08 Civ. 9361, 2016 WL 236248 (S.D.N.Y. Jan. 20, 2016) (quoting *Golden Horn Shipping Co. v. Volans Shipping Co.*, No. 14 Civ. 2168, 2015 WL 6684518, at *1 (S.D.N.Y. June 30, 2015)) (internal quotation marks omitted). And "[a] decision is contrary to law if it 'fails to apply or misapplies relevant statutes, case law, or rules of procedure.'" *Id.* (quoting *Golden Horn Shipping Co.*, 2015 WL 6684518, at *1). Under this standard, "magistrate judges are given 'broad discretion in

resolving nondispositive disputes and reversal is appropriate only if their discretion is abused.'"

*Infinity Headwear & Apparel, LLC v. Jay Franco & Sons, Inc.*, No. 15 Civ. 1259, 2017 WL

3309724, at *7 (S.D.N.Y. Aug. 2, 2017) (quoting *Advanced Analytics, Inc. v. Citigroup Glob.*

*Mkts., Inc.*, 301 F.R.D. 47, 50 (S.D.N.Y. 2014)).

### B. Discussion

On November 18, 2016, Plaintiff filed a letter motion asking Magistrate Judge Francis to

compel Defendants to disclose information about all promotions in the Law Department from

2004 to the present.  (Dkt. No. 81 at 2–3.)  Judge Francis granted the request, but limited the

scope to only attorneys who worked in SLU, reasoning that "Plaintiff's claims relate to the

failure to promote him to Senior Counsel within the SLU," and "where, as here, the impact of the

policies [challenged] is mediated by the actions of unit managers, the relevance of information

beyond the plaintiff's unit is attenuated."  (Dkt. No. 85 at 1–2.)

Gordon now challenges that decision, asserting that Judge Francis limited the scope of

discovery in a way that was unbriefed and unrequested by the parties.  (Dkt. No. 87 at 15.)

Moreover, Gordon contends that promotional data from the Law Department as a whole is

relevant to his disparate impact claim, because all final promotional decisions rest with the office

of Corporation Counsel, and attorneys compete across divisions for promotions.  (Dkt. No. 87 at

15–16; Dkt. No. 93 at 1–2.)  Similarly, application of some of the specific race-neutral practices

Gordon challenges as having a disparate impact, including the appointment of non-diverse

managers and the failure to conduct blind review of promotion recommendations, fall within the

responsibility of centralized offices that apply these practices across the entire Law Department.

(Dkt. No. 87 at 17–18.)  Consequently, Gordon contends that Judge Francis was incorrect to

assume that the discretion of unit managers undercuts the relevance of promotional data from other units.  (*Id.*)

The City responds that Judge Francis's decision to limit discovery to SLU was not erroneous and that, at any rate, Gordon has not met his burden of showing that it was *clearly* so. (Dkt. No. 91 at 9–11.)  The Court disagrees.  Centralized decisionmaking and the agency-wide application of challenged practices make promotional data from units outside SLU relevant to Gordon's disparate impact claim.  The magistrate judge thus erred in denying Plaintiff's motion to compel such disclosure.

The second category of information sought by Gordon pertains to efforts by the Law Department to internally screen its demographic data for disparate impacts.  (Dkt. No. 81 at 4–5.) Judge Francis denied Gordon's motion to compel as to this information, reasoning that "there has been no showing that those studies related to the otherwise neutral policies that plaintiff challenges here."  (Dkt. No. 85 at 2–3.)  Gordon contends that the denial was clearly erroneous, because he met his "burden of identifying documents that could lead to the discovery of admissible evidence," and the information would be relevant even if it did not identify the same practices being challenged here.  (Dkt. No. 87 at 20.)

The City responds that it has already produced sufficient documents, and the rest "go well beyond that necessary for plaintiff to conduct any disparate impact analysis."  (Dkt. No. 91 at 13–14.)  Again, the Court disagrees.  Reports on the Law Department's efforts to screen for disparate impact are relevant to Gordon's disparate impact claim against the Law Department. Because the Court is "left with the definite and firm conviction that a mistake has been committed," *Indergit*, 2016 WL 236248, at *1 (quoting *Golden Horn*, 2015 WL 6684518, at *1),

the objections to the denial of disclosure of the Law Department's screening information are sustained. Accordingly, the Court grants Plaintiff's motion to compel discovery.

## IV. Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is GRANTED IN PART and DENIED IN PART. Plaintiff's objections to Magistrate Judge Francis's Order are SUSTAINED and Plaintiff's motion to compel discovery is GRANTED.

The Clerk of Court is directed to close the motion at Docket Number 124.

SO ORDERED.

Dated: September 28, 2018
      New York, New York

_____
J. PAUL OETKEN
United States District Judge